# ORIGINAL

1  MARK LABATON (159555)
   KREINDLER & KREINDLER LLP
2  707 Wilshire Boulevard
   Los Angeles, California 90017
3  Telephone: (213) 622-6469
   Facsimile: (213) 622-6019
4  Email: mlabaton@kreindler.com

5

6  BARBARA J. HART (admitted pro hac vice)
   CHRISTOPHER J. KELLER (admitted pro hac vice)
7  MARK S. ARISOHN (admitted pro hac vice)
   CHRISTOPHER J. McDONALD (admitted pro hac vice)
8  LABATON SUCHAROW LLP
9  140 Broadway
   New York, New York 10005
10 Telephone: (212) 907-0700
   Facsimile: (212) 818-0477
11 Email: bhart@labaton.com

12

13

14

15

16                                           ) Case No.: CV 07-2536 PSG
   SCOTT P. AIRALLA, Individually and        ) (PLAx)
17 On Behalf of All Others Similarly Situated, )
                                             )
18                        Plaintiff,         ) Honorable Philip S. Gutierrez
                                             )
19        vs.                                ) CONSOLIDATED
                                             ) AMENDED CLASS
20 AMGEN INC., et al.,                       ) ACTION COMPLAINT FOR
                                             ) VIOLATION OF FEDERAL
21                        Defendants.        ) SECURITIES LAWS
                                             )
22                                           )
23                                           ) DEMAND FOR JURY
                                             ) TRIAL
24                                           )
25 THIS DOCUMENT RELATES TO:                 )
                                             )
26    ALL CASES                              )
                                             )
27                                           )
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

FILED
CLERK, U.S. DISTRICT COURT

OCT - 1 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

RECEIVED
NOT FILED

OCT - 1 2007
3:26

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

DOCKETED ON CM

OCT _ 3 2007

BY _____ 074

109

1

## **TABLE OF CONTENTS**

2  NATURE OF THE ACTION ................................................................1

3  PARTIES ........................................................................................5

4      Plaintiff ........................................................................................5

5      Defendants ....................................................................................5

6  CONTROL PERSON ALLEGATIONS/GROUP PLEADING .............................9

7  JURISDICTION AND VENUE ..........................................................11

8  FACTUAL ALLEGATIONS ..............................................................11

9     A.  Background:  Overview of ESAs and the ESA Market ...........................11

10

11     B.  Early Safety Signals with ESAs ....................................................15

12     C.  Amgen Misled Investors Concerning the Safety Profile of Its ESAs .......18

13        1.  The 2004 ODAC Meeting ...................................................18

14        2.  The DAHANCA 10 Trial .....................................................20

15        3.  The 103 Study and Amgen's Broader Fraud Concerning the

16           Safety of Its ESAs ...........................................................22

17     D.  Amgen Has Engaged In Extensive Off-Label Marketing ......................27

18     E.  The Truth Continues To Emerge ....................................................35

19     F.  The 2007 ODAC Meeting .............................................................42

20     G.  Defendants' False and Misleading Statements ..................................45

21        1.  Defendants' Actionable Omissions Regarding the DAHANCA

22           10 Trial .........................................................................45

23        2.  Defendants' False and Misleading Statements Regarding the

24           103 Study .......................................................................47

25        3.  Defendants' False and Misleading Statements Regarding the
         Safety of ESAs, Potential for Market Growth, and Risk of

26           Adverse Action by ODAC ...................................................47

27        4.  Defendants' False and Misleading Statements Regarding
         Amgen's Improper and Illegal Marketing Practices .........................54

28

5.   Defendants' False and Misleading Statements Regarding
Revenues and Earnings ................................................................56

ADDITIONAL SCIENTER ALLEGATIONS ........................................59

POST-CLASS PERIOD EVENTS .........................................................62

CLASS ACTION ALLEGATIONS .......................................................64

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-
THE-MARKET DOCTRINE ................................................................66

NO SAFE HARBOR .............................................................................67

LOSS CAUSATION ..............................................................................67

Disclosure of the Halt of the DAHANCA 10 Trial.........................68

Disclosure of the SEC Inquiry ........................................................68

Disclosure of the FDA Health Advisory .........................................68

Disclosure of the ODAC 2007 Recommendation for ESAs ............68

FIRST CLAIM FOR RELIEF (For Violation of Section 10(b) of the
Exchange Act and Rule 10b-5 Against All Defendants)........................69

SECOND CLAIM FOR RELIEF (For Violation of Section 20(a) of the
Exchange Act Against the Individual Defendants) ...............................72

REQUEST FOR RELIEF ......................................................................73

JURY DEMAND....................................................................................73

Lead Plaintiff Connecticut Retirement Plans and Trust Funds ("Plaintiff" or "Connecticut"), by its undersigned attorneys, hereby brings this Consolidated Amended Class Action Complaint ("Complaint") against Amgen, Inc. ("Amgen" or the "Company"), Kevin W. Sharer, Richard D. Nanula, Dennis M. Fenton, Roger M. Perlmutter, Brian M. McNamee, George J. Morrow, Edward V. Fritzky, Gilbert S. Omenn, and Franklin P. Johnson, Jr. (collectively, the "Individual Defendants" and together with Amgen, "Defendants"). The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of Amgen and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW#1, CW#2, etc.)), review and analysis of publicly available information, and consultations with experts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      This action is brought on behalf of a class of purchasers of the publicly traded securities of Amgen who bought their shares between April 22, 2004 and May 10, 2007, inclusive (the purchasers being the "Class" and the timeframe being the "Class Period"). Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants, with the requisite mental state per the Exchange Act, made a series of materially false and misleading statements and omissions during the Class Period which artificially inflated the value of Amgen's stock; later disclosures caused the stock price to decline, causing Plaintiff and the Class injury.

2.      Amgen and the Individual Defendants misled and defrauded investors concerning two of the Company's flagship products – Epogen® (epoetin alfa) ("Epogen") and Aranesp® (darbepoetin alfa) ("Aranesp"). Manufactured by recombinant DNA technology, Epogen and Aranesp are slightly different versions of a human protein that stimulates the production of red blood cells. They are used to combat anemia and thus avoid transfusions in certain patient populations (primarily patients with chronic kidney disease or cancer patients with chemotherapy-induced anemia ("CIA")).

3.      During the Class Period, Defendants systematically misrepresented to investors both the safety and market demand for Epogen and Aranesp. First, they knowingly concealed material information concerning a clinical trial of Aranesp known as DAHANCA 10. The study was designed to see whether high doses of Aranesp could aid in shrinking the tumors of certain cancer patients receiving radiation therapy. The investigators conducting the study halted it early and an interim analysis showed the opposite: cancer patients treated with Aranesp had greater tumor growth than those not receiving Aranesp. Overall survival time also favored those not treated with Aranesp.

4.      Amgen knew in mid-October 2006 that DAHANCA 10 had been temporarily halted, and it knew by early December 2006 that the study had been terminated early. Amgen did not inform investors of these developments. Information concerning DAHANCA 10 finally reached the market when a newsletter called *The Cancer Letter* published an article concerning the results of the study in mid-February 2007 – four months after Amgen had been informed that the study had been temporarily halted, and two-and-a-half months after Amgen learned that the decision had been made to terminate the study altogether.

5.      Second, Defendants misled investors concerning another highly material clinical trial of Aranesp known as the 103 Study. Defendants mischaracterized the results of the 103 Study, stating that they were "at best,

1  neutral and *perhaps* negative." (Emphasis added.)  In fact the study was an abject

2  failure for Aranesp.  In patients with anemia of cancer (*i.e.*, anemia caused by

3  cancer rather than by chemotherapy), those receiving Aranesp did not reduce their

4  need for transfusions and showed significantly shorter survival times compared to

5  patients whose anemia was treated with transfusion support.

6       6.     Defendants' mischaracterization of the 103 Study and concealment

7  of DAHANCA 10 highlight a broader effort by them to hide from investors and the

8  public substantial safety concerns associated with Epogen and Aranesp.  These

9  concerns had been raised by the U.S. Food and Drug Administration ("FDA")

10  three years earlier and were known to Amgen, which had participated in a meeting

11  with the FDA and its advisory board of leading oncology experts – the Oncology

12  Drug Advisory Committee, or ODAC – in 2004.

13       7.     Both Epogen and Aranesp are members of a drug class known as

14  ESAs.  The original clinical trials conducted to obtain initial FDA approval for

15  ESAs demonstrated that the drugs were effective in helping certain anemic patients

16  build their red blood cell levels and thereby avoid transfusions.  Although the trials

17  collected safety data, as all clinical trials do, they were not designed for the

18  purpose of measuring whether the study drug was safer than placebo in any

19  clinically meaningful sense.  In other words, the trials were not designed to

20  measure, as between study-drug patients and placebo patients, which groups had

21  greater frequency or severity of significant events affecting how patients function

22  or survive.  Examples of these significant events or "clinical endpoints" would

23  include cardiovascular events such as heart attacks or strokes, or overall survival

24  rates.

25       8.     Following FDA approval of Epogen (in 1989) and Aranesp (in

26  2001), several large-scale clinical trials of other ESAs showed an apparent excess

27  of adverse events associated with the use this class of drugs, namely decreased

28  overall survival, increased progression of tumor growth and/or increased frequency

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                                    3
Case No.: CV 07-2536 PSG (PLAx)

1  of cardiovascular events.  These "safety signals" raised within the FDA concerns

2  that this class of drugs may, in fact, be less safe than placebo when specifically

3  testing to measure for clinically significant endpoints.

4        9.     Amgen knew that definitive clinical data on survival rates and other

5  clinically significant endpoints was lacking and that the relevant studies that did

6  exist pointed to significant safety concerns.  Despite this, Amgen touted the safety

7  of Aranesp and Epogen throughout the Class Period, as well as Aranesp's vast

8  untapped potential both to (a) further penetrate the markets in patient populations it

9  was already approved to treat, and (b) grow its sales through expanding into new

10  patient populations.  Given the outstanding core safety questions, these statements

11  were both highly material (Amgen's ESA franchise represents roughly half its

12  bottom line) and highly misleading.

13        10.    Finally, Amgen's statements concerning its sales practices and

14  market growth potential constituted a fraud on investors for another reason: the

15  Company promoted Aranesp and Epogen for unapproved uses and increased per-

16  patient dosages through improper and, in some cases, unlawful means.  The Food,

17  Drug, and Cosmetic Act and accompanying regulations prohibit the promotion of a

18  drug for "off-label" uses, *i.e.*, for indications, dosage forms, dose regimens,

19  populations or other use parameters not mentioned in the FDA-approved labeling.

20  Amgen's filings with the Securities and Exchange Commission ("SEC") state that

21  "We . . . also manufacture and contract manufacture, price, sell, distribute, and

22  market or co-market our products *for their approved indications*."  (Emphasis

23  added.)

24        11.    However, throughout the Class Period, Amgen encouraged and

25  actively promoted the off-label usage of its products in a variety of unlawful ways,

26  including:  training its sales representatives on how to engage physicians in

27  discussions of the off-label uses of Amgen's products; having its sales force

28  recommend dose increases to achieve excessive target hemoglobin levels;

1  sponsoring pseudo-educational "speaker programs" for doctors and other medical

2  services providers touting the use of Aranesp in off-label settings; and marketing

3  ESAs by showing doctors how they could increase their profits through increased

4  Medicare reimbursements by prescribing larger quantities of the drugs.  Amgen

5  also designed rebate programs that improperly incented physicians to administer

6  Aranesp when it was not necessary to do so.

7                                    **PARTIES**

8  **Plaintiff**

9        12.      Lead Plaintiff Connecticut purchased Amgen common stock at

10  artificially inflated prices during the Class Period and has, accordingly, been

11  damaged by Defendants' wrongful conduct.  Attached hereto is a certification

12  reflecting Plaintiff's transactions in Amgen common stock during the Class Period.

13  **Defendants**

14        13.      Defendant Amgen is a global biotechnology company.  According to

15  its website (www.amgen.com), the Company "discovers, develops, manufactures

16  and markets human therapeutics based on advances in cellular and molecular

17  biology."  Amgen markets its products in the areas of supportive cancer care,

18  nephrology, inflammation and oncology.  The Company's principal products

19  include Aranesp, Epogen, Neulasta® (pegfilgrastim) ("Neulasta"), Neupogen®

20  (filgrastim) ("Neupogen") and Enbrel® (etanercept).  The Company markets its

21  principal products to healthcare providers, including clinics, dialysis centers,

22  hospitals and pharmacies.  Amgen is a Delaware corporation with its principal

23  place of business at One Amgen Center Drive, Thousand Oaks, California.

24        14.      Defendant Kevin W. Sharer ("Sharer") was, at all relevant times,

25  Amgen's President, Chief Executive Officer and Chairman of the Company's

26  Board of Directors.  Sharer became Amgen's Chairman in April 2000.  Sharer was

27  a direct and substantial participant in the fraud, who also profited from the sale of

28  Amgen securities at artificially inflated prices during the Class Period and received

substantial revenue-based bonuses and other compensation that was artificially increased by the wrongful conduct set forth herein. During the Class Period, Sharer sold approximately 1.2 million shares of Amgen stock, recognizing more than $96.8 million in proceeds. In addition, Sharer signed and certified, as required by Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX"), the Company's Annual Reports on Form 10-K for the years 2004, 2005 and 2006, which the Company filed with the SEC during the Class Period and which contained materially false and misleading statements and/or omissions. Sharer also certified, as required by Section 906 of SOX, the Company's Form 10-Qs for the second and third quarters in 2004, for the first, second and third quarters in 2005 and 2006, and for the first quarter in 2007.

15.     Defendant Richard D. Nanula ("Nanula") was the Company's Chief Financial Officer from the beginning of the Class Period through the date of his resignation from Amgen on April 10, 2007. Nanula was a direct and substantial participant in the fraud, who also profited from the sale of Amgen securities at artificially inflated prices during the Class Period and received substantial revenue-based bonuses and other compensation that was artificially increased by the wrongful conduct set forth herein. During the Class Period, Nanula sold 210,000 shares of Amgen stock, recognizing more than $13.6 million in proceeds. In addition, Nanula signed the following documents that the Company filed with the SEC during the Class Period and which contained materially false and misleading statements and/or omitted to state material facts: the Company's Annual Report on Form 10-K for the years 2004, 2005 and 2006 and the Company's Form 10-Q for the second and third quarters in 2004 and for the first, second and third quarters in 2005 and 2006. Nanula also certified, as required by Section 906 of SOX, the Company's Annual Reports on Form 10-K for the years 2004, 2005 and 2006 and the Company's Form 10-Qs for the second and third quarters in 2004 and for the first, second and third quarters in 2005 and 2006.

16.    Defendant Dennis M. Fenton ("Fenton") was, at all relevant times, the Company's Executive Vice President of Operations.  Fenton was a direct and substantial participant in the fraud, who also profited from the sale of Amgen securities at artificially inflated prices during the Class Period and received substantial revenue-based bonuses and other compensation that was artificially increased by the wrongful conduct set forth herein.  During the Class Period, Fenton sold 409,642 shares of Amgen stock, recognizing more than $28 million in proceeds.

17.    Defendant Roger M. Perlmutter ("Perlmutter") was, at all relevant times, the Company's Executive Vice President of Research and Development.  Perlmutter was a direct and substantial participant in the fraud, who also profited from the sale of Amgen securities at artificially inflated prices during the Class Period and received substantial revenue-based bonuses and other compensation that was artificially increased by the wrongful conduct set forth herein.  During the Class Period, Perlmutter sold 150,979 shares of Amgen stock, recognizing more than $12 million in proceeds.

18.    Defendant Brian M. McNamee ("McNamee") was, at all relevant times, the Company's Senior Vice President of Human Resources.  McNamee was a direct and substantial participant in the fraud, who also profited from the sale of Amgen securities at artificially inflated prices during the Class Period and received substantial revenue-based bonuses and other compensation that was artificially increased by the wrongful conduct set forth herein.  During the Class Period, McNamee sold 206,485 shares of Amgen stock, recognizing more than $15.8 million in proceeds.

19.    Defendant George J. Morrow ("Morrow") was, at all relevant times, the Company's Executive Vice President of Global Commercial Operations.  Morrow was a direct and substantial participant in the fraud, who also profited from the sale of Amgen securities at artificially inflated prices during the Class

1  Period and received substantial revenue-based bonuses and other compensation

2  that was artificially increased by the wrongful conduct set forth herein.  During the

3  Class Period, Morrow sold 303,335 shares of Amgen stock, recognizing more than

4  $24.6 million in proceeds.

5      20.     Defendant Edward V. Fritzky ("Fritzky") was, at all relevant times,

6  a member of the Company's Board of Directors.  Fritzky was a direct and

7  substantial participant in the fraud, who also profited from the sale of Amgen

8  securities at artificially inflated prices during the Class Period.  During the Class

9  Period, Fritzky sold 943,942 shares of Amgen stock, recognizing more than $54.6

10  million in proceeds. Fritzky signed the Company's Annual Report on Form 10-K

11  for 2004, which contained materially false and misleading statements and/or

12  omissions.

13      21.     Defendant Gilbert S. Omenn ("Omenn") was, at all relevant times, a

14  member of the Company's Board of Directors.  Omenn was a direct and substantial

15  participant in the fraud, who also profited from the sale of Amgen securities at

16  artificially inflated prices during the Class Period.  During the Class Period,

17  Omenn sold 22,805 shares of Amgen stock, recognizing more than $1.5 million in

18  proceeds. Omenn signed the Company's Annual Report on Form 10-K for the years

19  2004, 2005 and 2006, all of which contained materially false and misleading

20  statements and/or omissions.

21      22.     Defendant Franklin P. Johnson, Jr. ("Johnson") was, at all relevant

22  times, a member of the Company's Board of Directors.  Johnson was a direct and

23  substantial participant in the fraud, who also profited from the sale of Amgen

24  securities at artificially inflated prices during the Class Period.  During the Class

25  Period, Johnson sold 603,400 shares of Amgen stock, recognizing more than $25.4

26  million in proceeds. Johnson signed the Company's Annual Report on Form 10-K

27  for the years 2004 and 2005, both of which contained materially false and

28  misleading statements and/or omissions.

## CONTROL PERSON ALLEGATIONS/GROUP PLEADING

23.     The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of the Company, had access to the adverse undisclosed information about its business, operations, products and prospects through their access to internal corporate documents and information (including information concerning Aranesp and Epogen), conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

24.     The Individual Defendants participated in drafting, preparing, and/or approving the public reports and other statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

25.     The Individual Defendants, as senior executive officers and directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  As specified herein, the Company's SEC filings complained of herein were signed by the Individual Defendants and contained certifications by Defendants pursuant to §302 of SOX.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

26.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC

pursuant to the Exchange Act, traded on the NASDAQ stock market and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business, products, and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations. Under rules and regulations promulgated by the SEC under the Exchange Act, including Item 303 of Regulation S-K, Defendants also had a duty to report, among other things, all trends and uncertainties that were reasonably likely to affect Amgen's net sales, revenues, or income. Defendants' wrongdoing during the Class Period, as alleged herein, also violated this specific requirement and obligation.

27.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Amgen securities during the Class Period, which included the dissemination of materially false and misleading statements and concealment of material adverse facts. The scheme: (i) deceived the investing public regarding Amgen's performance, operations, business, products and prospects, and the true value of Amgen securities; and (ii) caused Plaintiff and other members of the Class to purchase Amgen securities at artificially inflated prices, which fell as the truth concerning Aranesp and Epogen ultimately became known.

28.     In making the statements complained of herein, Defendants, who were all senior officers and controlling persons of Amgen, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

**JURISDICTION AND VENUE**

29.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC.

30.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

31.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

32.     In connection with the acts alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities markets.

**FACTUAL ALLEGATIONS**

A.     **Background:  Overview of ESAs and the ESA Market**

33.     Erythropoiesis is the process by which the body produces erythrocytes, or red blood cells.  Red blood cells contain hemoglobin, a protein that functions primarily in the transport of oxygen from the lungs to the tissues of the body.  Hemoglobin levels are expressed in grams (g) per deciliter (dL) of whole blood.  An adequate supply of red blood cells is necessary to oxygenate the body.

34.     Anemia, a condition in which the blood is deficient in red blood cells or hemoglobin, impairs the body's ability to transfer oxygen to the tissues. Anemia has many potential causes, including an iron-poor diet, excessive bleeding, certain cancers, certain cancer treatments, and kidney or liver failure.

35.     A necessary step in the erythropoietic process is the production of erythropoietin, a protein made in the kidneys that stimulates red blood cell formation.  In the early 1980s, Amgen scientists cloned the gene for erythropoietin, a discovery that led eventually to the Company's commercialization of man-made

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS
Case No.:  CV 07-2536 PSG (PLAx)

11

14

versions of erythropoietin – epoetin alfa, which Amgen markets in the U.S. as Epogen, and darbepoetin alfa, which Amgen markets in the U.S. as Aranesp. Hoffmann La-Roche manufactures another ESA, epoetin beta, which it markets in Europe as NeoRecormon. Because epoetin alfa and epoetin beta, like endogenous erythropoietin, stimulate red blood cell formation, they are referred to as erythropoiesis-stimulating agents, or ESAs. Erythropoietin and its man-made copies are also sometimes referred to as EPO.

36.     While epoetin alfa was still in development, Amgen entered into a Product License Agreement ("PLA") with a subsidiary of Johnson & Johnson ("J&J"). Amgen granted J&J an exclusive license under Amgen's patents to market and sell Amgen-manufactured epoetin alfa in the U.S. for anemia in humans resulting from all treatments except in the dialysis and diagnostics settings.

37.     In 1989, the FDA approved Epogen for the treatment of anemia associated with chronic renal failure ("CRF"), including end stage renal disease patients and patients not on dialysis. The treatment for more severe cases of anemia in CRF patients had been whole blood or red cell transfusions. Epogen therapy was to elevate or maintain the red blood cell level and to reduce the need for transfusions in these patients.

38.     Through its own research and testing, J&J obtained FDA approval to market epoetin alfa to treat and reduce the need for transfusions in patients undergoing treatment for other diseases. Between 1991 and 1996, J&J secured FDA approvals to market epoetin alfa for persons who develop anemia as a consequence of chemotherapy for cancer, treatment of HIV infection with the pharmaceutical zidovudine, chronic kidney diseases in pre-dialysis patients, and in anemic patients scheduled to undergo elective, non-cardiac, non-vascular surgery. J&J markets its Amgen-manufactured product under the name Procrit® ("Procrit").

39.     Except for the difference in their marketing names, the Epogen and Procrit products are identical, as are their FDA-approved labels listing indications,

warnings and other information.  Pursuant to the PLA, however, Amgen is precluded from expanding its Epogen franchise to take advantage of the indications for epoetin alfa obtained by J&J.

40.     Amgen's solution to that limitation was to develop a new ESA, darbepoetin alfa.  The molecular structure of darbepoetin alfa is slightly different than that of epoetin alfa and lasts longer in the bloodstream.  The clinically significant impact was that darbepoetin alfa needed to be administered less often than epoetin alfa.  The commercially significant impact was that Amgen could now market a product in the lucrative oncology market and otherwise seek to expand its ESA franchise in ways the PLA precluded it from doing with Epogen.

41.     The PLA between Amgen and J&J, entered into when Amgen was still a struggling start-up hungry for capital, has allowed J&J to reap billions of dollars from sales of Procrit.  As described in a *Forbes* article entitled "Amgen's Enemies" dated October 30, 2006, Amgen "sidestepped" the PLA through its development of Aranesp so it could reclaim the market it had given to J&J.

42.     In 2001, the FDA awarded Amgen approval to market Aranesp for the treatment of anemia associated with chronic renal failure, including patients on dialysis (end stage renal disease) and patients not on dialysis.  In 2002, Amgen secured approval to market Aranesp for the treatment of anemia associated with cancer chemotherapy.  By early 2004, Aranesp had a 45% share of domestic non-dialysis ESA share to Procrit's 55%; Amgen has since overtaken J&J and now controls over half this market.

43.     Amgen's ESA franchise has been core to its survival and its success. Now a Fortune 200 company, Amgen is the largest biotechnology company in the world, generating $14.3 billion in revenues in 2006, approximately half of which come from sales of Epogen and Aranesp.  Indeed, the *New York Times* has described Epogen as the "best-selling drug ever created by biotechnology."

44.     *Forbes* further reported that to boost Aranesp sales even more, Amgen in 2004 began tying the level of rebates physicians can qualify for on their purchases of two other Amgen drugs, Neupogen and Neulasta, to the amount of Aranesp they purchase.

45.     Neupogen and Neulasta are to white blood cells what Epogen and Aranesp are to red – slightly different versions of a human protein manufactured by recombinant DNA technology that stimulates their production.  Oncologists who purchase and administer ESAs generally also require Neupogen and/or Neulasta for their practices.  As with its ESA franchise, Amgen has a patent estate protecting Neupogen and Neulasta.  Unlike with ESAs, Amgen does not share the franchise with a competitor/licensee; in the U.S., Amgen has a 98% share of sales to oncology clinics for white blood cell-boosting drugs.

46.     J&J has filed an action against Amgen in federal court in New Jersey alleging that Amgen's sales practices constitute an unlawful and anticompetitive tying arrangement and pricing scheme that violates U.S. antitrust law.  *See Ortho Biotech Products, L.P. v. Amgen Inc.*, C.A. No. 2:05-cv-04850-SRC-MF (D.N.J.).

47.     Although Amgen sells its red cell and white cell-boosting products to medical providers such as dialysis and oncology clinics, it is largely dependent on the federal government for its revenue stream.  Indeed, as reported by *Forbes*, Medicare spent $1.75 billion on Epogen in 2005, more than on any other drug.  As explained by Amgen's 2006 Form 10-K filed with the SEC:

> In the United States, dialysis providers are
> primarily reimbursed for EPOGEN® by the federal
> government through the End Stage Renal Disease
> Program ("ESRD Program") of Medicare.  The ESRD
> Program reimburses approved providers for 80% of
> allowed dialysis costs; the remainder is paid by other

sources, including patients, state Medicaid programs, private insurance, and to a lesser extent, state kidney patient programs. The ESRD Program reimbursement rate is established by federal law and is monitored and implemented by the Center for Medicare & Medicaid Service ("CMS"). Most patients receiving Aranesp®, Neulasta® and NEUPOGEN® for approved indications are covered by both government and private payer healthcare programs.

48.  During the Class Period a change occurred in how medical services providers are reimbursed by Medicare for their coverage-eligible purchases. Prior to January 1, 2005, Amgen and other drug companies were required under Medicare Part B to report average wholesale prices ("AWP") for their drugs to the Centers for Medicare and Medicaid Services ("CMS"). Purchasers of the drugs like doctors and other medical services providers were reimbursed by CMS based on these "posted prices" and not actual transaction prices. Purchases at prices less than the posted AWP created a "spread" resulting in a profit source for doctors.

49.  Pursuant to the Medicare Prescription Drug, Improvement and Modernization Act of 2003, companies now have to report actual net transaction prices (including rebates and other discounts) rather than AWP. The reimbursement formula is now calculated as "average sale price" or ASP, plus six percent.

**B.    Early Safety Signals with ESAs**

50.  The clinical testing conducted to obtain FDA approval for Epogen, Procrit and Aranesp established that subjects who were administered the study drug were less likely to require transfusions than subjects who were administered a placebo. The trials were *not* designed to assess, as a primary endpoint, the overall survival rates of participants or other clinically meaningful metrics.

51.     Several early studies observed an association between ESA therapy and cardiovascular events.  The original FDA-approved labels for both Epogen and Aranesp warned that they may increase the risk of cardiovascular events, including death, that higher risk of cardiovascular events may be associated with higher hemoglobin and/or higher rates of rise of hemoglobin, and that hemoglobin level should be managed to avoid exceeding a target level of 12 g/dL.

52.     At the time Procrit was approved for treating anemia associated with cancer chemotherapy in 1993, the FDA also noted that epoetin alfa could potentially serve as a growth factor for malignant tumors.  Amgen and J&J therefore agreed to conduct a study (N93-004) to rule out a decrease of 15 percent in the overall chemotherapy response rate with epoetin alfa when compared with patients receiving chemotherapy alone.  Amgen and J&J terminated the study early due to slow accrual rates.  The study did meet its objective, but there was also a higher incidence of vascular (extracardiac) adverse events in the group receiving epoetin alfa, and the median duration of survival was 10.5 months among epoetin alfa-treated subjects compared with 20.4 months among placebo-treated subjects.

53.     In the late 1990s and early 2000s there were several larger-scale clinical tests performed on ESAs, including the "Normal Hemocrit" Study, ENHANCE and BEST.

54.     The Normal Hematocrit Study, published in 1998, was a randomized controlled study of CRF patients with established heart disease.  The study compared anemic patients targeted to increase their hemoglobin to either low level or a normal level.  The study was stopped by its data safety monitoring board because of a higher rate of vascular thrombosis (the formation of blood clots within blood vessels) in patients randomized to the normal-level group.  Patients in that group also had a higher, although not statistically significantly higher, rate of nonfatal heart attacks and death.

55.     In 2003 and early 2004, data from two large-scale clinical trials testing ESAs on cancer patients in Europe, ENHANCE and BEST, raised concerns over the safety of the entire ESA class.  In the ENHANCE trial (also known as the "Henke" trial), patients with head and neck cancer dosed with Hoffmann-La Roche's epoetin beta product Neorecormon had substantially shorter progression-free survival and overall survival than the placebo group.  The Breast Cancer Erythropoietin Survival Trial ("BEST") (also known as INT-76 or the "Leyland-Jones" trial) was stopped after only four months because of increased mortality in breast cancer patients receiving an epoetin alfa product called Eprex manufactured by a J&J company for marketing outside the U.S.

56.     ENHANCE involved 351 patients; BEST involved over 900.  By contrast, the data set used by the FDA in 1993 to approve the use of epoetin alfa for cancer patients with chemotherapy-induced anemia consisted of pooled data from six clinical trials, none of which was designed to measure clinical outcomes as a primary endpoint, and which had a combined study population of 131 patients.

57.     Both ENHANCE and BEST studied ESAs marketed in Europe but not approved by the FDA for use in the U.S., evaluated patient populations for which ESAs had not been approved in the U.S., and dosed to high target hemoglobin levels.  While theses distinctions prevented the studies from providing definitive evidence of a safety problem involving Epogen or Aranesp, they did prompt substantial safety concerns on the part of the FDA, given the absence of any compelling countervailing evidence.  In other words, according to the FDA there were no large, well-controlled clinical trials measuring survival, tumor growth or other clinically significant metrics using *approved* ESAs in *approved* populations and targeting *approved* hemoglobin levels to show that ESAs were at least as safe as a placebo.  The earlier epoetin alfa and darbepoetin alfa clinical trials measuring study-drug and placebo transfusion percentages were not designed

to measure clinically significant outcomes and did not provide data robust enough to address the negative safety signals raised by ENHANCE and BEST.

**C.    Amgen Misled Investors Concerning the Safety Profile of Its ESAs**

**1.    The 2004 ODAC Meeting**

58.    In light of the safety signals raised by the ENHANCE and BEST trials, in May of 2004 the FDA convened a meeting of leading experts in the field of oncology – the Oncology Drug Advisory Committee, or ODAC – to seek its counsel as to what should be done (the "2004 ODAC Meeting").

59.    In the weeks leading to the 2004 ODAC Meeting, Amgen held a conference call with analysts on April 22, 2004 to discuss its earnings for the first quarter of 2004. Defendants Sharer, Nanula and Morrow participated for Amgen. Specifically concerning the ODAC Meeting, they were asked "Could you comment on a FDA meeting that I've heard about I believe several weeks from now where they're going to look into the safety of Aranesp and other erythropoietic products and what the scope of that meeting would be?" Defendant Morrow, Amgen's Executive Vice President of Global Commercial Operations, misleadingly downplayed the significance of the meeting and the safety concerns of the FDA:

> Yes, this is the oncology. It's called the ODAC meeting. It's going to be held on May 4. And it really was called due to the two studies that were done on Eprex and Neorecormon in Europe where there was an issue about long-term survival in cancer populations.
>
> So we had answered and recognized the risen issue for Tobin, Alpha, and Beta. Just as a reminder, those products were used off-label at higher hematocrit levels than dictated by the label. And we also feel there was some potential study design flaws.

1    And so we're anxious to learn more about those

2    studies during this meeting as well.

3        Now we had decided to participate in that meeting

4    *'cause the focus was not on Aranesp* and as Roger said

5    late last year, *there is no signal associated with Aranesp.*

6    We've had two perspective randomized placebo

7    controlled trials. *And the safety for Aranesp has been*

8    *comparable to placebo.*

9        We continue to investigate with well-designed

10    studies on Aranesp and we're working closely with the

11    FDA on this issue.  But just as a reminder, it's two weeks

12    away so that's pretty much all we know today.

13    (Emphasis added.)

14        60.    Contrary to Defendant Morrow's explanation on the call with

15    analysts, "the focus" of the 2004 ODAC Meeting *was* "on Aranesp."  The fact that

16    the ENHANCE and BEST trials had been conducted on a J&J-manufactured

17    epoetin alfa product and Hoffmann-La Roche's epoetin beta product was

18    irrelevant.  This was a class-wide issue implicating all ESAs, including Aranesp

19    and Epogen, until the FDA had a credible, evidence-based reason to conclude

20    something different.

21        61.    At the 2004 ODAC Meeting the FDA communicated to Amgen that

22    for the ESA safety issue to get resolved, Amgen and J&J should conduct clinical

23    trials that met a number of pre-specified criteria, which the FDA delineated.  The

24    discussion among ODAC members and between ODAC members and the FDA

25    also made clear that another important parameter was to test ESAs at target

26    hemoglobin levels approved by the FDA.

27        62.    Amgen made a presentation at the 2004 ODAC Meeting in which it

28    outlined the "Amgen Pharmacovigilance Program" – five planned or ongoing trials

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS
Case No.:  CV 07-2536 PSG (PLAx)                                                    19

23

involving Aranesp in different tumor treatment settings.  One of these, sponsored by the Danish Head and Neck Cancer Group ("DAHANCA") was Study SE-2002-9001 (the "DAHANCA 10 Trial"), which was to test Aranesp in subjects with head and neck cancer.  David Parkinson, M.D., Amgen's Vice President, Oncology Clinical Development, described the Amgen Pharmacovigilance Program as "a responsible and credible approach to definitively resolving the questions raise[d] in this morning's meeting."

63.     The 2004 ODAC Meeting was a two-day affair, with the ESA issue taking up part of the second day.  The ESA portion of the meeting was lightly covered by the press, which reported generally that there were inconclusive studies raising safety questions concerning overall survival, tumor growth and blood clotting, that additional clinical trials were needed, and that sponsors of ESAs, including Amgen, were conducting such trials.  There was no significant movement in Amgen's share price following the 2004 ODAC Meeting.

## 2.     The DAHANCA 10 Trial

64.     The DAHANCA 10 Trial tested whether high doses of Aranesp could aid in shrinking the tumors of certain cancer patients receiving radiation therapy.  On October 18, 2006, the DAHANCA investigators temporarily halted the study "due to information about potential unexpected negative effects related to immunohistochemical estimation of the so-called EPO receptor."  Pursuant to the DAHANCA 10 Protocol, "AMGEN will, like the departments involved, be kept informed about the study on an ongoing basis, including the extent to which unexpected adverse events occur."  Thus on information and belief, Amgen was informed of this development on or near October 18, 2006.

65.     On December 1, 2006, the DAHANCA investigators decided to terminate the study entirely.  As later described by the FDA, "This study was terminated as recommended by the data monitoring committee, based on both adverse effects on locoregional control rates and for a trend towards impaired

survival in an interim analysis." According to the DAHANCA 10 Interim Analysis, "there is a small but significant poor outcome in the patients treated with Aranesp" in that tumor growth was worse for those patients who took Aranesp than it was for those who did not. Amgen was informed in December 2006 that the study had been terminated. It chose not to inform the market.

66.     On February 16, 2007, a Washington based newsletter, *The Cancer Letter*, reported that the DAHANCA 10 Trial had been halted back in October 2006 because it showed "significantly inferior therapeutic outcome from adding Aranesp to radiation treatment of patients with head and neck cancer." Under the banner "Amgen Didn't Tell Wall Street About Results Of Danish Study," the article continues: "Several Wall Street sources who monitor Amgen confirmed that they have been awaiting these results and were not aware of them until hearing about the closing of the trial from this reporter."

67.     DAHANCA 10 was one of the five trials in the Amgen Pharmacovigilance Program – the so-called "responsible and credible approach to definitively resolving" the questions raised at the 2004 ODAC Meeting. In other words, this is a study that Amgen itself held out as being material to resolving the FDA's concerns over safety signals with ESAs. Indeed, the study's Principal Investigator, Dr. Jens Overgaard, appeared and spoke at the 2004 ODAC Meeting as a guest of Amgen.

68.     The same day *The Cancer Letter* was published, Amgen's stock dropped $1.55 per share, or 2.3%, to $66.73. After the market closed on February 28, 2007, Amgen announced that it had received an inquiry from the SEC's Atlanta District Office asking the Company to provide information and documents regarding the DAHANCA 10 Trial. The following day, on March 1, 2007, shares of Amgen reacted negatively to the news, falling from $64.26 per share to $61.70 per share.

3.     **The 103 Study and Amgen's Broader Fraud Concerning the Safety of Its ESAs**

69.     On January 25, 2007, *i.e.*, after Amgen knew the results of the DAHANCA 10 Trial but before *The Cancer Letter* exposed those results, Amgen held a conference call to discuss its fourth quarter 2006 earnings.  On that call the Company also announced the results of a clinical trial testing Aranesp in 939 patients with anemia of cancer.  Internally Amgen referred to this trial as Study 20010103 or the 103 Study.

70.     The key result of the 103 Study, as later described by the FDA, was that it "demonstrated significantly shorter survival in cancer patients receiving ESAs as compared those receiving transfusion support."  On the January 25 earnings call, however, Amgen described the results as "neutral and *perhaps negative*." (Emphasis added.)  Defendant Perlmutter, Amgen's Executive Vice President of Research and Development, described the results of the 103 Study as follows:

> Let me now turn to Aranesp.  In Aranesp, we received in the fourth quarter data from our Phase III study in the anemia of cancer setting.  Now, this is an attempt to expand the label for Aranesp to include patients with anemia that is not secondary to chemotherapy but, in fact, is attributed to the cancer itself.  The Phase III study evaluated anemic patients who had active malignancy who are not receiving chemotherapy or radiotherapy and in whom it was not planned to provide chemotherapy or radiotherapy in the near future.
>
> These individuals understandably are gravely ill, and in this patient population, one can expect that there

would be a high frequency of adverse events. The study was designed to show, as we had previously shown in Phase II studies, that Aranesp could reduce the frequency of transfusions and improve quality of life. With respect to the transfusion-end point, the study did not meet its primary end point.

We did not show a statistically significant reduction in transfusions in this patient population at the 16-week end point. Moreover, we did see a statistically significant adverse effect of Aranesp on overall mortality in this patient population, and so *we conclude that the risk benefit ratio for Aranesp in these extremely ill patients with anemia secondary to malignancy is, at best, neutral and perhaps negative.*

(Emphasis added.)

71.     No one within Amgen reasonably could have believed the spin Amgen put on the 103 Study results. It was a failure – Aranesp patients did not have fewer transfusions but they were more likely to die. By positioning the study as "neutral, and perhaps negative" and focusing on the "gravely ill" patient population, Amgen was not simply misleading the market as to that one event. Rather, it was continuing with a systematic pattern of misrepresenting to the market that the safety of Aranesp and Epogen, when used as directed, was beyond question.

72.     Amgen's misrepresentations concerning the safety of Epogen and Aranesp begin before the Class Period and continued through the entire Class Period. On quarterly earnings calls held on July 24, 2002 and October 23, 2002, Defendant Morrow falsely referred to various study results as "continu[ing] to validate the strong safety profile of Aranesp."

73.     On an earnings call held on January 22, 2004, Defendant Perlmutter further stated:

> we at Amgen have examined all of the data on darbepoetin alfa, that is Aranesp, therapy, in great deal [sic]. We find no evidence for adverse effects of Aranesp treatment on the survival of the cancer patient. In particular, two prospective, randomized double-blind placebo-controlled files in anemic patients receiving chemotherapy for either lympo proliferative malignancy or lung cancer have been performed.
>
> In these studies, the safety profiles of Aranesp and placebo were similar.

74.     Amgen's misrepresentations regarding ESA safety continued during the Class Period. On November 20, 2006, the Company posted a statement titled "Amgen Responds to CHOIR and CREATE Clinical Trial Data" on the "Featured Content" page of its website. CHOIR and CREATE were clinical trials of ESAs on chronic kidney disease patients; the results of both studies were published in the November 16, 2006 issue of the *New England Journal of Medicine*. The CHOIR data safety monitoring board terminated the study early due to findings of an increased risk of death and cardiovascular hospitalization in patients assigned to achieve a target hemoglobin of 13.5 g/dL with epoetin alfa. The study's primary hypothesis was that anemia correction to 13.5 g/dL in patients with chronic kidney disease would decrease mortality and cardiovascular morbidity, but the study showed the opposite. In CREATE, patients with chronic kidney disease and mild to moderate anemia were randomized to treatment with epoetin beta to either a high or a low target hemoglobin. On November 16, 2006, Roche Pharmaceuticals announced that the CREATE results "clearly show that there is no additional

cardiovascular benefit from treating to higher hemoglobin levels in this patient group."

75.      Attempting to reaffirm the safety of Aranesp and Epogen for their on-label uses, Amgen's November 20, 2006 website posting stated in relevant part:

> A very substantial body of evidence, developed over the past 17 years, demonstrates that anemia associated with chronic kidney disease can be treated safely and effectively with EPOGEN® and Aranesp®, when administered according to the Food and Drug Administration (FDA)-approved dosing guidelines.  In particular, the FDA-approved labels for both drugs define regimens aimed at achieving a hemoglobin target not to exceed 12 g/dL.
>
> In the CREATE and CHOIR studies, physicians treated patients differently than they would in standard clinical practice, and in particular sought to achieve hemoglobin targets substantially higher (> 13 g/dL) than those recommended by the FDA.  In the CHOIR study, patients assigned therapy designed to achieve a target hemoglobin level of 13.5 g/dL appeared to suffer more life-threatening events than those treated conventionally.

76.      Despite Amgen's assertions, there was *not* a substantial body of evidence demonstrating that Aranesp or Epogen had adequately been tested against placebo at approved doses to determine overall survival rates or other clinically significant endpoints.  Indeed, the key point of the 2004 ODAC Meeting was that there was a *lack* of evidence.  As Dr. Patricia Keegan, Director of the FDA's Center for Drug Evaluation and Research, Division of Biologic Oncology Products

1  stated at the 2004 ODAC Meeting, studies were necessary to determine "whether

2  or not [ESAs] are safe."

3    77.    By January 2007, several additional clinical trials with safety

4  signals – CHOIR, DAHANCA 10 and the 103 Study – had confirmed the concerns

5  raised earlier by ENHANCE and BEST, and no clinical trial results had established

6  the safety and efficacy of the on-label use of ESAs when measuring clinically

7  significant metrics such as overall survival.  Yet on the same earnings call during

8  which the 103 Study results were discussed, held January 25, 2007, Defendant

9  Morrow gave overall positive guidance for future ESA sales:

10          In 2007, we will once again focus on anemic

11          chronic kidney disease and chemotherapy induced

12          patients not currently being treated.  This pool of several

13          100,000 patients has and will continue to be the primary

14          driver of Aranesp growth.  We're also pleased with the

15          level of differentiation achieved versus the first

16          generation EPOs.  This will serve us well as we defend

17          against [Indiscernible] in Europe later this year.  Roger

18          did discuss the anemia of cancer, clinical findings and

19          it's far too early for us to asses any potential impact on

20          the marketplace.

21          Turning to EPOGEN, it's certainly going to be an

22          exciting year for this product.  If Roche decided to launch

23          peg-EPO, we're certainly ready for them.  The bigger

24          question is, are potential questions ready for peg-EPO,

25          and I think that's adequately addressed in the first bullet.

26          Regarding the NKF review of anemia guidelines, the fact

27          that 1.5 million patients have been treated with

28          EPOGEN, we have a well-established risk benefit profile,

and our promotion has always been strictly according to our label, we do not anticipate a major shift in clinical practice. However, given all the recent public debate, a small decline in sales cannot be ruled out in 2007.

78.     These projections of continued growth were untenable given all that Amgen knew about the evolving safety profile of ESAs (including the then-undisclosed results of DAHANCA 10).

79.     Also untenable was Defendant Sharer's statement, on the February 16, 2007 call with analysts concerning *The Cancer Letter* and DAHANCA 10, that "We strongly believe, as we have consistently stated, that Aranesp and Epogen are safe and effective medicines when used in accordance with label indications."

80.     In addition to the substantial safety concerns of which Defendants were then aware, they had every reason to believe that Amgen's Aranesp and Epogen franchises were in serious jeopardy for a second reason – the risk of adverse regulatory action by the FDA. As noted above, at its 2004 meeting, ODAC has specifically requested certain clinical studies be conducted to resolve the outstanding safety issues regarding its ESAs; Amgen, however, knew that it had not conducted or even attempted to conduct the requested trials, resulting in a substantial risk that ODAC would recommend, and the FDA would adopt, restrictions on the sale and use of Epogen and Aranesp when it next met to evaluate the drugs.

**D.     Amgen Has Engaged In Extensive Off-Label Marketing**

81.     At the same time the FDA was questioning whether ESAs were safe for *approved* indications and populations, Amgen was pushing Aranesp for *unapproved* indications and populations. Amgen's unparalleled success in marketing ESAs is due in part to its practice of promoting unapproved uses and increased per-patient dosages through improper and, in some cases, unlawful means.

82.     Although physicians may prescribe drugs for off-label uses, the law prohibits drug manufacturers from marketing or promoting their drugs for unapproved uses. A manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§331, 352.

83.     Acknowledging the "extensive regulation" of drug marketing by the FDA and other regulatory authorities, Amgen repeatedly affirmed in its Class Period filings with the SEC that "[we] manufacture and contract manufacture, price, sell, distribute, and market or co-market our products *for their approved indications*." (Emphasis added.)

84.     Notwithstanding the prohibitions against off-label marketing, Amgen developed a sophisticated and multifaceted scheme to circumvent the rules and grow sales.

85.     A key element in the scheme was the day-to-day interaction between the Amgen sales force and the doctors with whom they met. The FDA does not regulate the practice of medicine and federal regulations do not prohibit physicians from prescribing drugs for unapproved, off-label uses. Drug companies are permitted to provide information regarding such uses *in response to doctors' inquiries*. Amgen sales representatives were expected and encouraged to respond to doctor inquiries with detailed information about the various unlabeled uses to which Aranesp could be put. Indeed, Amgen sales representatives were trained to prompt doctors to ask questions that would permit them to begin the off-label dialog. Amgen gave its sales representatives training on the different types of questions to ask ("Problem Questions," "Situation Questions" or "Implication Questions") to best steer doctors into discussions of the potential off-label uses of Aranesp.

86.     Effective "best practices" for off-label sales techniques were shared throughout the Country.  CW#1, a former Amgen district sales manager based in Florida, was provided with a sales aid by his regional manager that was first written for Amgen sales personnel in Arizona (referred to in the document as the "Phoenix Storm").  It provides an "expanded list" of "excellent questions" for Amgen sales personnel to pose to Amgen customers, *e.g.*: "What is keeping you from using Aranesp in all your MDS/HIV/CIA patients?"; "What can I do to help you to remember to use Aranesp in your MDS/HIV/CIA patients?"; "Why have you not tried Aranesp in your MDS/HIV/CIA patients?"; and "How can we break you of this habit you have developed?  Can we come up with a list of MDS/HIV/CIA pts that you can target to try Aranesp?"  (MDS stands for myelodysplastic syndrome, an illness frequently tied to leukemia and often resulting in anemia.  No ESA has been approved by the FDA for the treatment of MDS, and Aranesp has not been approved for HIV-infected patients.)

87.     According to CW#2, a former Amgen sales representative and interim district manager in Houston, Amgen ostensibly repudiated the off-label promotion of Aranesp and Epogen but provided its sales staff with detailed information about off-label uses in the form of "color-coded spreadsheets, Power Point presentations and unpublished study results," to insure that they "were prepared to discuss any off-label topic."  CW#2 stated that Amgen was seeking "hard, fast and heavy to promote off-label uses for Aranesp."

88.     Sales representatives were also required to carry "Proof Source Binders" on all sales calls to promote Aranesp and/or Epogen.  As described above, the poor results of the 103 Study (conducted on patients with anemia of cancer) and DAHANCA 10 (conducted on patients with head and neck cancer) were publicized in January and February 2007, respectively.  CW#3, a former Amgen Health Systems manager based in Ohio, attended a two-day "corporate, national" meeting soon thereafter, on or around March 13 and 14, 2007, in

Orlando, Florida.  At that meeting, attendees, including sales representatives in Amgen's Oncology Business and Corporate Accounts units, were given explicit instructions to return, on-the-spot, their Proof Source Binders so that they could be destroyed.  In addition to the binders, the Company collected from employees all documents concerning anemia of cancer, an off-label use, so that they too could be destroyed.  The Company kept written records tracking, for each employee, what documents they brought to the meeting and turned over to the Company.

89.    Another component of Amgen's scheme to evade off-label marketing restrictions and thus boost its sales was its "speakers program." Speakers program events were *not* accredited continuing medical education seminars held under the auspices of an independent medical association.  They were dinners, paid for by Amgen, at which an "expert" speaker, paid by Amgen, would talk about off-label uses of Aranesp to physicians and other medical services providers in attendance, who were *also* paid by Amgen.  An Amgen document describes "Clinical Round Table" dinners held for clinicians and administrators who were to receive a $1,000 honorarium "***paid from marketing budget***" upon the Company's receipt of the attendee's program evaluation (emphasis added).

90.    CW#1 also described in detail how Amgen retained a doctor named Jeffrey Patton to make presentations to doctors throughout the Southeast sales region (Tennessee, Kentucky, Georgia, Missouri, Michigan, Alabama, Louisiana, and Florida) regarding the off-label use of Aranesp to treat MDS.  As a result of Dr. Patton's presentations and other marketing efforts by Amgen, as much as 20% of all Aranesp sales within the district managed by CW#1 came from off-label administration for the treatment of MDS.  According to a slide in one of Dr. Patton's presentations, the Aranesp market in Tennessee alone had off-label sales of almost 40%:

| | |
|---|---|
| Chemotherapy Induced Anemia | 50% |
| Anemia of Chronic Renal Insufficiency | 11% |
| *Anemia of Chronic Disease* | *17%* |
| *Anemia Secondary to MDS* | *22%* |

(Emphasis added to off-label uses.)

91.     CW#4, a former oncology sales representative at Amgen in New Jersey, confirmed the use of speakers to advance off-label uses.  CW#4 explained that Amgen would sponsor "speaker programs" for doctors, clinic managers, and pharmaceutical directors and that at these programs, Amgen would arrange for one speaker to discuss the "on-label" use of Aranesp, while a second speaker would discuss "off-label" uses.

92.     Amgen sales representatives also solicited business by marketing a Medicare "spread."  This was straightforward, and more lucrative to doctors before the law changed from AWP pricing to ASP pricing in 2005.  Getting reimbursed in amounts that exceed the drug's purchase price resulted in profit for the doctor. Amgen representatives also marketed a different kind of "spread," namely the financial benefits associated with dosing patients to higher target hemoglobin levels or dosing patients in ways that reached the same target hemoglobin levels but that required more Epogen or Aranesp to do it.  Simply put, doctors could make more (through reimbursements) or save more (through greater discounts or rebates) by using more of Amgen's ESAs in their patients.

93.     One example of sales representatives' efforts to drive increased drug dosages was reported by the *Boston Globe* last year, in an article dated October 24, 2006, titled "Some See Profiteering in Clinics' Use of Drug."  The article detailed Amgen's efforts to encourage doctors to administer Epogen intravenously, rather than subcutaneously.  The article explained that subcutaneous injection requires a substantially smaller dose to achieve the same therapeutic effect.  The article quoted one physician as stating that "Amgen sales representatives have told him he

1  could boost his earnings by following the lead" of clinic operators who administer

2  Epogen intravenously, thereby increasing his use of the drug.

3       94.     CW#5 shared one of Amgen's largest accounts and specifically

4  stated that Amgen promoted off-label use by encouraging doctors to prescribe

5  higher doses of Epogen and Aranesp than had been approved by the FDA.

6       95.     CW#2 also reported that Amgen had a company-wide practice of

7  encouraging dosages higher than those approved by the FDA. CW#2 explained

8  that Amgen sales representatives gave doctors dosing recommendations, and that

9  Amgen's management created incentives to increase dosages – referred to as "dose

10 driving" – by reviewing sales representatives' performance based on the size of the

11 dosages prescribed by the doctors with whom they worked. CW#2 stated that in

12 response to Amgen's monitoring of dose sizes, sales representatives would

13 sometimes accelerate dosing late in a fiscal quarter to meet their sales quotas.

14      96.     Other former sales representatives reported that Amgen also

15 promoted increased use of Epogen and Aranesp by encouraging doctors to give

16 patients high dosages of the drugs. CW#5, a former district sales manager in

17 Western Pennsylvania, recalled that Amgen's management applied immense

18 pressure down the chain of command to district managers, such as himself, and

19 sales representatives to meet ever increasing sales quotas, essentially forcing the

20 sales force to encourage the inappropriate administration of Epogen or Aranesp in

21 order to meet their sales goals.

22      97.     Amgen greatly enhanced the effectiveness of its efforts to drive

23 dosing higher by providing extremely large financial incentives for prescribing

24 physicians to increase their usage of the drugs. Unlike prescription drugs

25 purchased by patients through other chains of distribution such as community

26 pharmacies and mail order, Epogen and Aranesp are purchased by the physicians,

27 clinics, hospitals or other facilities that administer them. Accordingly,

28

1    pharmaceutical companies such as Amgen offer may offer discounts and rebates on
2    their purchases.

3        98.    The *New York Times* reported on May 9, 2007 that the total ESA
4    drug payments by Amgen to one group of six oncologists was in the millions of
5    dollars.  Six oncologists were reportedly paid $2.7 million by Amgen for
6    prescribing $9 million of Amgen's drugs in 2006.  In another reported occurrence,
7    one large kidney dialysis chain made 25 percent of its revenue from the ESA drugs
8    and an even bigger share of its profits.

9        99.    As discussed briefly above, Amgen's incentive payment program
10   ties rebates on Neupogen or Neulasta (white blood cell-boosting drugs used in
11   oncology practices) to purchases of Aranesp.  This tying arrangement prompted
12   strong opposition from some doctors, who felt that Amgen was attempting to
13   interfere with their medical judgment.  In an open letter to the Chairman and
14   Members of the Committee on Ways and Means, for a December 6, 2006 Hearing
15   on Patient Safety and Quality Issues in End Stage Renal Disease Treatment, Noshi
16   Ishak, owner and medical director of a New Hampshire kidney center wrote:

17           This is a total disgrace to the practice of medicine.  It is
18           shameful to allow rebates for achieving larger volume for
19           the use of a drug.  It is shameful that the physician is
20           forced to increase the dose of EPO for a patient who has
21           hemoglobin of 10.8 or 10.9 so the center can meet the
22           rebate threshold yet he knows that it will not do the
23           patient any good.

24       100.   According to several confidential witnesses, Amgen marketed
25   Epogen and Aranesp by explicitly discussing the financial benefits of prescribing
26   high volumes of these products with physicians and other medical services
27   providers, in violation of Medicare regulations.

28

101.    CW#2 and CW#4 separately explained that Amgen's national office provided spreadsheets and other tools to enable sales representatives to discuss the economics of Amgen drugs with doctors, clinic business managers, and their accountants.  CW#5 also confirmed that Amgen provided sales representatives with detailed documentation that allowed them to calculate the "margin and spread," *i.e.*, the profit that a medical practice could earn using particular Amgen drugs in combination.  CW#6 noted that while Amgen always included the caveat in its materials that representatives were not supposed to communicate these numbers to doctors, Amgen devoted extensive time to training its representatives on how to use the spreadsheets and perform the necessary calculations, with the clear expectation that sales representatives would make use of these materials when speaking with doctors, administrators and other personnel.

102.    Amgen's activities continued unabated until near the end of the Class Period, when its practices began to draw scrutiny from the press and, as noted above, from the government.  In addition to the *Boston Globe* article, *Forbes* reported on Amgen's marketing practices and highlighted the financial incentives that Amgen granted prescribing physicians.  The article further reported that as a result of these financial incentives, "dosing levels have crept up by a factor of four over the past decade, though some doubt that this makes dialysis patients live longer.  The higher doses have the side effect of fattening the bank accounts of both Amgen and the clinics that choose the prescriptions."

103.    On December 4, 2006, Amgen issued a press release "intended to clarify Amgen's position on the use of Epogen and Aranesp and to correct what the company believes are misleading and inaccurate news reports regarding the use of its drugs."  In the press release, Amgen claimed that "Amgen only promotes the use of Epogen and Aranesp consistent with the FDA label."

Standing alone, Amgen's plan to increase ESA sales by marketing off-label uses and "dose driving" financial incentives confirms that Amgen's public

statements about its performance, operations, business, products and prospects were materially false and misleading.  Amgen affirmatively created an impression that it was conforming to legitimate and sustainable business activities, a state of affairs that differed in a material way from that which actually existed.

**E.**     **The Truth Continues To Emerge**

104.    On February 23, 2007, the Associated Press published an article entitled "Amgen's Aranesp Taken Off Key Drug List for Use Against Anemia of Cancer" and announced:

> Amgen Inc.'s Aranesp anemia drug has been removed from an influential drug-reference list for a certain use, which could jeopardize a portion of the blockbuster drug's sales.  The USP DI, a drug-reference guide published by Thomson Corp., delisted Aranesp as a treatment for anemia in cancer patients who are not undergoing chemotherapy, Amgen spokesman David Polk said Thursday.  Public and private insurers use USP DI and other guides to help determine whether to cover various drug uses.  The delisting of Aranesp as a treatment for anemia of cancer could prompt insurers to drop or reduce coverage for that use.

105.    On February 27, 2007, the *New York Times* published an article entitled "Studies Show Anemia Drugs May Harm Cancer Patients."  The article, in relevant part, revealed:

> New studies are raising questions about whether drugs that have been used by millions of cancer patients might actually be harming them.

The drugs, sold by Amgen, Roche and Johnson & Johnson, are used to treat anemia caused by chemotherapy and meant to reduce the need for blood transfusions and give patients more energy.  But the new results suggest that the drugs may make the cancer itself worse.

In the studies, the drugs have generally been used in ways not approved on the labels.  And the companies say that, when used according to instructions, the drugs have a long history of safety.

. . .

Nevertheless, some cancer specialists and securities analysts say the new information may make doctors more cautious in using the drugs, which have combined sales for the three companies exceeding $11 billion and have been heavily promoted through efforts that include television commercials.

106.   On March 6, 2007, the Associated Press reported that: "In the latest blow to Amgen Inc., at least one company that administers Medicare plans has decided to stop paying for the use of the drug Aranesp to treat a certain type of anemia, citing safety concerns."

107.   In an article dated March 7, 2007, the *Rocky Mountain News* reported that Noridian Administrative Services LLC, one of 17 companies that administers Medicare plans, dropped coverage of Aranesp for anemia of cancer.

Amgen's Aranesp drug, which is manufactured in Longmont, won't be covered to treat a certain type of anemia by at least one company that administers Medicare plans.

1             Noridian Administrative Services LLC, which

2         administers Medicare plans in Colorado and some

3         dozen other Western states, will no longer pay for

4         Aranesp's use in anemia of cancer, medical director

5         William Mangold said.  The Food and Drug

6         Administration hasn't approved Aranesp's use in

7         anemia of cancer, but insurers have typically covered

8         this so called off-label use if prescribing doctors deem

9         it appropriate.

10     108.    On March 9, 2007, the FDA announced that it would include a black

11 box warning for all ESAs, including Aranesp and Epogen.  The boxed warning

12 also recommends the drugs be used at the lowest dose possible to boost red blood

13 cell levels to the lowest level necessary to avoid blood transfusions.  The press

14 release entitled "FDA Strengthens Safety Information for Erythropoiesis-

15 Stimulating Agents (ESAs)" stated, in relevant part:

16             The U.S. Food and Drug Administration (FDA)

17         today issued a public health advisory outlining new

18         safety information, including revised product labeling

19         about erythropoiesis-stimulating agents (ESAs), widely-

20         used drugs for the treatment of anemia.  The drugs

21         affected by the safety update are darbepoetin alfa

22         (Aranesp) and epoetin alfa (Epogen and Procrit).  (ESAs

23         are genetically engineered forms of the naturally

24         occurring human protein, erythropoietin.  Natural

25         erythropoietin is made by the kidney and increases the

26         number of red blood cells).

27            . . .

28

1          Recently completed studies describe an increased

2    risk of death, blood clots, strokes, and heart attacks in

3    patients with chronic kidney failure when ESAs were

4    given at higher than recommended doses.  In other

5    studies, more rapid tumor growth occurred in patients

6    with head and neck cancer who received these higher

7    doses.

8          In studies where ESAs were given at

9    recommended doses, an increased risk of death was

10    reported in patients with cancer who were not receiving

11    chemotherapy and an increased risk of blood clots was

12    observed in patients following orthopedic surgery.

13    109.    Immediately following this disclosure, the Company's share price

14  declined $1.31 per share, or 2.1%, to $60.86.

15    110.    In an article dated March 10, 2007, the *New York Times* reported

16  that on March 9, 2007, following the FDA's public health advisory, the American

17  Society of Clinical Oncology sent a note to its members saying that it had learned

18  that Medicare was cutting off reimbursement for all forms of erythropoietin.  It

19  was reported in the same article that FDA officials had said in issuing their public

20  health advisory "that the manufacturers had never demonstrated that use of Epo

21  actually improved energy levels or quality of life for patients undergoing

22  chemotherapy."  Finally, the *New York Times* reported that Amgen has estimated

23  that more than $500 million of the Aranesp's annual sales are for the treatment of

24  anemia caused by cancer itself, an off-label use.

25    111.    In an article dated March 19, 2007, the *Boston Globe* reported that

26  the FDA's public health advisory had prompted some members of Congress and

27  some doctors to urge Medicare to reconsider its reimbursement policy.  The same

28  article described the recent FDA findings as follows:

The FDA said doctors should use only the minimum amount of antianemia drugs needed to help patients avoid blood transfusions. It also said oncologists should not use the drugs in an attempt to improve quality of life for cancer patients. It allowed quality of life claims to remain for kidney patients, but said it plans to reexamine the validity of those claims.

112.    On March 21, 2007, Reuters published an article entitled "U.S. House Committee Targets Anemia Drug marketing." The article, in relevant part, stated:

The U.S. House Energy and Commerce Committee has asked Amgen Inc. [] and Johnson & Johnson [] for information on their anemia drug marketing practices following recent safety concerns.

Both companies said on Wednesday that they will comply with the request from committee.

The committee, which oversees the U.S. Food and Drug Administration, made its request on Wednesday in letters which also called for the companies to pull advertisements and end financial incentives to physicians.

113.    On March 21, 2007, U.S. Congressmen John Dingell and Bart Stupak wrote to Amgen and Johnson & Johnson seeking: (i) records that contain information about the anemia drug studies that were halted; (ii) documents related to the advertising of those products; and (iii) a statement as to when the companies first learned about any studies of the drugs that had been stopped and when the firms notified the FDA. The lawmakers also ordered Amgen and J&J to cease all direct-to-consumer advertising and physician incentives until the FDA determined whether measures need to be taken to protect the public from these products.

114.     On April 10, 2007, Amgen issued a press release announcing that its
Chief Financial Officer Richard Nanula had abruptly resigned.  Shares of Amgen
reacted negatively to the news, falling from $57.12 to $56.34.  Amgen also
announced that it would delay its earnings release by approximately five days to
include results of a clinical trial, Study 145, evaluating Aranesp as a treatment for
small cell lung cancer in patients receiving chemotherapy.

115.     On April 16, 2007, Bloomberg published a story entitled "Amgen
Anemia Drug Tied to Deaths, Researchers Say" concerning the results of a study
using Aranesp as treatment for Anemia of Cancer.  The article in relevant part,
revealed:

> One in four cancer patients given Amgen Inc.'s
> Aranesp anemia drug in a study died after 19 weeks, a
> rate about 5 points higher than among those on a placebo,
> a finding likely to make doctors more cautious about the
> product.
>
> Researchers today released new details about the
> study of 851 cancer patients.  The mortality rate was 49
> percent after two years, compared with 46 percent for the
> placebo, the scientists said today in Los Angeles.  The
> drug failed in the study to reach its goal of reducing
> blood transfusions, according to the report.
>
> While Aranesp is already the world's top-selling
> drug to treat anemia, the trial may prevent Amgen from
> winning U.S. approval to market the product for use in
> cancer patients not receiving chemotherapy, as distinct
> from those with anemia induced by such treatment.
>
> "This is potentially a practice-changing study,"
> said David Steensma, a hematologist at the Mayo Clinic

1    in Rochester, Minnesota, in a press conference.  He
2    wasn't involved with the study.  "People are going to
3    become more cautious in this setting."
4          Amgen earlier said the study had found "a
5    statistically significant increased risk of death" associated
6    with the drug, prompting the company's shares to fall 4.5
7    percent on Jan. 26, the most in more than a year.
8          . . .
9          The study results were released at an American
10   Association for Cancer Research meeting.
11         Of 419 patients on the drug, 136 were dead after
12   19 weeks and 250 after two years, according to the study.
13   Of 432 patients on the placebo, or inactive medicine, 94
14   died within 19 weeks and 216 were dead after two years.
15         . . .
16         Sales of Aranesp may fall as much as 20 percent
17   this year because of the negative clinical trial results.
18       116.    On April 19, 2007, Amgen announced that Study 145, which
19   examined Aranesp's use in treating lung cancer patients, found that Aranesp did
20   not increase the risk of death in patients receiving chemotherapy.
21       117.    On April 23, 2007, Amgen reported that first quarter 2007 earnings
22   per share increased 19% to $1.08 per share.  Amgen commented that it was,
23   however, reviewing its revenue forecasts as sales of Aranesp and Epogen could fall
24   due to recent negative study results.  Shares of Amgen fell from $62.19 per share
25   to $61.22 per share.
26       118.    On May 8, 2007, the FDA posted an analysis of Aranesp and
27   Epogen on its website, and noted that the drugs were "clearly demonstrated to be
28

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                                    41
Case No.:  CV 07-2536 PSG (PLAx)

1   unacceptable" in high doses.  Shares of Amgen fell from $63.76 per share to

2   $62.66 per share.

3        119.    On May 9, 2007, the *New York Times* published an article entitled

4   "Doctors Reap Millions for Anemia Drugs."  Expanding on the earlier news report

5   in *Forbes*, the article described in detail Amgen's practice of paying "rebates" to

6   doctors in proportion to the prescribed amount of Aranesp and Epogen.  The article

7   stated in relevant part:

8           Two of the world's largest drug companies are

9       paying hundreds of millions of dollars to doctors every

10      year in return for giving their patients anemia medicines,

11      which regulators now say may be unsafe at commonly

12      used doses.

13       . . .

14          Critics, including prominent cancer and kidney

15      doctors, say the payments give physicians an incentive to

16      prescribe the medicines at levels that might increase

17      patients' risks of heart attacks or strokes.

18          Industry analysts estimate that such payments - to

19      cancer doctors and the other big users of the drugs,

20      kidney dialysis centers - total hundreds of millions of

21      dollars a year and are an important source of profit for

22      doctors and the centers.  The payments have risen over

23      the last several years, as the makers of the drugs, Amgen

24      and Johnson & Johnson, compete for market share and

25      try to expand the overall business.

26  **F.**    **The 2007 ODAC Meeting**

27       120.    Finally, on May 10, 2007, ODAC again met to discuss the status of

28  ESAs (the "2007 ODAC Meeting").  After considering testimony from the FDA

1  and ESA marketers (including Amgen), ODAC voted overwhelmingly in favor of

2  restricting the use of ESAs and expanding existing warnings.  The FDA noted:

3  "there is no evidence that ESAs improve quality of life or cancer outcomes," and

4  "data continue to accumulate regarding the increased risk of mortality and of

5  possible tumor promotion from the use of ESAs."

6      121.    The 2007 ODAC Meeting for the first time informed investors of the

7  serious safety concerns recognized by ODAC in 2004 and Amgen's woeful failure

8  to conduct clinical trials of the type that ODAC had stated were needed to assess

9  the safety of ESAs.  Dr. Vinni Juneja, a Medical Officer with the FDA's Office of

10 Oncology Drug Products, was unequivocal: "With the 2004 recommendations in

11 mind, we ask the question, have any ongoing or proposed trials presented at ODAC

12 2004 or since ODAC 2004 fully met the Committee's recommendations?  The

13 answer, unfortunately, is no."

14     122.    Dr. Juneja emphasized that "no completed or ongoing trial has

15 addressed safety issues of ESAs in cancer patients with chemotherapy-associated

16 anemia using currently approved dosing regimens in a generalizable tumor type."

17     123.    Amgen's lack of candor at and after the 2004 ODAC Meeting was

18 also cited by the FDA.  Dr. Richard Pazdur, Director of the FDA's Office of

19 Oncology Drug Products commented:

20         I really think that there were, especially after the

21     2004 meeting, considerable controversy regarding the

22     safety of this drug which led obviously to that 2004

23     meeting.  The sponsor really has an obligation.  These are

24     not just studies that were out there being done by

25     investigators, no, *the two sponsors . . . in 2004 did*

26     *present these as trials that were supposed to answer the*

27     *questions that were posed by the Committee to*

28     *demonstrate the safety of these drugs.  In subsequent*

1   *conferences with the company, they told us that, "Well,*
2   *we really don't have necessarily access to the data on*
3   *the studies."* I really think if these studies were being
4   done to answer the questions, they really have the
5   obligation really to work with the investigators
6   prospectively after the 2004 meeting to provide us with
7   all of the data.

8   (Emphasis added.)

9   124.   Amgen's lack of candor was also cited in two subsequent news
10   articles.  On the next day, May 11, 2007, the *Los Angeles Times* published an
11   article where it stated that some members of ODAC suggested that Amgen "was
12   not being upfront about all the drug's risks."  Also on May 11, 2007, a Bloomberg
13   article reported that that the FDA was given limited access to results from
14   company studies and that Amgen did not provide complete responses to the FDA's
15   requests for data.

16   125.   Among other things, ODAC voted unanimously in favor of requiring
17   ESA manufacturers to conduct further studies to support the drugs' current
18   indications.  ODAC also voted 15-2 that the labeling for Epogen and Aranesp
19   should carry even stronger warnings than those in the Black Box warning that had
20   been added to the label in March.

21   126.   Further, the FDA concluded that Amgen had misstated the results of
22   two of the studies submitted to the FDA.  For Study 161, Amgen had stated that
23   the safety profile of Aranesp-treated patients was comparable to that of the
24   placebo-treated group.  When the FDA examined the data, it found that there was
25   shorter overall survival and a higher incidence of thrombovascular events in
26   Aranesp-treated patients.  For Study 145, Amgen reported that no difference in
27   overall survival was observed.  The FDA disagreed, finding that a failure to

demonstrate overall survival improvement with Aranesp does not exclude the possibility that the Aranesp arm had decreased survival.

127.   On May 10, 2007, as news of the 2007 ODAC Meeting circulated, shares of Amgen fell from $63.10 to $57.33 per share.

**G.   Defendants' False and Misleading Statements**

128.   Throughout the Class Period, Amgen filed annual reports on Form 10-K and quarterly reports on Form 10-Q with the SEC that contained materially false and misleading statements, and various Defendants also made other false and misleading statements and omissions in public announcements and on conference calls with stock analysts regarding the following matters: (i) the outcome of the DAHANCA 10 Trial, (ii) the outcome of the 103 Study, (iii) the safety of ESA drugs, growth potential of such drugs, and risk of adverse action by ODAC and the FDA, and (iv) the Company's improper and illegal marketing practices.

**1.   Defendants' Actionable Omissions Regarding the DAHANCA 10 Trial**

129.   Amgen made actionable omissions of material fact when it failed to timely disclose the adverse outcomes of the DAHANCA 10 Trial after learning of them on or about October 18, 2006 and December 1, 2006.

130.   The adverse outcomes of the DAHANCA 10 Trial were highly material to investors, as evidenced by, *inter alia*, the substantial share price decline resulting from its subsequent disclosure in *The Cancer Letter* on February 16, 2007.  Indeed, Amgen itself confirmed the importance of the trial results by immediately arranging a conference call with analysts on the same day that *The Cancer Letter* first disclosed them.

131.   Amgen's failure to disclose the results of the DAHANCA 10 Trial was deceptive and actionable in light of its own prior reliance on the DAHANCA 10 Trial, its many affirmative statements during the Class Period regarding the

safety of ESAs, and its regular practice of consistently and timely reported the results of clinical trials.

132.    First, at the 2004 ODAC Meeting, Amgen described its pharmacovigilance program involving its ESA drugs, and specifically identified the DAHANCA 10 Trial as a component of that program. Amgen thereby adopted the DAHANCA 10 Trial as an important element in its stated effort to address the safety concerns raised by ODAC.

133.    Second, Amgen made numerous statements regarding the safety and effectiveness of ESAs both before and during the Class Period, and such statements were false when made or were rendered false thereafter by nondisclosure of the DAHANCA 10 Trial results.  These statements include April 22, 2004 statements relating to the 2004 ODAC Meeting (*see* paragraph 136), its statements affirming the safety of ESAs on November 16, 2006 (*see* paragraph 139), similar statements on December 4, 2006 (*see* paragraph 140), and statements minimizing the significance of adverse results in the 103 Study on January 25, 2007 (*see* paragraph 141).

134.    Third, Amgen's nondisclosure of the DAHANCA 10 Trial results was deceptive in light of its practice of routinely reporting the results of clinical trials as they became available, including the following:

(a)    On November 12, 2005, a press release reporting results from a clinical trial involving the use of Aranesp to maintain stable hemoglobin control.

(b)    On December 11, 2005, a press release reporting interim results from a clinical trial involving the use of Aranesp to treat MDS.

(c)    On March 13, 2006, a press release reporting interim results from a clinical trial involving the use of Aranesp to treat patients with heart ailments.

(d)    On May 18, 2005, a press release reporting results from a clinical trial comparing the efficacy of J&J's Procrit with Aranesp.

(e)     On June 3, 2006, a press release reporting further interim results from a clinical trial involving the use of Aranesp to treat MDS.

(f)     On June 19, 2006, a press release reporting further interim results from a clinical trial involving the use of Aranesp to treat patients with heart ailments.

(g)     On December 9, 2006, a press release reporting results from a clinical trial involving the extended dosing of Aranesp.

(h)     Also on December 9, 2006, a second press release reporting results from a clinical trial involving the use of Aranesp to treat anemia of cancer (as distinct from chemotherapy-induced anemia).

2.     **Defendants' False and Misleading Statements Regarding the 103 Study**

135.     As set forth above in paragraphs 70 and 71, Amgen misrepresented the results of the 103 Study by falsely characterizing them as "neutral, and perhaps negative" and focusing on the "gravely ill" patient population, when the study, in fact, clearly contributed to the significant and growing safety concerns regarding Aranesp.

3.     **Defendants' False and Misleading Statements Regarding the Safety of ESAs, Potential for Market Growth, and Risk of Adverse Action by ODAC**

136.     Defendants' deception concerning ODAC began prior to its 2004 meeting. On a conference call with Wall Street analysts held on April 22, 2004 to discuss Amgen's first quarter 2004 results, Defendant Morrow responded to an analyst's inquiry about the 2004 ODAC meeting by stating that the Company "had decided to participate in that meeting *'cause the focus was not on Aranesp* and as Roger said late last year, *there is no signal associated with Aranesp.* We've had two perspective randomized placebo controlled trials. And *the safety for Aranesp has been comparable to placebo.*" (Emphasis added.)

137. This statement was false and misleading when made because it misrepresented or omitted the following material adverse facts:

(a) that the focus of the FDA's inquiry was on the use of the Amgen-manufactured ESAs in oncology patients in the U.S. market. Indeed, the March 30, 2004 notice of the ODAC meeting, in the Federal Register, at 69 FR 16582-02, stated that one of the two topics for the May 4 session was "Safety concerns *associated with ARANESP* (darbepoetin alfa) Amgen, Inc., *and PROCRIT* (epoetin alfa) Ortho Biotech, L.P., both of which are indicated for the treatment of anemia associated with cancer chemotherapy." (Emphasis added);

(b) that in the absence of well-controlled trials demonstrating otherwise, the FDA would assume that safety signals seen in earlier clinical trials applied to *all* ESA drugs, including Aranesp; and

(c) that no clinical trials to date had been designed to test overall survival rates or other clinically significant metrics, and therefore did not provide a medically sound basis for the conclusion that "the safety for Aranesp has been comparable to placebo."

138. As adverse clinical trial results began to appear in late 2006, Amgen repeatedly asserted that substantial clinic evidence supported the purported safety of Epogen and Aranesp when prescribed in accordance with FDA-approved dosing guidelines. These statements repeated Amgen's pre-Class Period statements concerning the drugs' safety, as set forth above in paragraphs 72 and 73.

139. On November 20, 2006, Amgen posted "Featured Content" on the Company's website titled "Amgen Responds to CHOIR and CREATE Clinical Trial Data," in which it reaffirmed the safety of Aranesp and Epogen for their on-label uses. The document stated in relevant part:

> A very substantial body of evidence, developed
> over the past 17 years, demonstrates that anemia
> associated with chronic kidney disease can be treated

1    safely and effectively with EPOGEN® and Aranesp®,
2    when administered according to the Food and Drug
3    Administration (FDA)-approved dosing guidelines. In
4    particular, the FDA-approved labels for both drugs define
5    regimens aimed at achieving a hemoglobin target not to
6    exceed 12 g/dL.

7    140.    Amgen addressed additional negative reports of its ESA drugs'
8    safety on December 4, 2006, when it issued a press release titled "Amgen
9    Responds to Reports About Use and Safety of EPOGEN and Aranesp in CKD
10   Anemia Therapy." In this press release, the Company stated:

11   Amgen [] today posted to its corporate web site
12   documents intended to clarify Amgen's position on the
13   use of EPOGEN(R) (Epoetin alfa) and Aranesp(R)
14   (darbepoetin alfa) and to correct what the company
15   believes are misleading and inaccurate news reports
16   regarding the use of its drugs.

17   . . .

18   EPOGEN and Aranesp are effective and safe
19   medicines when administered according to the Food and
20   Drug Administration (FDA) label.

21   141.    The following month, on its earnings call with stock analysts
22   discussing fourth quarter results, held on January 25, 2007, Defendant Morrow
23   minimized concerns raised by the 103 Study, commenting that *we have a well-
24   established risk benefit profile . . . ."* (Emphasis added.)

25   142.    On the same call, Defendant Sharer echoed Morrow's statements
26   regarding ESAs' safety. Addressing an analyst's question about the safety of
27   Epogen, he misleadingly distinguished the CHOIR study on the grounds that it had
28   involved a higher hemoglobin target:

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                    49
Case No.:  CV 07-2536 PSG (PLAx)

1          I think in the dialysis area, for EPOGEN in the

2      U.S., the CHOIR data clearly has gotten some interest,

3      but we want to emphasize that was for a hemoglobin

4      above what we dose, and what we promote and what's on

5      the label.

6      143.   The same misrepresentation was repeated the following month, on

7   February 16, 2007, when Amgen held a conference with analysts to discuss the

8   DAHANCA 10 Trial in response to the premature termination of the study

9   reported earlier that day in *The Cancer Letter*. Defendant Sharer told analysts

10  "[w]e strongly believe, as we have consistently stated, that Aranesp and Epogen

11  are safe and effective medicines when used in accordance with label indications."

12     144.   Several weeks later, on a conference call sponsored by Goldman

13  Sachs, Defendant Sharer again relied on the heightened hemoglobin target of a

14  study – this time DAHANCA 10 – to misleadingly minimize its importance:

15          You asked a key question. How do you think

16      about data that is not on-label as it affects the label? And

17      in that question is a substantial judgment by people who

18      are qualified in the world of science and medicine. We

19      cannot say, it just doesn't matter at all, it's completely

20      irrelevant. On the other hand, I don't think we can say

21      it's completely definitive either. And so as the FDA and

22      we think about how to properly alert doctors to this

23      information, we have to work through that. And *I think*

24      *the DAHANCA trial would be an example of that kind*

25      *of a challenge; that is, a trial at a very, very high*

26      *hemoglobin.*

27  (Emphasis added.)

28

---

145.    During the same conference, Defendant Sharer stated that *"When we look at the totality of the data, we believe our products are safe and effective when used on-label."* (Emphasis added.)  Defendant Morrow added: *"As a reminder, there is a large body of evidence in our labeled indications that support, as Kevin said, the safe and effective use of Aranesp."* (Emphasis added.)

146.    On March 9, 2007, Amgen issued a statement titled "Amgen's Statement on the Safety of Aranesp® (darbepoetin alfa) and EPOGEN® (Epoetin alfa)".  In relevant part the statement misleadingly stated:

> Aranesp® (darbepoetin alfa) and EPOGEN®
> (Epoetin alfa) have *favorable risk/benefit profiles* in
> approximately four million patients with chemotherapy-
> induced anemia or CKD when administered according to
> the FDA-approved dosing guidelines.

(Emphasis added.)

147.    On April 23, 2007, on a conference call with Wall Street analysts, Defendant Sharer again addressed the safety of Amgen's ESAs.  He stated:

> The overwhelming conclusion that -- that I reach
> and others have reached in looking at all that data is that
> on label *our drugs are certainly safe*.
>
> . . .
>
> At the ODEC meeting in some -- some weeks
> there will be a much more complete discussion about all
> of the data, and I am hopeful and optimistic that good
> judgments will be made there.  And so when I look at the
> overall body of evidence, the -- the length of time we
> used these drugs, again, *the aggregate of the results*
> *demonstrates a solid benefit risk profile when used on*
> *label.*

1          . . .

2          *It is certainly our very, very strong conviction*

3          *that our products are very safe when used on label.*  The

4          new 145 data is obviously reinforces that point of view.

5     (Emphasis added.)

6          148.    On May 3, 2007, Amgen participated in the Deutsche Bank 32nd

7     Annual Health Care Conference.  In discussing the safety of ESAs, Bob Bradway,

8     Amgen's Executive Vice President and Chief Financial Officer, stated in relevant

9     part: "We believe Aranesp and EPOGEN have proven safe and effective for years,

10    improving the lives of more than 4 million patients.  The aggregate of results

11    demonstrate a *solid benefit-risk profile when these products are used on-label.*"

12    (Emphasis added.)

13         149.    The statements set forth in paragraphs 139 through 148 were false

14    and misleading because during the Class Period Amgen (i) was aware that well-

15    designed clinical trials, including the DAHANCA 10 Trial, indicated substantial

16    safety concerns with Epogen and Aranesp, (ii) was aware that ODAC had

17    requested further studies in 2004 to evaluate these concerns but that Amgen had

18    failed to conduct these studies, and (iii) was aware that as a consequence of its

19    failure to conduct the studies requested by ODAC in 2004, there was a substantial

20    risk of adverse action by ODAC when it reconvened to again consider the safety of

21    ESAs, as occurred on May 10, 2007.

22         150.    Notwithstanding the serious safety concerns posed by ESAs,

23    Defendants also repeatedly asserted that the drugs held significant growth

24    potential.

25         151.    On July 22, 2004, Amgen issued an earnings release and held a

26    conference call with Wall Street analysts to discuss its second quarter 2004 results.

27    In response to a question from an analyst, Defendant Morrow stated: "You know,

28    *right now we really see a lot of growth potential in the anemia market,* and one of

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS          52
Case No.:  CV 07-2536 PSG (PLAx)

1  the things we have to do is get beyond these products being used as replacements

2  for transfusions and products that treat fatigue." (Emphasis added.)

3      152.    Commenting further on Amgen's pharmacology program on the

4  same conference call, Defendant Sharer added that "[w]e also continue to move

5  forward on a variety of clinical studies with Aranesp, which we believe has *strong*

6  *growth potential*." (Emphasis added.)

7      153.    On November 10, 2004, Amgen participated in the CIBC World

8  Markets 15th Annual Healthcare Conference call. Defendant Nanula commented

9  on Aranesp's potential going forward, stating:

10              what we think the big opportunity going forward

11            and have for a while is [] continued market penetration. I

12            think both we and our competitor, but I can really speak

13            for ours, we are investing heavily in the marketplace to

14            continue to grow in while we are working at gaining

15            share in the new ASP environment, which we'll talk

16            about in a moment, I think the market growth will

17            become more important versus market share gains as in

18            the past . . . We also have additional indications that we

19            are seeking in Aranesp, so we are highly focused on

20            growing this market, we think it has plenty of room to

21            grow as it's experienced in the last few years too.

22            . . .

23            *[W]e think the market has plenty of room to*

24            *grow....*

25  (Emphasis added.)

26      154.    On March 16, 2005, Amgen participated in the SG Cowen & Co.

27  25th Annual Health Care Conference. Dr. Anthoni Gringeri, Amgen's Senior

28

1    Director of Scientific Research and Licensing Operations, commented on

2    Aranesp's potential for growth as follows:

3                    . . . I wanted to highlight that this drug which has

4                    now been on the market for a little over 3 years has been

5                    highly successful in treating anemia in a variety of

6                    indications.  And we're very concerned that anemia

7                    remains a risk factor, both in renal disease and in other

8                    areas.  You'll see from the first bullet on this slide that

9                    more patients with chronic kidney disease still die before

10                   they reach dialysis.  So there is a large population of

11                   patients that needs to be reached.  And we feel that

12                   Aranesp is an ideal treatment option for these patients.

13       155.    The statements set forth in paragraphs 151 through 154 were false

14   and misleading when made because Amgen lacked any reasonable basis for

15   projecting growth in sales of Aranesp or Epogen during the Class Period in light of

16   the serious safety concerns associated with ESAs and the substantial risk that

17   greater limitations would be placed on the use of ESAs by the FDA in light of

18   Amgen's failure to conduct the clinic trials recommended by ODAC in 2004.

19       **4.    Defendants' False and Misleading Statements Regarding Amgen's**

20           **Improper and Illegal Marketing Practices**

21       156.    During the Class Period, Amgen repeatedly misrepresented that its

22   marketing practices complied with FDA regulations, including the FDA's

23   prohibition on marketing drugs for off-label uses.

24       157.    In Amgen's public filings, Defendants represented:

25                   We conduct research, preclinical testing, and

26                   clinical trials and we manufacture and contract

27                   manufacture our product candidates.  We also

28                   manufacture and contract manufacture, price, sell,

1     distribute, and market or co-market our products *for their*

2     *approved indications*. These activities are subject to

3     extensive regulation by numerous state and federal

4     governmental authorities in the United States, such as the

5     FDA and CMS, as well as in foreign countries, including

6     Europe.

7 (Emphasis added.)

8     158.    The foregoing representation was made in Amgen's Forms 10-K for

9 the fiscal years ended 2004, 2005, and 2006 and Forms 10-Q for the fiscal quarters

10 ended June 30, 2004, September 30, 2004, March 31, 2005, June 30, 2005,

11 September 30, 2005, March 31, 2006, June 30, 2006, September 30, 2006, and

12 March 31, 2007.

13     159.    Amgen and various of the Individual Defendants also repeatedly

14 affirmed Amgen's compliance with FDA regulations governing marketing of off-

15 label uses in public statements during the Class Period.

16     160.    On December 4, 2006, in a press release titled "Amgen Responds to

17 Reports About Use and Safety of EPOGEN and Aranesp in CKD Anemia

18 Therapy," the Company affirmed, "Amgen only promotes the use of EPOGEN and

19 Aranesp consistent with the FDA label."

20     161.    The following month, on January 25, 2007, Defendant Morrow

21 stated that "our promotion [of Epogen] has always been *strictly according to our*

22 *label*, we do not anticipate a major shift in clinical practice." (Emphasis added.)

23     162.    During the same call, Defendant Sharer again falsely affirmed

24 Amgen's adherence to FDA rules barring marketing of off-label uses. Addressing

25 an analyst's question about the safety of Epogen, he inaccurately asserted that the

26 CHOIR study, which showed adverse health effects from use of Epogen, was of

27 limited relevance because it "was for a hemoglobin above *what we dose, and what*

28 *we promote and what's on the label.*"

1  (Emphasis added.)

2      163.    The statements set forth in paragraphs 157 through 162 were false

3  and misleading because during the Class Period Amgen (i) actively marketed its

4  ESA drugs for off-label indications, particularly for MDS and anemia of cancer,

5  (ii) promoted usage of the drugs at dosage levels well above those approved by the

6  FDA and set forth on their labels, and (iii) presented the drugs as providing

7  benefits, particularly enhanced quality of life, which are not set forth on the drugs'

8  labels or approved by the FDA.

9      **5.    Defendants' False and Misleading Statements Regarding**

10          **Revenues and Earnings**

11     164.    The foregoing misrepresentations concerning safety problems with

12  ESAs, nondisclosure of the risk of adverse action by ODAC and the FDA,

13  misrepresentations and omissions concerning adverse clinic trial results, and

14  misrepresentations concerning marketing practices all rendered Amgen's financial

15  statements false and misleading during the Class Period.

16     165.    In its press release dated July 22, 2004 and Form 8-K dated July 28,

17  2004, Amgen reported adjusted earnings per share of $0.62, net income of $748

18  million, and revenues of $2.6 billion for the second fiscal quarter of 2004. The

19  same amounts were subsequently reported in the Form 10-Q filed by Amgen for

20  such quarter.

21     166.    In its press release dated October 20, 2004 and Form 8-K dated

22  October 26, 2004, Amgen reported adjusted earnings per share of $0.64, net

23  income of $236 million, and revenues of $2.7 billion for the third fiscal quarter of

24  2004.  The same amounts were subsequently reported in the Form 10-Q filed by

25  Amgen for such quarter.

26     167.    In its press release dated January 27, 2005 and Form 8-K dated

27  February 2, 2005, Amgen reported adjusted earnings per share of $0.58, net

28  income of $689 million, and revenues of $2.9 billion for the fourth fiscal quarter of

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                    56
Case No.:  CV 07-2536 PSG (PLAx)

2004.  The same amounts were subsequently reported in the Form 10-K filed by Amgen for 2004.

168.    In its press release dated April 21, 2005 and Form 8-K dated April 22, 2005, Amgen reported adjusted earnings per share of $0.72, net income of $854 million, and revenues of $2.8 billion for the first fiscal quarter of 2005.  The same amounts were subsequently reported in the Form 10-Q filed by Amgen for such quarter.

169.    In its press release dated July 19, 2005 and Form 8-K dated July 25, 2005, Amgen reported adjusted earnings per share of $0.88, net income of $1.0 billion, and revenues of $3.2 billion for the second fiscal quarter of 2005.  The same amounts were subsequently reported in the Form 10-Q filed by Amgen for such quarter.

170.    In its press release dated October 19, 2005 and Form 8-K dated October 25, 2005, Amgen reported adjusted earnings per share of $0.85, net income of $967 million, and revenues of $3.2 billion for the third fiscal quarter of 2005.  The same amounts were subsequently reported in the Form 10-Q filed by Amgen for such quarter.

171.    In its press release dated January 26, 2006 and Form 8-K dated February 1, 2006, Amgen reported adjusted earnings per share of $0.75, net income of $824 million, and revenues of $3.3 billion for the fourth fiscal quarter of 2005.  The same amounts were subsequently reported in the Form 10-K filed by Amgen for 2005.

172.    In its press release dated April 18, 2006 and Form 8-K dated April, 24, 2006, Amgen reported adjusted earnings per share of $0.91, net income of $1.0 billion, and revenues of $3.2 billion for the first fiscal quarter of 2006.  The same amounts were subsequently reported in the Form 10-Q filed by Amgen for such quarter.

173.    In its press release dated July 20, 2006 and Form 8-K dated July 24, 2006, Amgen reported adjusted earnings per share of $1.05, net income of $14 million, and revenues of $3.6 billion for the second fiscal quarter of 2006.  The same amounts were subsequently reported in the Form 10-Q filed by Amgen for such quarter.

174.    In its press release and Form 8-K dated October 23, 2006, Amgen reported adjusted earnings per share of $1.04, net income of $1.1 billion, and revenues of $3.61 billion for the third fiscal quarter of 2006.  The same amounts were subsequently reported in the Form 10-Q filed by Amgen for such quarter.

175.    In its press release and Form 8-K dated January 25, 2007, Amgen reported adjusted earnings per share of $0.90, net income of $833 million, and revenues of $3.84 billion for the fourth fiscal quarter of 2006.  The same amounts were subsequently reported in the Form 10-K filed by Amgen for 2006.

176.    In its press release and Form 8-K dated April 23, 2007, Amgen reported adjusted earnings per share of $1.08, net income of $1.1 billion, and revenues of $3.69 billion for the first fiscal quarter of 2007.  The same amounts were subsequently reported in the Form 10-Q filed by Amgen for such quarter.

177.    The statements set forth in paragraphs 165 through 176 were false and misleading because Amgen's misrepresentations concerning safety problems with ESAs, nondisclosure of the risk of adverse action by ODAC and the FDA, misrepresentations and omissions concerning adverse clinic trial results, and misrepresentations concerning marketing practices deceived investors as to the quality and nature of Amgen's revenue and earnings.  In fact, such matters caused Amgen's revenue and earnings from ESAs to be at significantly greater risk of diminishing due to (i) later determinations that existing on- and off-label uses of the drugs were either unsafe or ineffective, (ii) regulatory action to limit or prohibit such uses, and (iii) increased enforcement preventing continued marketing in violation of FDA law and regulations.

## ADDITIONAL SCIENTER ALLEGATIONS

178.   During the Class Period, all Defendants sold substantial amounts of Amgen common stock from their personal holdings while in possession of adverse non-public information about the risks of Aranesp.  Defendants held positions that would have made them privy to information about the safety of Aranesp and about Amgen's business practices.  The chart below details the number of shares Defendants sold during the class period and the proceeds gained from such sales:

| Defendant | Sale Date | # Shares | Market Value |
|---|---|---|---|
| **Dennis M. Fenton** | 27-Jul-04 | 30,000 | $1,683,300 |
| | 18-Aug-04 | 25,000 | 1,427,250 |
| | 3-Sep-04 | 20,000 | 1,192,200 |
| | 29-Oct-04 | 20,000 | 1,121,400 |
| | 12-Nov-04 | 20,000 | 1,182,400 |
| | 4-Feb-05 | 27,896 | 1,745,453 |
| | 23-May-05 | 30,000 | 1,847,100 |
| | 25-Jul-05 | 46,848 | 3,796,093 |
| | 7-Nov-05 | 25,000 | 2,000,000 |
| | 6-Dec-05 | 3,049 | 243,249 |
| | 24-Feb-06 | 28,800 | 2,145,024 |
| | 1-Jun-06 | 30,000 | 2,045,400 |
| | 26-Oct-06 | 40,000 | 2,991,286 |
| | 7-Nov-06 | 40,000 | 3,012,505 |
| | 6-Dec-06 | 3,049 | 213,095 |
| | 8-Dec-06 | 20,000 | 1,403,000 |
| | **Total** | **409,642** | **$28,048,756** |
| **Edward V. Fritzky** | 27-Apr-04 | 176,578 | $10,506,549 |
| | 15-Jul-04 | 8,728 | 488,768 |
| | 27-Jul-04 | 195,136 | 10,903,581 |

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS
Case No.: CV 07-2536 PSG (PLAx)

59

| Defendant | Sale Date | # Shares | Market Value |
|---|---|---|---|
| | 26-Oct-04 | 25,000 | 1,362,750 |
| | 26-Oct-04 | 182,360 | 9,831,956 |
| | 1-Feb-05 | 204,340 | 12,771,010 |
| | 26-Apr-05 | 151,800 | 8,800,690 |
| | **Total** | **943,942** | **$54,665,304** |
| **Franklin P. Johnson** | 29-Apr-04 | 24,000 | N/A |
| | 7-Jun-04 | 40,000 | $2,198,365 |
| | 5-Aug-04 | 12,400 | 696,693 |
| | 6-Aug-04 | 50,000 | 2,726,100 |
| | 12-Nov-04 | 57,600 | 3,438,108 |
| | 18-Nov-04 | 15,000 | 903,000 |
| | 3-Feb-05 | 34,400 | 2,141,423 |
| | 7-Mar-05 | 30,000 | 1,861,200 |
| | 5-May-05 | 24,000 | N/A |
| | 9-May-05 | 76,000 | 4,469,320 |
| | 2-Aug-05 | 100,000 | N/A |
| | 7-Sep-05 | 50,000 | N/A |
| | 8-Nov-05 | 25,000 | 2,006,973 |
| | 14-Nov-05 | 25,000 | 2,040,314 |
| | 17-Feb-06 | 40,000 | 2,979,588 |
| | **Total** | **603,400** | **$25,461,085** |
| **Brian M. McNamee** | 12-Nov-04 | 40,000 | $2,387,600 |
| | 16-Aug-05 | 50,000 | 4,020,772 |
| | 10-Nov-05 | 112,168 | 9,145,618 |
| | 3-Mar-06 | 2,157 | 162,616 |
| | 3-Mar-07 | 2,160 | 133,099 |
| | **Total** | **206,485** | **$15,849,705** |

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS
Case No.:  CV 07-2536 PSG (PLAx)

| Defendant | Sale Date | # Shares | Market Value |
|---|---|---|---|
| **George J. Morrow** | 25-Jul-05 | 303,335 | $24,604,492 |
| **Richard D. Nanula** | 14-May-04 | 7,149 | $405,634 |
| | 17-May-04 | 12,851 | 723,648 |
| | 16-May-05 | 9,149 | 576,296 |
| | 17-May-05 | 40,851 | 2,559,169 |
| | 3-Aug-05 | 65,000 | 5,368,528 |
| | 16-May-06 | 20,587 | N/A |
| | 17-May-06 | 24,413 | 1,689,302 |
| | 31-Oct-06 | 30,000 | 2,280,000 |
| | **Total** | **210,000** | **$13,602,577** |
| **Gilbert S. Omenn** | 19-Jan-05 | 2,200 | $141,152 |
| | 11-Feb-05 | 7,000 | 443,760 |
| | 7-Mar-05 | 2,000 | 125,055 |
| | 25-Jan-06 | 1,885 | 141,262 |
| | 22-Feb-06 | 6,000 | 450,769 |
| | 3-Mar-06 | 1,600 | 122,850 |
| | 25-Jan-07 | 2,120 | 159,297 |
| | **Total** | **22,805** | **$1,584,145** |
| **Roger M. Perlmutter** | 1-Apr-05 | 10,979 | $629,646 |
| | 27-Jul-05 | 40,000 | 3,241,778 |
| | 17-Nov-05 | 100,000 | 8,233,070 |
| | **Total** | **150,979** | **$12,104,493** |
| **Kevin W. Sharer** | 29-Apr-05 | 3,224 | N/A |
| | 28-Jul-05 | 263,827 | $21,392,522 |
| | 8-Nov-05 | 38,705 | N/A |
| | 8-Nov-05 | 945,460 | 75,449,234 |

| Defendant | Sale Date | # Shares | Market Value |
|-----------|-----------|----------|--------------|
|           | **Total** | **1,251,216** | **$96,841,757** |

179.     Also, during the Class Period, and with the Company's securities trading at artificially inflated prices, Amgen raised capital on significantly superior terms through its public financing activities. For example, due to the Company's artificially inflated securities prices, the Company was able to complete two convertible bond offerings in November 2006, and two convertible note offerings in February 2006, realizing over $5 billion dollars for Amgen.

## POST-CLASS PERIOD EVENTS

180.     On May 10, 2007, Amgen received a subpoena from the New York Attorney General seeking documents related to "promotional activities, sales and marketing activities, medical education, clinical studies, pricing and contracting, license and distribution agreements and corporate communications."

181.     On May 15, 2007, Medicare announced a proposal to limit reimbursement for Aranesp to patients with especially severe anemia and deny it entirely to all patients with certain kinds of cancer.

182.     On May 16, 2007, the United States Senate Committee on Finance issued a letter to Amgen "requesting a briefing to discuss the issues and concerns reported in the media as to the marketing and safety" of ESAs.

183.     In response to the most recent developments, on May 22, 2007, Amgen issued a press release insisting that the May 10, 2007 findings by ODAC were only advisory and that FDA officials, while they commonly follow the recommendations of their advisory panels, are not bound to do so.

184.     On May 30, the Ranking Member of the Committee on Finance of the United States Senate, Senator Chuck Grassley, issued a press release describing his ongoing inquiry into the pricing and marketing of anti-anemia drugs given to kidney and cancer patients and the FDA's access to data from the drug maker's

1  studies of such drugs.  The press release included a letter from Senator Grassley to
2  Amgen's CEO, Kevin Sharer, requesting a briefing to discuss the issues and
3  concerns over the marketing and safety of Aranesp and Epogen.

4      185.    On July 16, 2007, Bloomberg, in an article entitled "Amgen, J&J
5  Anemia Drugs Limited by California Insurer" stated that Blue Shield of California,
6  a nonprofit insurer with 3.3 million members, is limiting payments for anemia
7  drugs from Amgen Inc. and Johnson & Johnson, medicines that at high doses are
8  tied to heart attacks and stroke.  Shares of Amgen fell 90 cents, or 1.6 percent, to
9  $56.03.

10     186.    On July 30, 2007, the U.S. Centers for Medicare and Medicaid
11 Services announced plans to limit what dosages of the EPO drugs it would
12 reimburse for saying the drugs are only necessary for patients with hemoglobin
13 levels less than 10 grams per deciliter.  Amgen shares fell $2.74, or 5.1 percent, to
14 $51.

15     187.    On August 10, 2007, the *Los Angeles Times* commenting on the
16 government's new reimbursement rules for EPO drugs, quoted a biotech analyst
17 with Thomas Weisel Partners as predicting the federal government may no longer
18 reimburse doctors for as many as a third of the patients currently on the
19 medications.

20     188.    On August 13, 2007, the Associated Press reported that Amgen
21 would "likely lose at least 40 percent of their US Aranesp revenue by 2008 with
22 even greater downside possible for both Aranesp and Epogen if upcoming
23 reimbursement and regulatory decisions go against them."

24     189.    On August 15, 2007, Amgen announced initiatives to reduce
25 company staff by 12-14 percent.  The Company also announced that adjusted
26 earnings per share guidance for 2007 has been changed from $4.28 to a range of
27 $4.13-$4.23, excluding restructuring charges.  Amgen acknowledged that the
28 cutbacks are in direct response to lower sales of Aranesp.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                   63
Case No.:  CV 07-2536 PSG (PLAx)

190.    In an article dated August 16, 2007, Kerry A. Dolan, writing for *Forbes*, suggested that it is: "the perils of pushing some drugs too hard and too broadly" that "came home to roost" a day earlier, when "Amgen announced a restructuring that includes laying off as many as 2,600 people and cutting spending by $1.9 billion.

191.    On September 11, 2007, a panel of experts for the FDA met to further discuss the risks involved in the use of ESAs to treat Anemia of Cancer. While the panel voted against requiring Amgen to label Aranesp and Epogen with a ceiling hemoglobin level of 11g/dL, in an article dated September 12, 2007, CNN.money.com reported that the scrutiny into Amgen's practices and the risks in the off-label use of ESAs is not over.

192.    The FDA is still expected to make some changes to the label, said agency spokesman Karen Riley.  But when asked to recommend a red blood cell limit for the label, the answers from the panelists varied widely.  Analysts didn't laud the vote as a major victory for Amgen, but portrayed it as a problem averted. James Reddoch, analyst for Friedman, Billings, Ramsey, referred (in a published note) to the vote as a "bullet dodged" and "the lack of a new negative, more than as a positive."  Christopher Raymond, analyst for the firm R.W. Baird, wrote in his note that "our worst fears did not come true" but said Amgen's franchise is not "out of the woods" because FDA scrutiny is expected to continue.

## CLASS ACTION ALLEGATIONS

193.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the securities of Amgen during the period from April 22, 2004 through May 10, 2007, inclusive.  Excluded from the Class are Defendants; the affiliates and subsidiaries of the Company; the officers and directors of the Company and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; the legal representatives, heirs,

1 | successors, and assigns of any excluded person; and any entity in which any
2 | excluded person has or had a controlling interest.

3 |      194.    The members of the Class are so numerous that joinder of all
4 | members is impracticable.  Throughout the Class Period, Amgen had more than 1.1
5 | billion of shares of common stock outstanding, which were actively traded on the
6 | NASDAQ.  The average daily trading volume during the Class Period was more
7 | than 9.14 million shares.  While the exact number of Class members is unknown to
8 | Plaintiff at this time, Plaintiff believes that there are at least thousands of members
9 | of the proposed Class.  Record owners and other members of the Class may be
10 | identified from records maintained by Amgen or its transfer agent and can be
11 | notified of the pendency of this action by mail and publication using forms of
12 | notice similar to those customarily used in securities class actions.

13 |      195.    Plaintiff's claims are typical of the claims of the members of the
14 | Class as all members of the Class were similarly damaged by Defendants'
15 | wrongful conduct as complained of herein.

16 |      196.    Plaintiff will fairly and adequately protect the interests of the
17 | members of the Class and has retained counsel competent and experienced in class
18 | and securities litigation.  Plaintiff has no interests that conflict with the interests of
19 | the Class.

20 |      197.    Common questions of law and fact exist as to all members of the
21 | Class and predominate over any questions solely affecting individual members of
22 | the Class.  Among the questions of law and fact common to the Class are:

23 |      (a)    whether Defendants' statements and omissions during the Class
24 | Period materially misrepresented the safety of Aranesp;

25 |      (b)    whether Defendants' acts and omissions as alleged herein
26 | violated federal securities laws;

27 |      (c)    whether Defendants participated in the wrongful scheme
28 | described herein;

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS      65
Case No.:  CV 07-2536 PSG (PLAx)

69

(d)     whether Defendants acted with scienter; and

(e)     whether the members of the Class have sustained damages and the proper measure of damages.

198.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

199.     At all relevant times, the market for Amgen securities was an efficient market for the following reasons, among others:

(a)     Amgen's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Amgen filed periodic and other public reports with the SEC and the NASDAQ;

(c)     Amgen regularly communicated with public investors by means of established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Amgen was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and customers of their respective brokerage firms.  Those reports were publicly available and entered the public marketplace.

200.     As a result of the foregoing, the market for Amgen's securities promptly digested current information regarding Amgen from all publicly available

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                                   66
Case No.:  CV 07-2536 PSG (PLAx)

1   sources and reflected such information in Amgen's stock price.  Under these

2   circumstances, all purchasers of Amgen's securities during the Class Period

3   suffered similar injury through their purchase of Amgen's securities at artificially

4   inflated prices, which fell as the truth concerning Aranesp became known, and a

5   presumption of reliance applies.

6   ## NO SAFE HARBOR

7       201.    The statutory safe harbor provided for forward-looking statements

8   under certain circumstances does not apply to any of the allegedly false statements

9   pleaded in this complaint.  Many of the specific statements pleaded herein were not

10  identified as "forward-looking statements" when made.  To the extent there were

11  any forward-looking statements, there were no meaningful cautionary statements

12  identifying important factors that could cause actual results to differ materially

13  from those in the purportedly forward-looking statements.  Alternatively, to the

14  extent that the statutory safe harbor does apply to any forward-looking statements

15  pleaded herein, Defendants are liable for those false forward-looking statements

16  because at the time each of those forward-looking statements was made, the

17  particular speaker knew that the particular forward-looking statement was false,

18  and/or the forward-looking statement was authorized and/or approved by an

19  executive officer of Amgen who knew that those statements were false when made.

20  ## LOSS CAUSATION

21      202.    As detailed herein, throughout the Class Period, the Defendants

22  made material misrepresentations and omissions and engaged in a scheme and

23  course of conduct to deceive the market that resulted in artificially inflated prices

24  for Amgen common stock.  As a result, Plaintiff and other members of the Class

25  purchased Amgen common stock at artificially inflated prices.  When the

26  Company's prior misrepresentations, omissions and other fraudulent conduct were

27  revealed through a series of partial corrective disclosures, the price of Amgen

28  common stock fell significantly on several occasions (as detailed herein), as

portions of the artificial inflation were removed from the Company's stock price. As a result of its purchases of Amgen common stock during the Class Period, Plaintiff and the other members of the Class therefore suffered economic loss.

**Disclosure of the Halt of the DAHANCA 10 Trial**

203.    On February 16, 2007, a Washington based newsletter, *The Cancer Letter*, reported that the DAHANCA 10 Trial had been halted four months earlier, in October 2006, because it showed adverse outcomes in patients using Aranesp. The same day, Amgen's stock dropped $1.55 per share, or 2.3%, to $66.73.

**Disclosure of the SEC Inquiry**

204.    After the market closed on February 28, 2007, Amgen announced that it had received an informal inquiry from the SEC regarding its disclosure of the DAHANCA 10 Trial.

205.    The following day, on March 1, 2007, the Company's stock price declined from $64.26 per share to $61.70 per share, a one day decline of 4%.

**Disclosure of the FDA Health Advisory**

206.    On March 9, 2007, the FDA announced that it would mandate a black box warning for ESAs, including Aranesp and Epogen, as a result of safety concerns with the drugs.  The boxed warning recommended the drugs be used at the lowest dose possible.  Immediately following this disclosure, the Company's share price declined $1.31 per share, or 2.1%, to $60.86.

**Disclosure of the ODAC 2007 Recommendation for ESAs**

207.    On May 10, 2006, ODAC voted at a public hearing in favor of adding new restrictions on the use of ESA drugs and requiring the drug makers to conduct new clinical trials.  Members of ODAC expressed concern regarding the safety of the drugs, Amgen's failure to conduct the clinical trials previously requested by ODAC in 2004, and reports of improper marketing practices by Amgen and J&J.  Immediately following this disclosure, Amgen's stock dropped $5.77 per share, or 9.1%, to $57.33.

**FIRST CLAIM FOR RELIEF**

**(For Violation of Section 10(b) of the Exchange Act**

**and Rule 10b-5 Against All Defendants)**

208.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

209.    During the Class Period, Defendants carried out a common plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Amgen securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

210.    Defendants (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Amgen's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  All Defendants are liable either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

211.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Amgen's financial well-being, business and prospects, as specified herein.

212.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS
Case No.:  CV 07-2536 PSG (PLAx)

69

73

1   engaged in acts, practices, and a course of conduct as alleged herein in an effort to

2   assure investors of Amgen's financial condition and performance and continued

3   substantial growth, which included the making of, or the participation in the

4   making of, untrue statements of material facts and omitting to state material facts

5   necessary in order to make the statements made about Amgen and its business

6   operations and future prospects in light of the circumstances under which they

7   were made, not misleading, as alleged more particularly herein, and engaged in

8   transactions, practices and a course of business which operated as a fraud and

9   deceit upon the purchasers of Amgen securities during the Class Period.

10       213.    Each of the Individual Defendants' primary liability, and controlling

11   person liability, arises from the following facts: (i) the Individual Defendants were

12   high-level executives and/or directors at the Company during the Class Period and

13   members of the Company's management team or had control thereof; (ii) each of

14   these Defendants, by virtue of his responsibilities and activities as a senior officer

15   and/or director of the Company was privy to and participated in the creation,

16   development and reporting of the Company's internal budgets, plans, projections

17   and/or reports; (iii) each of these Defendants enjoyed significant personal contact

18   and familiarity with the other Defendants and was advised of, and had access to,

19   other members of the Company's management team, internal reports and other

20   data and information about the Company's finances, operations, and sales at all

21   relevant times; and (iv) each of these Defendants was aware of the Company's

22   dissemination of information to the investing public which they knew or recklessly

23   disregarded was materially false and misleading.

24       214.    The Defendants had actual knowledge of the misrepresentations and

25   omissions of material facts set forth herein, or acted with reckless disregard for the

26   truth in that they failed to ascertain and to disclose such facts, even though such

27   facts were available to them. Such Defendants' material misrepresentations and/or

28   omissions were done knowingly or recklessly and for the purpose and effect of

concealing Amgen's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

215. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Amgen's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Amgen's securities were artificially inflated, and relying, directly or indirectly, on the false and misleading statements made by Defendants, or upon the integrity of the market in which Amgen's securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Amgen securities during the Class Period at artificially high prices and were damaged thereby.

216. At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Amgen was experiencing, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Amgen securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

217.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

218.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### (For Violation of Section 20(a) of the Exchange Act

### Against the Individual Defendants)

219.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

220.    The Individual Defendants were controlling persons of Amgen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or to shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

221.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular

1 transactions giving rise to the securities violations as alleged herein, and exercised
2 the same.

3     222.    As set forth above, Amgen and the Individual Defendants each
4 violated Section 10 (b) and SEC Rule 10b-5 by their acts and omissions as alleged
5 in this Complaint.  By virtue of their positions as controlling persons, the
6 Individual Defendants are liable pursuant to Section 20 (a) of the Exchange Act.
7 As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the
8 other members of the Class suffered damages in connection with their purchases of
9 the Company's securities during the Class Period.

10                **REQUEST FOR RELIEF**

11     WHEREFORE, Plaintiff prays for relief and judgment on behalf of itself and
12 the Class, as follows:

13        (a)    Determining that this action is a proper class action and
14 certifying Plaintiff as class representative under Rule 23 of the Federal Rules of
15 Civil Procedure;

16        (b)    Awarding compensatory damages in favor of Plaintiff and the
17 other members of the Class against all Defendants, jointly and severally, for all
18 damages sustained as a result of Defendants' wrongdoing, in an amount to be
19 proven at trial, including interest thereon;

20        (c)    Awarding Plaintiff and the Class their reasonable costs and
21 expenses incurred in this action, including counsel fees and expert fees; and

22        (d)    Such other and further relief as the Court may deem just and
23 proper.

24                **JURY DEMAND**

25

26     Plaintiff demands a jury trial as to all issues so triable.

27

28

Dated:  October 1, 2007

Respectfully submitted,

By: _____

    Gretchen M. Nelson (#112566)
    Mark Labaton (#159555)
**KREINDLER & KREINDLER LLP**
707 Wilshire Boulevard
Los Angeles, California  90017
Telephone:  (213) 622-6469
Facsimile:  (213) 622-6019

*Local Counsel*

**LABATON SUCHAROW LLP**
Barbara J. Hart
Christopher J. Keller
Mark S. Arisohn
Christopher J. McDonald
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Attorneys for Lead Plaintiff Connecticut
Retirement Plans and Trust Funds and Lead
Counsel for the Putative Class*

# EXHIBIT A

EXHIBIT A

## AMENDED CERTIFICATION

I, Catherine E. LaMarr, as General Counsel to the Connecticut Retirement Plans & Trust Funds ("Connecticut"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Connecticut. I have reviewed the Consolidated Amended Class Action Complaint For Violation of Federal Securities Laws prepared against Amgen Inc. ("Amgen");

2.    Connecticut did not purchase Amgen at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Connecticut is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.    Connecticut's transactions in Amgen for the class period from April 22, 2004 to May 10, 2007, are reflected in Exhibit A, attached hereto;

5.    Connecticut has not sought to serve as a lead plaintiff in a class action under the federal securities laws during the last three years preceding the date of this certification. Connecticut has sought to serve, and has been appointed, as lead plaintiff in a derivative action captioned *In re UnitedHealth Group Incorporation Shareholder Derivative Litigation*, No. 06-1216 JMR-FLN (D. Minn.).

6.    Beyond its pro rata share of any recovery, Connecticut will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 28th day of September, 2007.

Catherine E. LaMarr
*General Counsel,*
Connecticut Retirement Plans and Trust Funds

79

Exhibit A
**Connecticut Retirement Plans & Trust Funds**
Class Period: 04/22/2004 to 05/10/2007

AMGEN INC

| Trans Type | Trade Date | Shares | | Price Per Share | Cost/ Proceeds |
|---|---|---|---|---|---|
| BUY | 04/26/04 | 7,284.00 | $ | 59.15 | ($430,838.40) |
| SELL | 05/18/04 | -7,284.00 | $ | 56.05 | $408,286.32 |
| SELL | 06/18/04 | -4,000.00 | $ | 53.78 | $215,114.96 |
| SELL | 07/30/04 | -2,400.00 | $ | 56.88 | $136,508.80 |
| BUY | 09/15/04 | 15,083.00 | $ | 58.26 | ($878,792.89) |
| BUY | 09/22/04 | 13,970.00 | $ | 58.05 | ($811,004.60) |
| BUY | 09/23/04 | 1,799.00 | $ | 57.88 | ($104,121.98) |
| BUY | 09/28/04 | 22,879.00 | $ | 57.31 | ($1,311,298.44) |
| BUY | 10/05/04 | 73,308.00 | $ | 57.41 | ($4,208,773.56) |
| BUY | 10/19/04 | 7,951.00 | $ | 56.72 | ($450,960.84) |
| SELL | 11/16/04 | -27,880.00 | $ | 59.57 | $1,660,906.54 |
| SELL | 11/17/04 | -27,880.00 | $ | 59.82 | $1,667,689.59 |
| BUY | 12/01/04 | 5.00 | $ | 60.81 | ($304.05) |
| BUY | 12/01/04 | 692.00 | $ | 60.80 | ($42,072.56) |
| BUY | 12/02/04 | 6,983.00 | $ | 62.45 | ($436,084.16) |
| BUY | 12/14/04 | 14,310.00 | $ | 64.58 | ($924,084.00) |
| SELL | 12/21/04 | -15,271.00 | $ | 63.48 | $969,410.92 |
| SELL | 01/05/05 | -10,841.00 | $ | 62.71 | $679,837.28 |
| SELL | 01/06/05 | -13,008.00 | $ | 63.01 | $819,591.47 |
| SELL | 01/18/05 | -12,421.00 | $ | 63.88 | $793,488.23 |
| SELL | 01/19/05 | -2,916.00 | $ | 63.75 | $185,903.46 |
| SELL | 01/19/05 | -29,809.00 | $ | 63.77 | $1,900,919.97 |
| SELL | 01/20/05 | -16,954.00 | $ | 63.35 | $1,074,005.64 |
| BUY | 04/04/05 | 4,565.00 | $ | 57.16 | ($260,913.95) |
| BUY | 04/05/05 | 4,559.00 | $ | 57.65 | ($262,816.77) |
| BUY | 05/09/05 | 3.00 | $ | 59.97 | ($179.92) |
| BUY | 05/09/05 | 32,591.00 | $ | 60.07 | ($1,957,852.18) |
| BUY | 05/10/05 | 44,795.00 | $ | 60.88 | ($2,727,245.03) |
| BUY | 05/11/05 | 38,274.00 | $ | 60.88 | ($2,330,191.56) |
| BUY | 05/23/05 | 4,211.00 | $ | 61.96 | ($260,909.35) |
| BUY | 05/24/05 | 10,789.00 | $ | 62.78 | ($677,342.06) |
| BUY | 06/01/05 | 18,400.00 | $ | 63.35 | ($1,165,728.32) |
| SELL | 06/06/05 | -3,329.00 | $ | 61.47 | $204,635.38 |
| SELL | 06/07/05 | -7,763.00 | $ | 60.76 | $471,669.46 |
| SELL | 07/06/05 | -5,341.00 | $ | 63.58 | $339,579.93 |
| BUY | 08/02/05 | 9,854.00 | $ | 82.71 | ($814,980.00) |
| BUY | 08/03/05 | 23,746.00 | $ | 83.17 | ($1,975,002.32) |
| BUY | 08/08/05 | 4,926.00 | $ | 80.38 | ($395,970.60) |
| BUY | 08/08/05 | 10,788.00 | $ | 80.43 | ($867,625.98) |
| BUY | 08/09/05 | 20,625.00 | $ | 79.56 | ($1,640,832.19) |
| SELL | 08/10/05 | -3,000.00 | $ | 79.57 | $238,700.01 |
| BUY | 08/16/05 | 6,018.00 | $ | 80.40 | ($483,867.67) |

| | | | | | |
|---|---|---|---|---|---|
| BUY | 08/16/05 | 3,258.00 | $ | 80.52 | ($262,327.97) |
| BUY | 08/16/05 | 3,400.00 | $ | 80.04 | ($272,136.00) |
| BUY | 08/16/05 | 4,600.00 | $ | 80.43 | ($369,995.02) |
| BUY | 08/16/05 | 1,900.00 | $ | 80.43 | ($152,824.03) |
| BUY | 08/16/05 | 3,700.00 | $ | 80.43 | ($297,604.69) |
| BUY | 08/16/05 | 3,900.00 | $ | 80.43 | ($313,691.43) |
| BUY | 08/17/05 | 3,007.00 | $ | 79.55 | ($239,218.27) |
| BUY | 08/17/05 | 4,750.00 | $ | 79.98 | ($379,905.00) |
| BUY | 08/22/05 | 15,065.00 | $ | 78.89 | ($1,188,471.82) |
| BUY | 08/23/05 | 4,224.00 | $ | 79.02 | ($333,780.48) |
| BUY | 08/23/05 | 15,668.00 | $ | 79.17 | ($1,240,399.52) |
| BUY | 08/24/05 | 1,507.00 | $ | 78.74 | ($118,653.65) |
| BUY | 08/24/05 | 17,322.00 | $ | 79.50 | ($1,377,024.52) |
| BUY | 08/24/05 | 25.00 | $ | 78.68 | ($1,967.07) |
| BUY | 08/25/05 | 2,327.00 | $ | 79.43 | ($184,837.57) |
| BUY | 08/29/05 | 20,866.00 | $ | 79.71 | ($1,663,308.15) |
| BUY | 08/30/05 | 10,277.00 | $ | 79.83 | ($820,393.38) |
| BUY | 09/14/05 | 4,607.00 | $ | 83.13 | ($382,976.69) |
| BUY | 09/16/05 | 5,000.00 | $ | 84.84 | ($424,197.50) |
| BUY | 09/26/05 | 5,501.00 | $ | 82.54 | ($454,037.69) |
| BUY | 10/25/05 | 5,696.00 | $ | 75.74 | ($431,432.70) |
| BUY | 10/26/05 | 7,557.00 | $ | 75.73 | ($572,308.99) |
| BUY | 10/27/05 | 5,358.00 | $ | 74.43 | ($398,811.48) |
| BUY | 10/28/05 | 3,915.00 | $ | 75.18 | ($294,314.83) |
| BUY | 11/01/05 | 2,377.00 | $ | 75.10 | ($178,505.09) |
| BUY | 11/02/05 | 2,376.00 | $ | 75.17 | ($178,592.28) |
| BUY | 11/07/05 | 6,500.00 | $ | 79.90 | ($519,350.00) |
| BUY | 11/08/05 | 3,300.00 | $ | 79.80 | ($263,340.00) |
| BUY | 11/08/05 | 11,160.00 | $ | 80.43 | ($897,557.51) |
| BUY | 11/08/05 | 845.00 | $ | 80.50 | ($68,022.50) |
| SELL | 11/09/05 | -3,911.00 | $ | 80.49 | $314,800.43 |
| BUY | 11/09/05 | 1,314.00 | $ | 80.18 | ($105,354.55) |
| SELL | 11/10/05 | -3,358.00 | $ | 80.78 | $271,248.89 |
| BUY | 11/21/05 | 6,950.00 | $ | 83.71 | ($581,808.83) |
| BUY | 11/23/05 | 14,555.00 | $ | 82.98 | ($1,207,804.47) |
| BUY | 11/28/05 | 6,749.00 | $ | 81.40 | ($549,349.03) |
| SELL | 12/01/05 | -1,200.00 | $ | 81.64 | $97,968.00 |
| BUY | 12/01/05 | 11,194.00 | $ | 81.60 | ($913,419.21) |
| SELL | 01/06/06 | -13,562.00 | $ | 78.86 | $1,069,562.77 |
| SELL | 01/20/06 | -69.00 | $ | 76.99 | $5,312.36 |
| SELL | 01/20/06 | -2,078.00 | $ | 76.23 | $158,401.48 |
| SELL | 01/20/06 | -11,246.00 | $ | 77.10 | $867,050.09 |
| SELL | 02/08/06 | -5,270.00 | $ | 72.10 | $379,947.95 |
| SELL | 02/17/06 | -5,338.00 | $ | 74.46 | $397,471.81 |
| SELL | 03/17/06 | -15,300.00 | $ | 73.25 | $1,120,779.33 |
| SELL | 03/21/06 | -2,154.00 | $ | 72.15 | $155,400.93 |
| SELL | 03/28/06 | -25,174.00 | $ | 73.27 | $1,844,535.48 |
| SELL | 03/31/06 | -5,000.00 | $ | 72.75 | $363,761.83 |
| BUY | 03/31/06 | 2,000.00 | $ | 73.04 | ($146,075.00) |
| SELL | 04/10/06 | -2,826.00 | $ | 70.88 | $200,315.41 |
| SELL | 04/11/06 | -2,484.00 | $ | 70.15 | $174,252.95 |
| BUY | 04/11/06 | 800.00 | $ | 70.01 | ($56,004.00) |

81

| | | | | | |
|---|---|---|---|---|---|
| BUY | 04/12/06 | 11,175.00 | $ | 70.14 | ($783,766.45) |
| SELL | 04/17/06 | -4,496.00 | $ | 69.83 | $313,966.71 |
| SELL | 04/20/06 | -8,589.00 | $ | 68.21 | $585,863.47 |
| SELL | 04/24/06 | -19,399.00 | $ | 66.75 | $1,294,954.05 |
| BUY | 05/01/06 | 4,202.00 | $ | 67.24 | ($282,549.21) |
| SELL | 05/02/06 | -5,787.00 | $ | 65.93 | $381,564.54 |
| SELL | 05/04/06 | -12,824.00 | $ | 67.09 | $860,415.24 |
| SELL | 05/10/06 | -9,030.00 | $ | 68.12 | $615,089.35 |
| SELL | 05/12/06 | -6,583.00 | $ | 67.86 | $446,699.44 |
| SELL | 05/16/06 | -6,439.00 | $ | 69.33 | $446,418.90 |
| SELL | 05/17/06 | -2,741.00 | $ | 68.64 | $188,149.35 |
| BUY | 05/22/06 | 5,215.00 | $ | 68.11 | ($355,180.09) |
| SELL | 05/25/06 | -10,066.00 | $ | 67.82 | $682,659.17 |
| SELL | 05/30/06 | -4,857.00 | $ | 67.61 | $328,396.45 |
| SELL | 06/02/06 | -11,003.00 | $ | 68.61 | $754,938.85 |
| SELL | 06/08/06 | -5,967.00 | $ | 67.70 | $403,964.82 |
| SELL | 06/12/06 | -4,967.00 | $ | 67.58 | $335,654.08 |
| BUY | 06/15/06 | 4,600.00 | $ | 67.34 | ($309,775.04) |
| BUY | 06/15/06 | 500.00 | $ | 67.48 | ($33,737.50) |
| SELL | 06/19/06 | -3,059.00 | $ | 66.06 | $202,089.99 |
| BUY | 06/23/06 | 300.00 | $ | 65.22 | ($19,564.50) |
| SELL | 06/26/06 | -3,863.00 | $ | 64.69 | $249,892.88 |
| SELL | 06/27/06 | -1,717.00 | $ | 64.33 | $110,454.30 |
| SELL | 07/11/06 | -4,114.00 | $ | 66.67 | $274,296.63 |
| SELL | 07/12/06 | -3,358.00 | $ | 66.46 | $223,183.95 |
| BUY | 07/25/06 | 6,839.00 | $ | 67.61 | ($462,371.80) |
| BUY | 07/28/06 | 400.00 | $ | 69.12 | ($27,646.00) |
| SELL | 07/31/06 | -3,012.00 | $ | 69.73 | $210,035.37 |
| BUY | 08/09/06 | 2,453.00 | $ | 67.99 | ($166,788.30) |
| BUY | 08/22/06 | 4,092.00 | $ | 67.23 | ($275,093.29) |
| BUY | 08/23/06 | 1,300.00 | $ | 67.19 | ($87,345.18) |
| BUY | 08/29/06 | 1,200.00 | $ | 68.69 | ($82,430.64) |
| BUY | 08/30/06 | 3,587.00 | $ | 68.30 | ($244,996.40) |
| BUY | 09/05/06 | 9,206.00 | $ | 69.05 | ($635,639.32) |
| BUY | 09/06/06 | 12,263.00 | $ | 68.69 | ($842,356.51) |
| BUY | 09/18/06 | 1,660.00 | $ | 69.80 | ($115,859.70) |
| BUY | 09/19/06 | 3,070.00 | $ | 69.68 | ($213,920.37) |
| BUY | 09/21/06 | 5,496.00 | $ | 71.97 | ($395,555.91) |
| BUY | 09/25/06 | 3,113.00 | $ | 70.83 | ($220,506.55) |
| BUY | 09/28/06 | 7,454.00 | $ | 71.72 | ($534,611.32) |
| BUY | 10/03/06 | 14,797.00 | $ | 71.29 | ($1,054,833.74) |
| BUY | 10/03/06 | 8,531.00 | $ | 71.10 | ($606,580.55) |
| BUY | 10/04/06 | 10,954.00 | $ | 72.42 | ($793,274.43) |
| BUY | 10/05/06 | 10,954.00 | $ | 73.93 | ($809,800.74) |
| SELL | 10/06/06 | -1,377.00 | $ | 73.82 | $101,652.93 |
| BUY | 10/10/06 | 1,697.00 | $ | 73.61 | ($124,921.94) |
| SELL | 10/30/06 | -2,624.00 | $ | 76.27 | $200,143.39 |
| BUY | 11/08/06 | 64,774.00 | $ | 74.79 | ($4,844,395.65) |
| BUY | 11/09/06 | 11,400.00 | $ | 74.30 | ($847,014.30) |
| BUY | 11/13/06 | 9,427.00 | $ | 72.84 | ($686,706.05) |
| BUY | 11/15/06 | 512.00 | $ | 73.41 | ($37,586.48) |
| BUY | 11/15/06 | 17,306.00 | $ | 73.54 | ($1,272,607.34) |

| | | | | | |
|---|---|---|---|---|---|
| BUY | 11/16/06 | 29,598.00 | $ | 72.96 | ($2,159,538.16) |
| BUY | 11/16/06 | 1,333.00 | $ | 73.03 | ($97,348.44) |
| BUY | 11/17/06 | 26,493.00 | $ | 72.52 | ($1,921,229.97) |
| BUY | 11/20/06 | 29,480.00 | $ | 73.17 | ($2,157,157.73) |
| BUY | 11/21/06 | 23,972.00 | $ | 72.94 | ($1,748,510.49) |
| BUY | 11/21/06 | 13,086.00 | $ | 72.84 | ($953,152.83) |
| BUY | 11/27/06 | 24,192.00 | $ | 71.91 | ($1,739,608.01) |
| BUY | 11/29/06 | 7,566.00 | $ | 72.17 | ($546,025.36) |
| BUY | 12/04/06 | 13,481.00 | $ | 69.30 | ($934,194.21) |
| BUY | 12/04/06 | 16,602.00 | $ | 69.05 | ($1,146,406.29) |
| BUY | 12/05/06 | 15,259.00 | $ | 69.08 | ($1,054,105.46) |
| BUY | 12/05/06 | 500.00 | $ | 69.07 | ($34,534.35) |
| BUY | 12/06/06 | 23,783.00 | $ | 69.63 | ($1,656,076.88) |
| BUY | 12/07/06 | 19,266.00 | $ | 69.39 | ($1,336,840.77) |
| TFR- | 12/08/06 | -1,475.00 | $ | 80.43 | $118,639.71 |
| TFR- | 12/08/06 | -1,500.00 | $ | 76.99 | $115,484.96 |
| TFR- | 12/08/06 | -1,322.00 | $ | 80.43 | $106,333.35 |
| TFR+ | 12/08/06 | 1,475.00 | $ | 80.43 | ($118,639.71) |
| TFR+ | 12/08/06 | 1,500.00 | $ | 76.99 | ($115,484.96) |
| TFR+ | 12/08/06 | 1,322.00 | $ | 80.43 | ($106,333.35) |
| BUY | 12/11/06 | 8,628.00 | $ | 70.01 | ($604,074.75) |
| BUY | 12/12/06 | 18,017.00 | $ | 69.56 | ($1,253,303.96) |
| BUY | 12/13/06 | 14,007.00 | $ | 69.76 | ($977,066.69) |
| SELL | 12/14/06 | -3,647.00 | $ | 69.82 | $254,645.77 |
| BUY | 12/15/06 | 19,392.00 | $ | 70.80 | ($1,373,017.59) |
| BUY | 12/19/06 | 22,222.00 | $ | 69.90 | ($1,553,240.03) |
| BUY | 12/20/06 | 20,513.00 | $ | 69.67 | ($1,429,214.55) |
| BUY | 01/03/07 | 3,479.00 | $ | 69.32 | ($241,151.76) |
| BUY | 01/03/07 | 14,253.00 | $ | 69.13 | ($985,342.68) |
| BUY | 01/05/07 | 13,170.00 | $ | 71.59 | ($942,811.33) |
| BUY | 01/08/07 | 15,948.00 | $ | 71.22 | ($1,135,840.48) |
| BUY | 01/10/07 | 40,649.00 | $ | 70.97 | ($2,884,660.35) |
| BUY | 01/11/07 | 50,145.00 | $ | 71.73 | ($3,596,730.35) |
| BUY | 01/17/07 | 50,516.00 | $ | 73.74 | ($3,724,802.31) |
| BUY | 01/18/07 | 16,505.00 | $ | 73.87 | ($1,219,298.62) |
| SELL | 01/19/07 | -800.00 | $ | 74.18 | $59,345.69 |
| BUY | 01/29/07 | 19,778.00 | $ | 70.36 | ($1,391,653.26) |
| BUY | 01/30/07 | 11,781.00 | $ | 70.72 | ($833,174.70) |
| BUY | 02/05/07 | 20,303.00 | $ | 69.73 | ($1,415,638.86) |
| BUY | 02/15/07 | 6,183.00 | $ | 68.36 | ($422,656.90) |
| BUY | 02/16/07 | 5,267.00 | $ | 67.15 | ($353,690.11) |
| BUY | 02/20/07 | 12,884.00 | $ | 66.61 | ($858,223.85) |
| BUY | 02/21/07 | 5,327.00 | $ | 66.98 | ($356,797.67) |
| SELL | 03/01/07 | -100.00 | $ | 62.21 | $6,221.30 |
| BUY | 03/02/07 | 20,945.00 | $ | 61.95 | ($1,297,584.64) |
| SELL | 03/08/07 | -1,700.00 | $ | 61.90 | $105,223.36 |
| BUY | 03/12/07 | 11,359.00 | $ | 60.21 | ($683,959.47) |
| BUY | 03/13/07 | 1,572.00 | $ | 61.09 | ($96,040.40) |
| BUY | 03/20/07 | 17,361.00 | $ | 59.45 | ($1,032,055.89) |
| BUY | 03/21/07 | 1,794.00 | $ | 59.99 | ($107,620.45) |
| SELL | 03/27/07 | -200.00 | $ | 56.53 | $11,305.62 |
| BUY | 03/27/07 | 300.00 | $ | 56.68 | ($17,002.50) |

## PROOF OF SERVICE

STATE OF CALIFORNIA   )
COUNTY OF LOS ANGELES )

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 707 Wilshire Boulevard, Suite 4100, Los Angeles, California 90017

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached service list, as

**__X__ BY MAIL:**
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

**____ BY PERSONAL SERVICE:**
I caused such envelope to be delivered by hand to the offices of the addressee(s) noted below:

**____ BY FEDERAL EXPRESS OR OVERNIGHT COURIER**

**____ BY ELECTRONIC MAIL:**
I caused said documents to be transmitted by electronic mail to the e-mail address(es) noted below:

**____ BY TELECOPIER:**
I caused said documents to be transmitted by facsimile at the numbers listed below:

**____ (State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

**__X__ (Federal)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 1, 2007, at Los Angeles, California.

| Katherine Montenegro | |
|---|---|
| (Type of Print Name) | (Signature) |

206090.1

1

## SERVICE LIST

2

3  Marc M Seltzer
   Ryan C. Kirkpatrick
   Susman Godfrey
4  1901 Avenue of the Stars, Suite 950
   Los Angeles, CA 90067-6029
5  310-789-3102

6  Matthew P Montegomery
   Barrak Rodos & Bacine
7  402 W. Broadway, Suite 850
   San Diego, CA 92101
8  619-231-1051

9  Michael F Ghozland
   Ramzi Abadou
10 Lerach Coughlin Stoia Geller Rudman and Robbins
   9601 Wilshire Boulevard, Suite 510
11 Los Angeles, CA 90210
   310-859-3100

12
   Darren J Robbins
13 Susan G Taylor
   Lerach Coughlin Stoia Geller Rudman and Robbins
14 655 West Broadway, Suite 1900
   San Diego, CA 92101
15 619-231-1058

16 Karen Hanson Riebel
   Richard A. Lockridge
17 Lockridge Grindal Nauen
   100 Washington Avenue South, Suite 2200
18 Minneapolis, MN 55401-2159
   612-339-6900

19
   Joseph C. Kohn
20 Dennis Sheils
   Kohn Swift & Graff
21 1 South Broad Street, Suite 2100
   Philadelphia, PA 19107-2924
22 215-238-1700

23 Bruce W Leppla
   Joy A. Kruse
24 Richard M. Heimann
   Lieff Cabraser Heimann and Bernstein
25 275 Battery Street
   San Francisco, CA 94111-3339
26 415-956-1000

27

28

206090.1

1   Arthur Stock
    Barbara Podell
2   Glen Abramson
    Sherrie R. Savett
3   Berger & Montague
    1622 Locust Street
4   Philadelphia, PA 19103-6365
    215-875-3000
5
    Alan I Ellman
6   Andrei V Rado
    Barbara J Hart
7   Christopher J Keller
    Christopher J McDonald
8   Mark Arisohn
    Labaton Sucharow LLP
9   140 Broadway
    New York, New York 10005
10  212-907-0700

11  Mark I Labaton
    Kreindler & Kreindler LLP
12  707 Wilshire Boulevard, Suite 4100
    Los Angeles, CA 90017
13  213-622-6469

14  Jeff S Westerman
    Sabrina S Kim
15  Milberg Weiss and Bershad
    One California Plaza
16  300 South Grand Avenue, Suite 3900
    Los Angeles, CA 90071
17  213-617-1200

18  Christopher Kim
    Lisa. J. Yang
19  Nicolas Orihuela
    Lim Ruger & Kim
20  1055 W 7th St, Ste 2800
    Los Angeles, CA 90017
21  213-955-9500

22  Timothy J Burke
    Stull Stull and Brody
23  10940 Wilshire Boulevard, Suite 2300
    Los Angeles, CA 90024
24  310-209-2468

25  John Nadolenco
    Mack Anderson
26  Steven O. Kramer
    Mayer Brown Rowe and Maw
27  350 South Grand Avenue, 25th Floor
    Los Angeles, CA 90071-1503
28  213-229-9500

206090.1

1  Michael M Goldberg
   Robert W Kellerman
2  Glancy Binkow and Goldberg
   1801 Avenue of the Stars, Suite 311
3  Los Angeles, CA 90067
   310-201-9150
4
5  D Seamus Kaskela
   Richard A Maiskas
6  Schiffrin Barroway Topaz and Kessler
   280 King of Prussia Road
7  Radnor, PA 19087
   610-667-7706
8  Evan J Smith
   Steven S. Wang
9  Brodsky and Smith
   9595 Wilshire Boulevard, Suite 900
10 Beverly Hills, CA 90212
   310-300-8425
11
   Frederic S Fox
12 Jeffrey P. Campisi
   Joel B. Strauss
13 Kaplan Fox and Kilsheimer
   805 3rd Avenue, 22nd Floor
14 New York, NY 10022
   212-687-1980
15
   Joe Tabacco
16 Nicole Lavallee
   Berman DeValerio Pease Tabacco Burt & Pucillo
17 425 California Street, Suite 2025
   San Francisco, CA 94104-2205
18 415-433-3200
19 Lori S Brody
   Kaplan Fox and Kilsheimer
20 1801 Century Park East, Suite 1460
   Los Angeles, CA 90067
21 310-785-0800
22 Lee A Webb
   Robert W. Kellerman
23 Stoll Keenon Ogden
   500 West Jefferson Street Suite 2000
24 Louisville, KY 40202
   502-333-6000
25
26
27
28

206090.1