Gretchen M. Nelson (#112566)
KREINDLER & KREINDLER LLP
707 Wilshire Boulevard
Los Angeles, California 90017
Telephone: (213) 622-6469
Facsimile: (213) 622-6019
Email: gnelson@kreindler.com
*Local Counsel for Lead Plaintiff*
*Connecticut Retirement Plans And Trust Funds*

Jonathan M. Plasse (*admitted pro hac vice*)
Christopher J. McDonald (*admitted pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cmcdonald@labaton.com
*Attorneys for Lead Plaintiff*
*Connecticut Retirement Plans And Trust Funds and*
*Lead Counsel for the Putative Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| IN RE AMGEN INC. SECURITIES LITIGATION | Case No. CV 07-2536 PSG (PLAx) |
| | Honorable Philip S. Gutierrez |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| | Date:          June 15, 2009<br>Time:          1:30 p.m.<br>Courtroom:  790 - Roybal |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

TABLE OF TERMS AND ABBREVIATIONS ....................................................v

I.    INTRODUCTION ......................................................................................1

II.   SUBSTANTIVE BACKGROUND...........................................................2

III.  PROCEDURAL BACKGROUND ...........................................................8

IV.  THE STANDARDS ON A CLASS CERTIFICATION MOTION.................8

V.   ARGUMENT ...........................................................................................10

    A.  The Prerequisites Of Rule 23(a) Have Been Satisfied .............................10

        1.  Numerosity Has Been Satisfied.......................................................10

        2.  Commonality Has Been Satisfied.....................................................10

        3.  Typicality Has Been Satisfied ..........................................................11

        4.  Adequacy Has Been Satisfied ..........................................................12

    B.  The Requirements Of Rule 23(b)(3) Have Been Satisfied........................14

        1.  Common Questions of Law or Fact Predominate over Questions Affecting Only Individual Class Members ......................14

        2.  A Class Action Is the Superior Method of Adjudicating the Claims Asserted Here ..................................................................19

    C.  Loss Causation Is Not A Class Certification Issue And Should Not Be Considered By The Court At This Procedural Juncture........................................................................................................21

VI.  CONCLUSION.........................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................24

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ..............................................................14, 19

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ..........................................................18

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ...........................................................11

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ...............................................................*passim*

*Binder v. Gillespie*,
   184 F.3d 1059 (9th Cir. 1999) ......................................................16, 17

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) .........................................................*passim*

*Chamberlan v. Ford Motor Co.*,
   223 F.R.D. 524 (N.D. Cal. 2004) ......................................................20

*In re Cooper Cos. Inc. Sec. Litig.*,
   2009 WL 32568 (C.D. Cal. Jan. 5, 2009) ..........................................*passim*

*In re Credit Suisse-AOL Sec. Litig.*,
   253 F.R.D. 17 (D. Mass. 2008) ........................................................24

*In re Daou Sys. Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .........................................................14

*Darquea v. Jarden Corp.*,
   No: 06 Civ. 722 (CLB) (Consolidated) 2008 U.S. Dist. LEXIS
   17747 (S.D.N.Y. Mar. 6, 2008) ........................................................24

*Dukes v. Wal-Mart, Inc.*,
   509 F.3d 1168 (9th Cir. 2007) .......................................................9, 18

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................14, 23, 24

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ..................................................................9

*Epstein v. MCA, Inc.*,
   50 F.3d 644 (9th Cir. 1995), *rev'd on other grounds sub nom.*,
   *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996)..........................20

*In re First Capital Holdings Fin. Prods. Sec. Litig.,*
   No. MDL 901, 1993 WL 144861 (C.D. Cal. Feb. 26, 1993) .......................... 14

*Freedman v. Louisiana-Pac. Corp.,*
   922 F. Supp. 377 (D. Or. 1996.) ................................................................... 19

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ...................................................................... 12

*Huberman v. Tag-It Pacific Inc.,*
   2009 WL 485053 (9th Cir. Feb. 11, 2009) ............................................... 16, 22

*La. Mun. Police Employees Ret. Sys. v. Dunphy,*
   No. 03-CV-4372 (DMC), 2008 WL 700181 (D.N.J. Mar. 13, 2008) .............. 24

*Lapin v. Goldman Sachs & Co.,*
   No. 04 Civ. 2236 (RJS), 2008 WL 4222850
   (S.D.N.Y. Sept. 15, 2008) .............................................................................. 24

*In re LDK Solar Sec. Litig.,*
   No. C 07-05182 (WHA), 2009 WL 196369
   (N.D. Cal. Jan. 28, 2009) ........................................................................*passim*

*In re Micron Tech., Inc. Sec. Litig.,*
   247 F.R.D. 627 (D. Idaho 2007) ........................................................... 1, 23, 24

*In re Nature's Sunshine Prods. Inc. Sec. Litig.,*
   251 F.R.D. 656 (D. Utah 2008) ..................................................................... 24

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*
   *v. Am. West Holding Corp.,*
   320 F.3d 920 (9th Cir. 2003) .................................................................... 15, 19

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,*
   487 F.3d 261 (5th Cir. 2007) .................................................................*passim*

*Ross v. Abercrombie & Fitch Co.,*
   No. 2:05-CV-0819, 2:05-CV-0489, 2:05-CV- 0913,
   2:05-CV-1084, 2:05-CV-0998, 2:05-CV-0964, 2:05-CV-0959,
   2:05-CV-0860, 2:05-CV-0879, 2:05-CV-0893, 2008 WL 4059873
   (S.D. Ohio Aug. 26, 2008) ............................................................................ 24

*Schaefer v. Overland Express Family of Funds,*
   169 F.R.D. 124 (S.D. Cal. 1996) .................................................................. 11

*In re Seagate Tech. II Sec. Litig.,*
   843 F. Supp. 1341 (N.D. Cal. 1994) .............................................................. 19

*Stanton v. Boeing Co.,*
   327 F.3d 938 (9th Cir. 2003) ....................................................................... 12

*In re Unioil Sec. Litig.,*
   107 F.R.D. 615 (C.D. Cal. 1985) ............................................................. 10, 12

*Wagner v. Barrick Gold Corp.*,
 251 F.R.D. 112 (S.D.N.Y. 2008) ........................................................ 24

## STATUTES

Fed. R. Civ. P. 23(a)(1) ........................................................ 10, 12

Fed. R. Civ. P. 23 ........................................................ 9

Fed. R. Civ. P. 23(a) ........................................................ 1

Fed. R. Civ. P. 23(g) ........................................................ *passim*

Fed. R. Civ. P. 23(b)(3) ........................................................ 13, 25

## TABLE OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| Amgen | Amgen, Inc. |
| Aranesp | Aranesp® (darbepoetin alfa) |
| BEST | The Breast Cancer Erythropoietin Survival Trial |
| Class | all persons who purchased the securities of Amgen during the period from April 22, 2004 through May 10, 2007, inclusive |
| Class Period | April 22, 2004 through May 10, 2007, inclusive |
| Complaint | Consolidated Amended Class Action Complaint for Violation of Federal Securities Laws dated October 1, 2007 |
| CW | Confidential Witness |
| DAHANCA | Danish Head and Neck Cancer Group |
| DAHANCA 10 Trial | Study of the importance of Novel Erythropoiesis Stimulating Protein (Aranesp®) for the effect of radiotherapy in patients with primary squamous cell carcinoma of the head and neck |
| Defendants | the Individual Defendants together with Amgen |
| ENHANCE | clinical trial also referred to in the Complaint as the "Henke" trial |
| Epogen | Epogen® (epoetin alfa) |
| ESA | Erythropoiesis Stimulating Agent |
| FDA | United States Food and Drug Administration |
| Individual Defendants | Kevin W. Sharer, Richard D. Nanula, Dennis M. Fenton, Roger M. Perlmutter<br>[The Complaint lists additional Individual Defendants not included here.  Claims against the other Individual Defendants were dismissed.  *See* Dkt. No. 137] |
| Morrow | Defendant George J. Morrow |

| ODAC | Food and Drug Administration Oncologic Drugs Advisory Committee |
|---|---|
| Perlmutter | Defendant Roger M. Perlmutter |
| Plaintiff | Lead Plaintiff Connecticut Retirement Plans and Trust Funds |
| PSLRA | Private Securities Litigation Reform Act |
| SEC | United States Securities and Exchange Commission |
| Sharer | Defendant Kevin W. Sharer |

1    Lead Plaintiff Connecticut Retirement Plans and Trust Funds hereby submits

2  this memorandum in support of its motion for class certification.

3  **I.    INTRODUCTION**

4    With this motion, Plaintiff seeks to certify the Class defined in the

5  Complaint (at ¶ 193) pursuant to Federal Rules of Civil Procedure 23(a) and

6  (b)(3).[1]  As discussed below, the four "prerequisites" of Rule 23(a), namely

7  numerosity, commonality, typicality and adequacy, have been satisfied.  Likewise,

8  the requirements of Rule 23(b)(3) have been met because questions common to

9  members of the Class "predominate over any questions affecting only individual

10 members," and proceeding as a class action "is superior to other available methods

11 for fairly and efficiently adjudicating the controversy."

12    Unfortunately, we must also address an issue that, to be candid, has no

13 business being discussed at the class certification stage.  Based on a widely

14 criticized Fifth Circuit decision, Defendants intend to argue that Plaintiff must

15 prove loss causation before the Class can be certified.[2]  As discussed further below,

16 loss causation is a merits issue that has no bearing on any Rule 23 requirement this

17 Court must decide now.  Indeed, the loss causation element of Plaintiff's securities

18 fraud claim *supports* certification because it is a question of law common to all

19 members of the Class under Rule 23(a)(1).  This Court should decline to follow the

20 Fifth Circuit, certify the Class and appoint Plaintiff as its representative.

21 _____

22   [1]   "Complaint" refers to Plaintiff's Consolidated Amended Class Action
   Complaint For Violation of Federal Securities Laws, dated October 1, 2007.
23 References herein to paragraphs in the Complaint are denoted as follows: "¶ _."
   For the Court's convenience, a Table of Terms and Abbreviations from the
24 Complaint that are used herein follows the Table of Authorities.

25   [2]   The case is *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d
   261 (5th Cir. 2007).  Two courts in this Circuit have expressly rejected its holding
26 that a securities fraud plaintiff must prove loss causation at the class certification
   stage.  *In re LDK Solar Sec. Litig.*, No. C 07-05182 (WHA) 2009 WL 196369
27 (N.D. Cal. Jan. 28, 2009.); *In re Micron Tech., Inc. Sec. Litig.*, 247 F.R.D. 627 (D.
   Idaho 2007).  Other decisions rejecting *Oscar* are discussed in Section V.C., *infra*.

28

## II.   SUBSTANTIVE BACKGROUND

The Complaint's substantive allegations, which this Court "must take . . . as true" in its Rule 23 analysis,[3] have been discussed at length in Plaintiff's opposition to Defendants' motion to dismiss and the Court's Order rejecting that motion in part.  (Dkt. Nos. 110, 137.)  Accordingly, we will only provide an overview of the allegations here, although in doing so we will also refer to facts not in the Complaint because the Court "may also consider extrinsic evidence."[4]

Aranesp and Epogen are in a class of drugs known as erythropepoietin-stimulating agents, or ESAs.  ESAs stimulate the production of red blood cells, which contain hemoglobin – a protein that transports oxygen from the lungs to the tissues of the body.  ¶ 7, 33, 35.  ESAs have been approved by the Food and Drug Administration to elevate or maintain red blood cell levels in certain patient populations with anemia for the limited purpose of reducing the need for transfusions in these patients.  *See* ¶¶ 34, 37-40; Declaration of Christopher J. McDonald in Support of Class Certification (the "McDonald Declaration"),[5] Exhibit 1 at 157:16-18 ("the intended and licensed indication [] is avoidance of blood transfusion"); Exhibit 2 at 12:6-12 ("The ESAs are indicated to decrease the number of patients who receive red-cell transfusions.").

Amgen's ESA "franchise" has been critical to its rise to preeminence as the world's largest biotechnology company; by 2006, Aranesp and Epogen generated roughly half of Amgen's $14.3 billion in annual revenue.  ¶ 43.

Amgen and the Individual Defendants are alleged to have violated the federal securities laws by knowingly or recklessly making materially false and

---

[3]   *In re Cooper Cos. Inc. Sec. Litig.*, 2009 WL 32568, (C.D. Cal. Jan. 5, 2009) (citing *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975)).

[4]   *Id.*

[5]   References herein to exhibits annexed to the McDonald Declaration are denoted as follows: "Exhibit _."

misleading statements and omissions concerning Aranesp and Epogen during a roughly three-year Class Period spanning from April 22, 2004 to May 10, 2007. These statements and omissions had the effect of artificially inflating the price of Amgen's common stock.  A series of corrective disclosures leading to and at the end of the Class Period disclosed the falsity and misleading nature of Defendants' prior representations and counteracted the artificial inflation of Amgen's stock price.

As detailed in the Complaint, many of Defendants' misrepresentations and omissions related to the events and clinical trials involving the safety of Amgen's ESAs, including: (i) a May 2004 meeting of an FDA "Advisory Committee" that Defendant Morrow described as a non-event even though the meeting was convened to address a troubling lack of safety data with Amgen's ESAs (¶¶ 58, 61, 76), (ii) a clinical trial involving Aranesp known as DAHANCA 10, the results of which Defendants failed to disclose despite knowing the trial had been terminated early because the trial showed increased tumor growth and a trend toward shorter survival rates in head and neck cancer patients who were taking Aranesp compared to patients on placebo (¶¶ 64-65 and Exhibit 3), and (iii) a clinical trial known as the 103 Study, the results of which Defendants tried to spin as being "neutral and perhaps negative" when in fact patients receiving Aranesp did not reduce their need for transfusions, but did show significantly shorter survival times compared to patients whose anemia was treated with transfusion support (¶¶ 5, 70, 71). Defendants also made a series of false and misleading statements during the Class Period concerning the safety of Amgen's ESAs when used "on-label" (*i.e.*, when used to avoid transfusions in patient populations for which the FDA has approved ESA use up to certain specified hemoglobin levels).

Events surrounding two meetings of the FDA's Oncologic Drugs Advisory Committee, or ODAC, essentially bookend the Class Period.  In the weeks prior to an ODAC meeting in May 2004, Defendant George Morrow, Amgen's EVP of

Global Commercial Operations, uttered the first statements alleged in the Complaint to be actionably false and misleading.  On an April 22, 2004 earnings call, Morrow responded to a question about the 2004 ODAC Meeting by assuring analysts that "the focus [of the meeting] was not on Aranesp…," that there was "no [safety] signal associated with Aranesp," and that "the safety for Aranesp has been comparable to placebo."  ¶¶59, 136.

In fact, the 2004 ODAC Meeting had been convened specifically for the purpose of assessing the safety of Amgen's ESAs.  In 2003 and 2004, two European clinical trials, known as ENHANCE and BEST, had raised red flags as to the safety of drugs in the ESA class.  ENHANCE documented increased tumor progression and lower survival rates in head and neck cancer patients being administered an ESA compared with patients administered a placebo; BEST was terminated early – after only four months – because of increased mortality and detrimental effects on tumor outcomes in breast cancer patients administered an ESA compared with patients administered a placebo.  ¶¶ 55, 56, 60, 77; Exhibit 4 at 14.

The ESA patients in BEST and ENHANCE received doses designed to boost hemoglobin to levels higher than approved for ESAs marketed in the United States. The failed DAHANCA 10 Trial, which was terminated during the Class Period, also dosed patients to higher target hemoglobin levels than what the FDA had approved for U.S. patients.  ¶ 51, 64, 65.[6]  These trials later prompted the FDA to assess what was and *was not* known about the safety of ESAs:

_____

[6]       DAHANCA 10 is also significant because it shows that Defendants will not let the truth get in the way of saying whatever is expedient at the time.  At the 2004 ODAC Meeting, an FDA official framed the key question that needed to be answered: "whether or not at the approved dose and for the intended and licensed indication, which is the avoidance of blood transfusions, whether or not [ESAs] are safe?"  Exhibit 1 at 157:16-19.  Knowing that the *on-label* safety of ESAs was at issue, Amgen unveiled a "Pharmacovigilance Program" that it described as "a

*(continued)*

1   While the risks of treatment strategies in which ESAs are used to

2   achieve and maintain hemoglobin levels in excess of that needed to

3   avoid transfusions have been clearly demonstrated to be unacceptable,

4   there are insufficient data from adequate and well-controlled studies

5   designed to assess effects on survival or tumor promotion employing

6   the *recommended* doses of ESAs.

7   Exhibit 4 (emphasis in original).  The FDA's statement appears in a "Briefing

8   Document" it prepared in anticipation of the May 10, 2007 ODAC meeting that

9   marks the end of the Class Period.  In the above-quoted passage, the clause *after*

10  the comma was undoubtedly true on the date of the 2007 ODAC Meeting.  But it

11  was also true days earlier, when an Amgen executive stated that Aranesp and

12

13  *(continued)*

14  responsible and credible approach to definitively resolving the questions raise[d] in
    this morning's meeting."  *Id.* at 65:7-9.  DAHANCA 10 was one of the clinical
15  trials in the Pharmacovigilance Program.

16  Fast forward to February 16, 2007.  An article in *The Cancer Letter* disclosed
17  the DAHANCA 10 failure (and Amgen's failure to inform the market).  *See*
    Exhibit 3.  Amgen immediately began damage control, convening a conference call
18  with analysts that same day.  *See* Exhibit 5.  Did Defendants acknowledge that they
19  now had a partial (and extremely negative) answer to the on-label safety question?
    Not even close.  Instead, Defendants Sharer and Perlmutter were quick to point out
20  that it was "a head and neck cancer trial," *i.e.*, an off-label population, that patients
    were dosed using an "amount of Aranesp [that was] substantially more than the
21  label," and that Amgen was "trying to explore a use of the drug that is oxygenating
22  the tumor that is not on label"  In other words, DAHANCA 10 "was an off-label
    exploration."  *Id.* at 2, 12, 11.  In a complete about-face from the position Amgen
23  took at the 2004 ODAC Meeting, both Sharer and Perlmutter also stressed that the
24  DAHANCA 10 results had no connection whatsoever to the safety of Amgen's
    ESAs when used on-label.  *See id.* at 2 ("We strongly believe, as we have
25  consistently stated, that Aranesp and Epogen are safe and effective medicines
26  when used in accordance with label indications."); *id.* at 3 ("So to sum up, all
    existing data support the safe use of Aranesp to treat chemotherapy-induced
27  anemia when administered according to the label instructions.").

28

Epogen had "a solid benefit-risk profile when these products are used on-label" (¶ 148), and weeks earlier, when Defendant Sharer stated that "on label our drugs are certainly safe" (¶ 147), and months earlier, when Amgen issued a statement that Aranesp and Epogen "have favorable risk/benefit profiles" (¶ 146), and the prior year, when Amgen issued a press release stating that Aranesp and Epogen "are effective and safe medicines when administered according to the Food and Drug Administration (FDA) label" (¶ 140).[7]

Indeed, "there [were] insufficient data from adequate and well-controlled studies designed to assess effects on survival or tumor promotion employing the *recommended* doses of ESAs" at the commencement of the Class Period in April of 2004, when Defendant Morrow stated that "the safety of Aranesp has been comparable to placebo" (¶ 59). Yet Defendants repeatedly stressed that on-label safety of Aranesp and Epogen was simply not in question, while knowing or recklessly disregarding the fact that their statements simply were not true.

Defendants' artificial inflation of Amgen's stock price was not limited to material misrepresentations and omissions in which discussion of on-label "safety" is explicit. For instance, Defendants touted ESA sales figures and boasted of the strong potential for future growth with statements unencumbered by any mention of the lurking on-label safety concerns.[8] Defendants also repeated in multiple filings with the SEC during the Class Period that "[we . . . ] market or co-market our products for their approved indications." ¶ 83; *see also* ¶¶ 77, 103, 157, 158, 160-62. In fact, Amgen's marketing of its ESAs was financially rather than medically driven. *See, e.g.*, ¶ 97- 99, 102, 113, 119; Exhibit 6 at 87:6-23; 208:19-209:24 ("spreadsheets" and "calculators" were "given to us by the marketing department and the financial experts in the company on how to promote the

---

[7]   *See also* ¶¶ 70, 75, 79, 136, 139, 140-43.
[8]   *See* ¶¶ 77, 151-154, 165-176.

1  product – how to show physicians a spread, a profitability, between Aranesp and

2  Procrit and making a direct comparison, which was against guidelines by Medicare

3  and Medicaid"; Amgen employees were "pressured to use" the calculator tool in a

4  manner that was "improper").[9]

5       Defendants' material misrepresentations and omissions concerning sales,

6  growth and marketing similarly had the effect of inflating Amgen's common stock

7  price in that they affirmatively created an impression that Amgen was conforming

8  to legitimate and sustainable business activities, a state of affairs that differed in a

9  material way from that which actually existed.  The corrective disclosures leading

10  to and at the 2007 ODAC Meeting disclosed the falsity and misleading nature of

11  Defendants' prior representations and reduced Defendants' ability to claim that

12  continued growth was likely or to create the impression that Amgen's historical

13  sales and marketing practices were based on legitimate and sustainable business

14

15

16       [9]  As the Court knows (*see* Joint Rule 26(f) Report (Dkt. # 160 ) at III.B.), one

17  of the confidential witnesses who supplied information to Plaintiff in connection
with its investigation relating to Amgen's marketing practices did not oppose
having his name disclosed to Defendants.  That witness, CW#1 in the Complaint,

18  is a former Amgen district sales manager based in Florida named Diego Naranjo.

19  Defendants deposed Mr. Naranjo on January 16, 2009.  At his deposition, Mr.
Naranjo confirmed that practices identified in the Complaint by confidential

20  witnesses in other parts of the Country were taking place in the Southeast region.

21  *See*, *e.g.*, Exhibit 6 at 87:6-23 *and compare with* ¶ 101(confidential witnesses from
Texas, New Jersey and Pennsylvania describing "spreadsheets and other tools to

22  enable sales representatives to discuss the economics of Amgen drugs" with
clients, and "detailed documentation that allowed them to calculate the 'margin

23  and spread'"); Exhibit 6 at 208:19-209:24 *and compare with* ¶ 96 ("Amgen's
management applied immense pressure down the chain of command to district

24  managers, such as [confidential witness from Pennsylvania], and sales

25  representatives to meet ever increasing sales quotas, essentially forcing the sales
force to encourage the inappropriate administration of Epogen or Aranesp in order

26  to meet their sales goals."); Exhibit 6 at 123:12-13 *and compare with* ¶ 87

27  (confidential witness from Texas stating that Amgen provided "color-coded
spreadsheets" and other materials so that sales personnel "were prepared to discuss

28  any off-label topic.").

1   activities, and counteracted the artificial inflation of Amgen's stock price.  ¶¶ 202-
2   207.

3   **III.     PROCEDURAL BACKGROUND**

4            The first complaint in this consolidated action was filed on April 17, 2007,
5   after several partial corrective disclosures.  (Dkt. No. 1.)  Plaintiff first appeared on
6   June 18, 2007, when it filed its lead plaintiff motion.  (Dkt. No. 28.)  By Order
7   dated July 31, 2007 (the "Lead Plaintiff Order"), this Court appointed Plaintiff as
8   lead plaintiff and Plaintiff's counsel, Labaton Sucharow LLP, as lead counsel.
9   (Dkt. No. 82.)  Plaintiff filed the Complaint on October 1, 2007.  (Dkt. No. 109.)
10  Defendants' motion to dismiss was granted in part and denied in part on February
11  1, 2008.  (Dkt. No. 137.)  Pursuant to the Stipulation re Discovery and Motion
12  Schedule (Dkt. No. 172), the parties have engaged in written discovery and the
13  production of documents.  Defendants have also issued multiple subpoenas to
14  investment managers identified in Plaintiff's discovery responses and taken three
15  depositions to date.

16  **IV.     THE STANDARDS ON A CLASS CERTIFICATION MOTION**

17           A party seeking class certification must first establish the four
18  "prerequisites" of Rule 23(a):

19           (1) the class is so numerous that joinder of all members is
20           impracticable; (2) there are questions of law or fact common to the
21           class; (3) the claims or defenses of the representative parties are
22           typical of the claims or defenses of the class; and (4) the
23           representative parties will fairly and adequately protect the interests of
24           the class.

25           The party seeking class certification must then satisfy one of the categories
26  in Rule 23(b).  Plaintiff moves pursuant to Rule 23(b)(3), which requires that "the
27  questions of law or fact common to class members predominate over any questions
28  affecting only individual members, and that a class action is superior to other

1    available methods for fairly and efficiently adjudicating the controversy."  The

2    Rule itself lists four "matters pertinent to these findings," namely:

3         (A) the class members' interests in individually controlling the prosecution

4         or defense of separate actions; (B) the extent and nature of any litigation

5         concerning the controversy already begun by or against class members; (C)

6         the desirability or undesirability of concentrating the litigation of the claims

7         in the particular forum; and (D) the likely difficulties in managing a class

8         action.

9         In determining whether a class should be certified, the question is not

10   whether plaintiffs will prevail on the merits, but whether the requirements of

11   Federal Rule of Civil Procedure 23 have been met.  *See Eisen v. Carlisle &*

12   *Jacquelin*, 417 U.S. 156, 178 (1974) ("We find nothing in either the language or

13   history of Rule 23 that gives a court any authority to conduct a preliminary inquiry

14   into the merits of a suit in order to determine whether it may be maintained as a

15   class action."); *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1177 (9th Cir. 2007)

16   (objections not related to Rule 23 requirements, but to ultimate merits of the case,

17   should properly be addressed by a jury considering the merits rather than a judge

18   considering class certification).  While district courts "must consider evidence

19   which goes to the requirements of Rule 23 at the class certification stage even if

20   the evidence may also relate to the underlying merits of the case" (*id.* at 1178 n.2),

21   considering evidence that may speak to the merits of a case "does not mean that a

22   district court should mistake class action certification for summary judgment."

23   *Cooper,* 2009 WL 32568, *1 n.7.

24        Finally, "it is well recognized that Rule 23 is to be liberally construed in a

25   securities fraud context because class actions are particularly effective in serving as

26   private policing weapons against corporate wrongdoing."  *Blackie v. Barrack*, 524

27   F.2d 891, 902 (9th Cir. 1975).

28

## V.    ARGUMENT

### A.    The Prerequisites Of Rule 23(a) Have Been Satisfied

#### 1.    Numerosity Has Been Satisfied

The Class satisfies the numerosity prerequisite because joinder of its "thousands of members" is "impracticable." ¶ 194; Fed. R. Civ. P. 23(a)(1).  *See also* Exhibit 7 (Declaration of Scott D. Hakala, Ph.D., CFA Regarding Market Efficiency, at IV.7 (identifying over 1,000 institutional investors holding Amgen shares throughout Class Period)).  In the securities litigation context, courts have found numerosity satisfied where "several million" shares of stock were purchased during the class period.  *In re Unioil Sec. Litig.*, 107 F.R.D. 615, 618 (C.D. Cal. 1985); *see also In re Cooper*, 2009 WL 32568, *3 (court may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year).  A plaintiff need not state the exact number of class members when the plaintiff's allegations "plainly suffice" to meet the numerosity requirement.  *Id.* (citation omitted).

Believing numerosity to be fairly non-controversial here, Plaintiff sought to determine whether Defendants would contest it.  *See* Exhibit 8.  Defendants have indicated that they "do not anticipate contesting numerosity at the class certification stage."  Exhibit 9.  It is thus clear that the Class satisfies the numerosity prerequisite of Rule 23(a)(1).

#### 2.    Commonality Has Been Satisfied

There are several issues of law or fact common to the Class that "form the core of a case for securities fraud."  *Cooper*, 2009 WL 32568, at *4.  These include whether Defendants' statements and omissions were false and misleading, whether they were material, whether Defendants acted with scienter, and whether members of the Class have sustained damages and the proper measure of damages.  *See also* ¶ 197; Lead Plaintiff Order at 3 ("Here, there is no doubt that common questions of law or fact exist between the related actions.").

1    If Class members chose to pursue individual actions, "all class members

2    would still have to prove these questions."  *In re Cooper,* 2009 WL 32568, *4

3    (commonality requirement satisfied where plaintiffs, *inter alia*, alleged that

4    defendants violated the Securities and Exchange Act and that the price of Cooper's

5    publicly traded securities was artificially inflated).  *See Blackie* 524 F.2d 891, 903

6    (finding commonality satisfied: "Confronted with a class of purchasers allegedly

7    defrauded over a period of time by similar misrepresentations, courts have taken

8    the common sense approach that the class is united by a common interest in

9    determining whether a defendant's course of conduct is in its broad outlines

10   actionable, which is not defeated by slight differences in class members' positions,

11   and that the issue may profitably be tried in one suit."); *Schaefer v. Overland*

12   *Express Family of Funds*, 169 F.R.D. 124, 128 (S.D. Cal. 1996) (proposed class

13   satisfied commonality requirement when all potential class members had "the same

14   basic legal claims (securities fraud) based on the same nucleus of operative

15   facts.").

16   In light of the foregoing, the commonality prerequisite of Rule 23(a)(2) is

17   satisfied.

18   **3.   Typicality Has Been Satisfied**

19   Rule 23(a)(3) requires that "the claims and defenses of the representative

20   parties are typical of the claims and defenses of the class."  The Ninth Circuit does

21   not require that the named plaintiffs' injuries be "identical with those of the other

22   class members, [but] only that the unnamed class members have injuries similar to

23   those of the named plaintiffs and that the injuries result from the same injurious

24   course of conduct."  *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001).

25   Plaintiff's claims and injuries are typical of and co-extensive with the claims

26   and injuries of other class members.  All Class members purchased Amgen shares

27   during the Class Period and are alleged to have suffered losses as a result of

28   Defendants' wrongdoing.  "Under [Rule 23's] permissive standards, representative

claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998); *see also* Lead Plaintiff Order at 7 ("Connecticut Retirement further appears to satisfy the requirement[] under FRCP 23 of typicality"; "Connecticut Retirement claims are substantially identical with those of the absent class members").  Plaintiff "bought [Amgen] stock and sold it for investment purposes, subject to the same information and representations as the market at large." *In re Cooper,* 2009 WL 32568, *5.  This Court, therefore, should find that the typicality requirement is satisfied.

### 4.    Adequacy Has Been Satisfied

Rule 23(a)(4)'s adequacy requirement entails two inquiries: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class.  *See Hanlon*, 150 F.3d at 1020; *Stanton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  In the securities class action context, district courts in the Ninth Circuit have formulated the issue of adequacy as determining whether the "representative party's attorney [would] be qualified" and whether "the named plaintiffs' interests [would] not be antagonistic to the remainder of the class." *In re Cooper,* 2009 WL 32568, *6 (citing *Schaefer*, 169 F.R.D. at 130.)  *See also Unioil*, 107 F.R.D. at 622 (citations omitted) ("Although a court may consider potential conflicts of interest, the Ninth Circuit has observed that courts generally decline to consider conflicts at the outset, unless the conflict is apparent and at the very heart of the suit.").

With respect to Plaintiff's counsel, the Court has already held that "Connecticut Retirement satisfies the adequacy of representation requirement of FRCP 23.  Connecticut Retirement's chosen counsel has considerable experience in the prosecution of class actions and federal securities law claims."  Lead

1   Plaintiff Order at 7.  *See also* McDonald Declaration ¶ 3 & Exhibits 17 and 18

2   (concerning adequacy and the factors the Court "must consider" per Rule 23(g)).

3       Likewise, the Court has previously noted that "Connecticut Retirement's

4   interests are aligned with the other class members because it seeks to recover funds

5   for purchases of Amgen stock during the Class Period.  Connecticut Retirement

6   has also signed a sworn statement affirming its willingness to serve as, and to

7   assume responsibilities of, class representative." *Id.*[10]

8       The General Counsel of the Office of the Treasurer of the State of

9   Connecticut (the Treasurer is the sole fiduciary of the Connecticut Retirement

10  Plans and Trust Funds) has sat for a two-day deposition in this action.  *See* Exhibit

11  12; *id.* at 14:17-18.  The testimony elicited at that deposition confirms that

12  Plaintiff: is actively monitoring and participating in the action; has adequate (and,

13  indeed, statutorily imposed) safeguards in place for the preservation of evidence,

14  and; is knowledgeable about the issues.  *See id.* at 57:13-58:9; 62:20-63:25;

15  287:15-288:24; 39:8-20; 70:23-71:9; 71:21-72:17; 200:24-201:5; 210:7-211:14;

16  213:12-214:2; 218:4-16.[11]  In light of the foregoing and Plaintiff's substantial

17  holdings in Amgen stock (*see* Lead Plaintiff Order at 6-7), Plaintiff has the

18  necessary motivation to "pursue this suit with vigor." *In re Cooper,* 2009 WL

19  32568, at *6 (finding that pension fund plaintiffs were adequate class

20  representatives).  Accordingly, the Court should find that Plaintiff and its counsel

21  satisfy the adequacy requirement.

22

23      [10]   For the Court's convenience, the Certification cited by the Court in support
24  of its holding in the Lead Plaintiff Order is being resubmitted herewith, as is the
    Amended Certification attached to the Complaint.  *See* Exhibits 10 and 11.

25      [11]   It is also worth noting that Plaintiff, a public pension fund concerned with
26  corporate governance (*see*, *e.g.*, Exhibit 12 at 182:19-25; 195:25-196:6; 196:21-25-
    197:12) as well as corporate fraud, has been found to be an adequate
27  representative for certified classes in prior securities fraud actions.  *See* Exhibits 13
    (litigation class) and 14 (settlement class).
28

**B.**   **The Requirements Of Rule 23(b)(3) Have Been Satisfied**

  **1.**   **Common Questions of Law or Fact Predominate over Questions Affecting Only Individual Class Members**

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Supreme Court and the Ninth Circuit have recognized that the predominance inquiry is easily met in securities class actions. *See id.* at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *In re First Capital Holdings Fin. Prods. Sec. Litig.*, No. MDL 901, 1993 WL 144861, at *6 (C.D. Cal. Feb. 26, 1993) ("The Ninth Circuit has repeatedly found that common issues predominate in federal securities actions where the proposed class members have all been injured by the same alleged course of conduct.") (citing cases). This action easily satisfies the predominance test.

Although the allegations in the Complaint "sound in fraud," Plaintiff's claims are not based on a common law fraud but on violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, and Rule 10b-5, promulgated thereunder. ¶¶ 208-222. While reliance is a necessary element of a common law fraud claim, violations of Section 10(b) and Rule 10b-5 require a plaintiff to prove the more technically named element "transaction causation"[12] (although as a practical matter courts and commentators use the terms transaction causation and reliance interchangeably). The reliance element in common law fraud can make such claims poor candidates for class treatment; whether each

---

[12]   The remaining elements required to establish a federal securities fraud claim are: a material misrepresentation or omission of fact; scienter; a connection with the purchase or sale of a security; loss causation; and economic loss (damages). *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)).

1  would-be class member heard and detrimentally relied on a defendant's misleading
2  statement could require, depending on the circumstances, individualized inquiries
3  that counsel against finding that "questions of law or fact common to class
4  members predominate over any questions affecting only individual members" for
5  purposes of a Rule 23(b) inquiry.

6  However, in the context of a securities fraud action, the Supreme Court in
7  the seminal case of *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988), established a
8  mechanism by which reliance need not be proven by each individual class member
9  but may instead be presumed for the class as a whole. As the Court noted, "[t]he
10  modern securities markets, literally involving millions of shares changing hands
11  daily, differ from the face-to-face transactions contemplated by early fraud cases,
12  and our understanding of Rule 10b-5's reliance requirement must encompass these
13  differences." *Id.* at 243-244.

14  Whether reliance may be presumed in a securities fraud class action turns on
15  whether the market in which the securities trade is "efficient." The logic that
16  allows reliance to be presumed is that "in a modern and efficient securities market,
17  the market price of a stock incorporates all available public information.
18  Therefore, any person who trades shares relies on the integrity of the market
19  price." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West
20  Holding Corp.*, 320 F.3d 920, 947 (9th Cir. 2003) (citations omitted).

21  The practical effect, and what distinguishes securities fraud actions from
22  common law fraud claims, is that purchasers who never heard or saw ***any*** false
23  statements about a company can still claim to have relied on them because, through
24  the operation of the "efficient market," the false information inflated the price that
25  ***all*** market participants paid for the company's stock. As succinctly stated in
26  *Blackie*:

27  The culpability of each defendant's conduct is to be measured against the
28  statutorily imposed duty not to manipulate the market. Differences in

1   sophistication, etc., among purchasers have no bearing in the impersonal

2   market fraud context, because dissemination of false information necessarily

3   translates through market mechanisms into price inflation which harms each

4   purchaser identically.

5   524 F.2d at 905.

6        The aptly named fraud-on-the-market doctrine thus requires a securities

7   fraud class action plaintiff to prove market efficiency (and other requirements

8   discussed below), which then triggers application of the presumption of reliance,

9   which, in turn, neutralizes concerns over whether allegations of "fraud" will derail

10   a finding that common issues predominate under a Rule 23(b)(3) analysis.  *See*

11   *Huberman v. Tag-It Pac. Inc.*, 2009 WL 485053 (9th Cir. Feb. 11, 2009) ("Here,

12   where Tag-It was traded on a national exchange and the stock prices reflected

13   public information an efficient market is present.  Therefore, the fraud-on-the-

14   market presumption applies, eliminating the need for individual reliance by each

15   class member.")

16        There are several factors that may be analyzed to determine whether an

17   efficient market exists, including: (1) whether the stock trades at high weekly

18   volume; (2) whether securities analysts follow and report on the stock; (3) whether

19   the stock has market makers and arbitrageurs; (4) whether the company is eligible

20   to file a Form S-3 registration statement with the SEC; and (5) whether there are

21   empirical facts showing a cause and effect relationship between unexpected

22   corporate events or financial releases and an immediate response in the stock price.

23   *See Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) (internal citation

24   omitted); *see also In re LDK Solar Sec. Litig.*, No. C 07-05182 (WHA), 2009 WL

25   196396 at *6.  At least one court in this district has found two indicators of an

26   efficient market (whether the stock was widely traded on a national exchange, and

27   whether it was covered by financial analysts) sufficient to support a fraud on the

28   market pleading.  *In re Cooper,* 2009 WL 32568, *8.

1    Plaintiffs alleged in the Complaint that "the market for Amgen securities

2    was and efficient market" for a number of reasons.  Defendants admitted to these

3    allegations.  *See* Complaint ¶ 199 and Defendants' Answer and Affirmative

4    Defenses (Dkt. No. 149) at ¶ 199.  *See also* Exhibits 8 and 9.

5    Plaintiff has also established the factors supporting the determination that

6    the market for Amgen securities is efficient through the report of its expert, Scott

7    D. Hakala, Ph.D., CFA.  Exhibit 7.  Based on the analyses described in his report

8    (specifically including analyses of the factors identified in *Binder*), Dr. Hakala

9    "found strong evidence for the level of market efficiency required for class

10   certification [and] found no evidence of an undeveloped or inefficient market with

11   respect to the trading of the common shares of Amgen.  *Id.* at III.5.

12   For the fraud-on-the-market presumption to apply, "a plaintiff must also

13   allege that the defendant made material, public misrepresentations that would

14   induce a reasonable, relying investor to misjudge the value of the shares, and that

15   the plaintiff traded the shares between the time the misrepresentations were made

16   and the time the truth was revealed."  *Basic*, 485 U.S. at 248 (1988).  Plaintiff has

17   satisfied these additional requirements.  *See* ¶¶ 12, 128-177 (discussing material,

18   public misrepresentations and omissions in press releases, SEC filings, analyst

19   calls), 209; Lead Plaintiff Order at 7.  *See also Cooper*, 2009 WL 32568, *9

20   (statements made "…in analyst calls are certainly public and material to valuation

21   of a company….").

22   While *Basic* also holds that the fraud-on-the-market presumption can be

23   rebutted if "the link between the alleged misrepresentation and either the price

24   received (or paid) by the plaintiff" is severed (485 U.S. at 248), "[n]ot every rumor

25   or hint or partial disclosure of fraud immediately rebuts the fraud-on-the-market

26   presumption."  *LDK Solar Sec. Litig.*, No. C 07-05182 (WHA), 2009 WL 196396

27   at *8.  Put another way, not all information is provided equal weight:

28

> The investing public justifiably places heavy reliance on the statements and
> opinions of corporate insiders. In order to avoid Rule 10b-5 liability, any
> material information which insiders fail to disclose must be transmitted to
> the public with a degree of intensity and credibility sufficient to effectively
> counter-balance any misleading impression created by the insiders' one-
> sided representations.

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).  *See also
LDK Solar*, No. C-07-05182 (WHA), 2009 WL 196396, at *8 ("If some tentative
or partial disclosure of fraud is published but the truth is not fully revealed, there
would be no reason to assume that the market *fully* recovered from the impact of
misrepresentation or omission. Investors who purchased after such a disclosure
may well have done so at a price still inflated by the same fraud (even if less so)
and may suffer losses when the *full* details of the fraud are exposed."); Exhibit 7 at
III.5.d. & n.2.

Moreover, at the class certification stage it is "inappropriate for a district
court to delve into whether the statements at issue could have actually misinformed
the market and changed the valuation of a security."  *In re Cooper,* 2009 WL
32568, *9, citing *Basic*, 408 U.S. 249 n. 29.  In other words, "[p]roof of that sort is
a matter for trial, throughout which the district court retains the authority to amend
the certification order as may be appropriate."  *Basic*, 408 U.S. 249 n.29 (emphasis
added).  *See also Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1176 (9th Cir. 2007)
(holding that Rule 23 provides district courts with "broad discretion" to determine
whether a class should be certified and then to later revisit that certification if
"later evidence disproves Plaintiffs' contentions that common issues predominate
..."); *Cooper,* 2009 WL 32568, *11 (rejecting defendants' argument that
disclosures and statements made prior to a merger nullified alleged
misrepresentations made on a later date by the defendants in the merger
announcement:  "Contrary to Defendants' assertion, the Court is not obligated to

1    discern the meaning and impact of specific, possibly corrective, statements at this

2    stage of the case….").

3          Based on all of the foregoing, Amgen common stock was traded in "a

4    modern and efficient securities market." *No. 84 Employer-Teamster Joint Council*

5    *Pension Trust Fund*, 320 F.3d 920, 947 (9th Cir. 2003). Accordingly, the Court

6    should find that Plaintiff has successfully invoked the fraud-on-the-market doctrine

7    and triggered the presumption of reliance. Pursuant to Rule 23(b), the Court

8    should further find that common issues predominate.

9          **2.    A Class Action Is the Superior Method of Adjudicating the**

10                **Claims Asserted Here**

11         Rule 23(b)(3) also requires that a class action be superior to other methods

12   for fairly and efficiently adjudicating the controversy. Where, as here, plaintiffs

13   seek "a determination on essentially the same issues," courts have consistently

14   found "the class action device to [be the] superior method of adjudicating

15   securities fraud claims." *Freedman v. Louisiana-Pacific Corp.* 922 F. Supp. 377,

16   400 (D. Or. 1996) (citations omitted); *In re Seagate Tech. II Sec. Litig.*, 843

17   F. Supp. 1341, 1350 (N.D. Cal. 1994) ("The use of the class action device has long

18   been the favored approach of courts faced with a Rule 10b-5 action in which

19   numerous traders have allegedly been injured.").

20         Not only would separate and possibly scattered actions be needlessly

21   repetitive and inefficient in the absence of class certification, but most if not all

22   Class members would be discouraged from even seeking relief because their

23   potential recovery would be outweighed by the costs of pursuing litigation. *See*

24   *Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action

25   mechanism is to overcome the problem that small recoveries do not provide the

26   incentive for any individual to bring a solo action prosecuting his or her rights.");

27   *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 527 (N.D. Cal. 2004) ("Here, few

28   potential class members could afford to undertake individual litigation against Ford

to recover the relatively modest damages at issue.  Therefore, in the absence of a class action, few class members would have any meaningful redress against Ford as a practical matter.")  For similar reasons, individual members of the Class have little interest in controlling the litigation.  Rule 23(b)(3)(A) therefore counsels in favor of certification.

Rule 23(b)(3)(B) and (C) instruct that courts consider whether other litigation has been brought against Defendants by Class members and whether concentrating the litigation in the Central District of California is desirable.  Both factors likewise counsel in favor of superiority.  The similar actions on file have already been consolidated by this Court and Amgen resides in this district.  *See* Lead Plaintiff Order at 3-4; ¶ 13.

Finally, Plaintiff submits that per Rule 23(b)(3)(B), there are no management or administration issues that would cause difficulties going forward or at trial.  "Indeed, it is difficult to imagine a case where class certification would be more appropriate.  Without it, thousands of identical complaints by [former MCA] shareholders would have to be filed—the very result the class action mechanism was designed to avoid."  *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995), *rev'd on other grounds sub nom., Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996).  *See also Cooper*, 2009 WL 32568, *13, n.8 ( "for those class members whose alleged losses are not significant enough to spur them to seek relief individually, a class action provides an opportunity to find redress without footing the crippling costs of litigation"); ¶ 198.

For all the foregoing reasons, proceeding by the class action mechanism is clearly superior to any other method to secure the just, speedy, and inexpensive determination of Class members' claims.

**C.**     **Loss Causation Is Not A Class Certification Issue And Should Not Be Considered By The Court At This Procedural Juncture**

Defendants have made clear their intent to make a "loss causation" argument that relies on *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), in opposing Plaintiff's class certification motion.  *See* Exhibit 15. Defendants also made clear their intent to rely on analyst reports and perhaps other "publicly available" documents in support of their loss causation argument.  *See* Exhibit 16.  Given the page limitations for reply briefs, Plaintiff will briefly address Defendants' anticipated argument here.[13]

The holding in *Oscar*, a split decision, is perhaps best summarized by the dissent:

> In this appeal from the district court's order granting class action certification, the majority departs drastically from the Supreme Court's decision in *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), which held that securities class action plaintiffs are entitled to a rebuttable presumption of reliance, or transaction causation, if the plaintiffs traded in the stock at issue

---

[13]     Given the unexpectedly large volume of "loss causation" documents Defendants produced, Plaintiff will limit this anticipatory challenge to exposing the core legal flaw in *Oscar*.  *Compare* Exhibit 16 (total number of documents anticipated to be "three or four binders worth") *with* McDonald Declaration ¶ 4 (Defendants produced four 5-inch binders of documents – 142 documents in total – on January 15, 2009; six days later, Defendants produced a DVD with *over 2,000 additional documents* (512 MB of data)).  From this massive pool of "publicly available" materials, Defendants apparently intend to select and submit a subset in furtherance of whatever "loss causation" arguments they intend to make.  Which begs the question: if Defendants intend to argue, per *Oscar*, that Plaintiff has failed to "prove" loss causation, why would any extraneous materials be necessary?  No matter how Defendants actually intend to use their "loss causation" documents in opposing this motion, Plaintiff will address Defendants' arguments and evidence in its reply.  (Plaintiff also recognizes that its reply may or may not be the end of the briefing on this motion, and that the agreement brokered between the parties (as reflected in Exhibit 16) is in no way binding on this Court.)

1   during the proposed class period in reliance on the integrity of the

2   price set by an open and efficient market. The majority instead holds

3   that plaintiffs are entitled to *Basic* 's presumption of reliance only if

4   they also prove loss causation, that is, if they prove by a

5   preponderance of all admissible evidence that the defendants' alleged

6   misrepresentations were the proximate cause of the plaintiffs'

7   economic loss.  The majority's decision is, in effect, a breathtaking

8   revision of securities class action procedure that eviscerates *Basic* 's

9   fraud-on-the-market presumption, creates a split from other circuits by

10  requiring mini-trials on the merits of cases at the class certification

11  stage, and effectively overrules legitimately binding circuit

12  precedents.

13  *Oscar*, 487 F.3d at 272 (Dennis, J., dissenting).  Indeed, the Ninth Circuit

14  effectively rejected the "logic" of *Oscar* just last month in *Huberman*.  The

15  plaintiff was not required to establish loss causation *at any point prior to trial*.

16  Loss causation was not required *at all* at class certification, and on summary

17  judgment, the Court construed loss causation evidence *in plaintiff's favor*, finding

18  that genuine issues of material fact existed.  2009 WL 485053, at * 2, 3.

19      *Oscar*'s drastic departure from Supreme Court precedent has been explicitly

20  considered and rejected by courts in this Circuit and across the Country.  Most

21  recently, Judge Alsup in the Northern District of California had occasion to

22  consider a defense opposition to class certification that relied on Oscar:

23      The breadth of the *Oscar* holding is striking.  It essentially injects

24      what is fundamentally a merits inquiry into the class-certification

25      inquiry through the back door: it requires the *plaintiff* to *prove* loss

26      causation in order to avail itself of the benefit of the fraud-on-the-

27      market presumption (without which certification is virtually

28      impossible).

1        This order declines to adopt *Oscar's* loss-causation requirement for

2    class-certification.  *Oscar* placed the Fifth Circuit in a minority --

3    indeed, apparently solitary -- stance among the circuits; it is in no

4    small amount of tension with the Supreme Court's decision in *Basic v.*

5    *Levinson*; and although the Ninth Circuit has yet to address the issue

6    specifically in the context of class certification, this circuit's precedent

7    strongly suggests it would reject such a rule.

8    *In re LDK Solar Sec. Litig.*, 2009 No. C 07-05182 (WHA), 2009 WL 196369 (Jan.

9    28, 2009, N.D. Cal.) *(emphasis in original)*.  In *In re Micron Tech., Inc. Sec. Litig.*,

10   247 F.R.D. 627, 632 (D. Idaho 2007), the defendant cited *Oscar* for the proposition

11   that "at the class certification stage, plaintiffs must prove that it is more probable

12   than not that the corrective disclosure--the revealing of the secret--made a

13   significant contribution to a price decline."  *Id*. (internal quotes omitted).  Relying

14   on the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336

15   (2005), the *Micron* court rejected this argument:

16       *Dura* does not list loss causation as a necessary predicate to

17   application of the fraud-on-the market doctrine.  Instead, *Dura* lists

18   reliance and loss causation as separate elements, subject to separate

19   proof.  Loss causation, then, is an issue related to the merits rather

20   than to the Rule 23 inquiry into whether common issues will

21   predominate.  Accordingly, the Court's rigorous analysis cannot

22   extend to the loss causation issue at this stage of the proceedings.

23   247 F.R.D. 627, at *5.  *See also Cooper*, 2009 WL 32568, *11 (C.D. Cal. 2009)

24   ("If Defendants can show, as a matter of law, that certain proposed class members'

25   losses were not caused by misstatements, ***then they should do so at summary***

26   ***judgment or trial***") (emphasis added), citing *Micron Tech.*, 247 F.R.D. at 634.

27       Courts outside the Ninth Circuit have also had occasion to consider and

28   reject *Oscar.  See, e.g., In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 30 at n.

16 (D. Mass. 2008); *In re Nature's Sunshine Prods. Inc. Sec. Litig.*, 251 F.R.D. 656, 665 (D. Utah 2008); *Lapin v. Goldman Sachs & Co.*, No. 04 Civ. 2236 (RJS), 2008 WL 4222850, at *14 (S.D.N.Y.  Sept. 15, 2008); *Ross v. Abercrombie & Fitch Co.*, No. 2:05-CV-0819, 2:05-CV-0489, 2:05-CV- 0913, 2:05-CV-1084, 2:05-CV-0998, 2:05-CV-0964, 2:05-CV-0959, 2:05-CV-0860, 2:05-CV-0879, 2:05-CV-0893, 2008 WL 4059873, at *3 (S.D. Ohio Aug. 26, 2008) ("No other Court of Appeals, and no district court outside the Fifth Circuit, appears to have followed *Oscar*."); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) ("Defendants have not established how Loss Causation is related to any necessary element of Rule 23"); *La. Mun. Police Employees Ret. Sys. v. Dunphy*, No. 03-CV-4372 (DMC), 2008 WL 700181, at *7 (D.N.J. Mar. 13, 2008); *Darquea v. Jarden Corp.*, No. 06 Civ. 722 (CLB) (Consolidated) 2008 U.S. Dist. LEXIS 17747, at *11 (S.D.N.Y. Mar. 6, 2008); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118 (S.D.N.Y. 2008).

This loud and growing chorus of opposition to *Oscar* is not surprising. What *Oscar* does is essentially pencil in a fifth prerequisite under Rule 23(a), applicable only to securities class action plaintiffs, on an issue that bears not at all on the criteria necessary to establish certification, *except to support it*.  As explained in *Dura*, loss causation is "a causal connection between the material misrepresentation and the loss."  544 U.S. at 342.  Each Class member mush show it.  Loss causation is therefore a common question of law that counsels in favor of finding that the commonality prerequisite of Rule 23(a) has been satisfied.

Loss causation is a merits issue to be resolved at a later stage in this action. The *Oscar* case was wrongly decided and this Court should not follow it.

## VI.   CONCLUSION

For the foregoing reasons, Lead Plaintiff Connecticut Retirement Plans and Trust Funds respectfully requests that this Court: (i) certify this action to proceed as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure; (ii) appoint Connecticut Retirement Plans and Trust Funds to serve as class representative; (iii) appoint Labaton Sucharow LLP as Class Counsel pursuant to Rule 23(g), and Kreindler & Kreindler LLP as Local Counsel on behalf of Lead Plaintiff and the Class; and (iv) grant such other and further relief as the Court deems just and proper.

Dated:  March 4, 2009

Respectfully submitted,


By:   /s/ Gretchen M. Nelson
Gretchen M. Nelson (#112566)
**KREINDLER & KREINDLER LLP**
707 Wilshire Boulevard
Los Angeles, California  90017
Telephone:  (213) 622-6469
Facsimile:  (213) 622-6019
*Local Counsel  for Lead Plaintiff Connecticut Retirement Plans and Trust Funds*

**LABATON SUCHAROW LLP**
Jonathan M. Plasse (*admitted pro hac vice*)
Christopher J. McDonald (*admitted pro hac vice*)
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
*Attorneys for Lead Plaintiff Connecticut Retirement Plans and Trust Funds and Lead Counsel for the Putative Class*