1  MAYER BROWN LLP
   STEVEN O. KRAMER (SBN 079626)
2    *skramer@mayerbrown.com*
   JOHN NADOLENCO (SBN 181128)
3    *jnadolenco@mayerbrown.com*
   MELISSA PASTRANA (SBN 254307)
4    *mpastrana@mayerbrown.com*
   350 South Grand Avenue, 25th Floor
5  Los Angeles, CA  90071-1503
   Telephone:   (213) 229-9500
6  Facsimile:    (213) 625-0248

7
   Attorneys for Defendants
8  AMGEN INC., KEVIN W. SHARER,
   RICHARD D. NANULA, ROGER M.
9  PERLMUTTER and GEORGE J. MORROW

10

11              **UNITED STATES DISTRICT COURT**

12             **CENTRAL DISTRICT OF CALIFORNIA**

13                    **WESTERN DIVISION**

14

15                                  CASE NO. CV 07-2536 PSG (PLAx)

16  IN RE AMGEN INC.               **MEMORANDUM OF POINTS AND**
    SECURITIES LITIGATION          **AUTHORITIES IN OPPOSITION TO LEAD**
17                                 **PLAINTIFF'S MOTION FOR CLASS**
                                   **CERTIFICATION**
18
                                   [Filed concurrently with Request for Judicial
19                                 Notice; Supporting Declarations of Steven Kramer
                                   and Sean E. Harper; Evidentiary Objections and
20                                 Request to Strike; and Declarations of Steven
                                   Kramer and Scott Rhode in Support of Evidentiary
21                                 Objections]

22                                 DATE:      June 15, 2009
                                   TIME:      1:30 p.m.
23                                 PLACE:   790 – Roybal

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND ............................................................................................. 3

III.   PLAINTIFF HAS NOT MET ITS HEAVY BURDEN UNDER RULE 23 ................. 10

       A.    There is no basis for the proposed class period. ................................... 11

             1.    There is no basis to begin the class period on April 22, 2004. ............... 12

             2.    There is no basis to use any post-DAHANCA corrective event to
                   end the class period. ....................................................................... 15

                   a.    May 10, 2007:  the ODAC vote ......................................... 15

                   b.    March 9, 2007:  Announcement of a "Boxed" Warning ............... 18

                   c.    February 28, 2007:  SEC Informal Inquiry ............................ 20

       B.    Plaintiff Cannot Establish Reliance. ............................................... 20

             1.    The fraud-on-the-market presumption applies only where there is a
                   basis to presume the market was misled. ............................................ 21

             2.    The fraud-on-the-market presumption does not apply before
                   December 1, 2006 or after February 16, 2007. ..................................... 25

             3.    The fraud-on-the-market presumption does not apply to the
                   DAHANCA period (December 1, 2006 to February 16, 2007). .............. 26

       C.    Plaintiff cannot satisfy the adequacy requirement. ............................... 29

IV.    CONCLUSION .............................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009) ........................................................................ 12, 18

*In re Alliance Pharm. Corp. Sec. Litig.*,
279 F. Supp. 2d 171 (S.D.N.Y. 2003) .............................................................. 28

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) .......................................................................................... 29

*Anspach v. City of Philadelphia*,
503 F.3d 256 (1st Cir. 2007) ............................................................................ 15

*In re Avista Corp. Sec. Litig.*,
415 F. Supp. 2d 1214 (E.D. Wash. 2005) ........................................................ 20

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .................................................................................... passim

*Bishop v. Petro-Chem. Transport, LLC*,
582 F.Supp.2d 1290 (E.D. Cal. 2008) .............................................................. 11

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ...................................................................... 11, 30

*In re Broadcom Sec. Litig.*,
2005 WL 1403756 (C.D. Cal. 2005) ................................................................ 22

*Broadsky v. YahooA Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) ........................................................... 12

*Brody v. Transitional Hospitals Corp.*,
280 F.3d 997 (9th Cir. 2002) ........................................................................... 27

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .......................................................................................... 16

*In re Clearly Canadian Sec. Litig.*,
875 F. Supp. 1410 (N.D. Cal. 1995) ................................................................ 12

*In re Convergent Technologies Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ...................................................................... 14, 15

*In re Cooper Companies Inc. Sec. Litig.*,
2009 WL 32568 (C.D. Cal. 2009) .................................................................... 25

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978) .......................................................................................... 10

# TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*In re Data Access Sys. Sec. Litig.*,
  103 F.R.D. 130 (D.N.J. 1984)................................................................ 12, 18

*Dukes v. Wal-Mart*,
  509 F.3d 1168 (9th Cir. 2007) ............................................................... 10, 11

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................ 24

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)................................................................................ 10

*Fener v. Belo Corp.*,
  2008 WL 876967 (N.D. Tex. 2008)........................................................ 22

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) ................................................................. 10

*General Telephone Co. of Southwest v. Falcon*,
  457 U.S. 147 (1982)................................................................................ 10

*In re Hansen Natural Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................. 20

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
  189 F.3d 971 (9th Cir. 1999) ................................................................. 28

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ................................................................. 28

*Huberman v. Tag-It Pac. Inc.*,
  2009 WL 485053 (9th Cir. 2009) ........................................................... 24

*In re Initial Public Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)..................................................................... 10, 11

*Larson v. Dumke*,
  900 F.3d 1363 (9th Cir. 1989) ............................................................... 29

*In re LDK Solar Sec. Litig.*,
  2009 WL 196369 (N.D. Cal. 2009) ........................................................ 25

*Longman v. Food Lion Inc.*,
  197 F.3d 675 (4th Cir. 1999) ................................................................. 18, 29

*In re LTV Sec. Litig.*,
  88 F.R.D. 134 (N.D. Tex. 1980) ............................................................ 12, 18

*In re Merck & Co. Sec. Litig*,
  432 F.3d 261 (3d Cir. 2005).................................................................... 18, 29

-iii-

28800783

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*In re Micron Technologies, Inc. Sec. Litig.*,
  247 F.R.D. 627 (D. Idaho 2007) ...................................................................... 24

*Mulford v. Altria Group, Inc.*,
  242 F.R.D. 615 (D.N.M. 2007) ........................................................................ 10

*NASD Dispute Resolution, Inc. v. Judicial Council of State of Cal.*,
  488 F.3d 1065 (9th Cir. 2007) ......................................................................... 24

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ........................................................................... 22

*In re Omnicom Group, Inc. Sec. Litig.*,
  541 F.Supp.2d 546 (S.D.N.Y. 2008) ................................................... 18, 22, 29

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ...................................................................... 15, 27

*In re ORFA Sec. Litig.*,
  654 F.Supp. 1449 (D.N.J. 1987) ............................................................... 12, 18

*Oscar Private Equity Investments v. Allegiance Telecom, Inc.*,
  487 F.3d 261 (5th Cir. 2007) .................................................................23, 25, 26

*Pandes v. Scios Nova, Inc.*,
  1996 WL 539711 (N.D. Cal. 1996) ................................................................. 28

*Piel v. Nat'l Semiconductor Corp.*,
  86 F.R.D. 357 (E.D. Pa. 1980) ........................................................................ 12

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ......................................................................... 28

*Raab v. Gen. Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) .............................................................................. 15

*Reiter v. Sonotone*,
  442 U.S. 330 (1979) ........................................................................................ 11

*In re Ribozyme Pharm., Inc. Sec. Litig.*,
  205 F.R.D. 572 (D. Colo. 2001) ...................................................................... 12

*In re Seagate Technologies II Sec. Litig.*,
  843 F. Supp. 1341 (N.D. Cal. 1994) .......................................................... 29, 30

*Siracusano v. Matrixx Initiatives, Inc.*,
  2005 WL 3970117 (D. Ariz. 2005) ............................................................ 27, 28

*In re Sofamor Danek Corp.*,
  123 F.3d 394 (6th Cir. 1997) .......................................................................... 15

28800783

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Stevelman v. Alias Research, Inc.,*
 2000 WL 888385 (D. Conn. 2000) ................................................................. 12

*Szabo v. Bridgeport Machines, Inc.,*
 249 F.3d 672 (7th Cir. 2001) ......................................................................... 11

*Teachers' Ret. Sys. of Louisiana v. Hunter,*
 477 F.3d 162 (4th Cir. 2007) .................................................................. 18, 29

*TSC Indus., Inc. v. Northway, Inc.,*
 426 U.S. 438 (1988) ....................................................................................... 27

*In re Vantive Corp. Sec. Litig.,*
 283 F.3d 1079 (9th Cir. 2002) ....................................................................... 12

*In re Verizon Sec. Litig.,*
 11 F.3d 865 (9th Cir. 1993) ........................................................................... 15

*In re Xcelera.com Sec. Litig.,*
 No. 00-11649-RWZ (D. Mass. 2008) ............................................................ 22


**STATUTES**

United States Code, title 15
 § 78u-5(c) ....................................................................................................... 15

United States Code, title 42
 § 262(a)(2)(C)(i)(I) .......................................................................................... 4


**RULES**

Federal Rules of Civil Procedure
 Rule 23 ................................................................................................... passim

Ninth Circuit Rule 36-3 ......................................................................................... 24


**REGULATIONS**

69 Federal Register 61, 1658283 ..................................................................... 5, 13

72 Federal Register 63, 15887 ............................................................................. 16

Code of Federal Regulations, title 17
 § 240.10b-5 (SEC Rule 10b-5) ................................................................. 20, 24

Code of Federal Regulations, title 21
 § 601.25(d)(1) ................................................................................................... 4

28800783

1

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

**OTHER AUTHORITIES**

1 McLaughlin on Class Actions § 4:3 ......................................................................... 12

CV 03-9407 CAS (MCX)

28800783

## I.   **INTRODUCTION**

Driven solely by the prospect of creating an enormous and specious damage claim, Lead Plaintiff seeks to certify a class period spanning more than three years, far longer than the 14-month period criticized by the Ninth Circuit Court of Appeals as "unusually long."  To rationalize this lengthy class period, Plaintiff relies on its own unfounded allegations that Defendants misled the market by concealing and misrepresenting safety information about Amgen's two erythropoeisis-stimulating agents ("ESAs"), Aranesp® and Epogen®.  But class certification requires a rigorous analysis, and Plaintiff has the burden to show, with evidence, that the class period is justifiable and that Rule 23 is satisfied.  Here, the proposed class period is wholly arbitrary, and Plaintiff is not entitled to invoke the fraud-on-the-market presumption, leaving the predominance requirement unsatisfied.  Public information demonstrates that the proposed class period is not tied to any alleged omission or misrepresentation (or any correction or disclosure).  The market closely followed the results of clinical studies and meetings of the FDA 2004 Oncologic Drugs Advisory Committee ("ODAC"), made its own evaluation of how FDA decisions might affect Amgen's sales of ESAs, and then reacted when regulators and others made decisions with respect to ESA labels and reimbursement.  Although the market reacted to events as they occurred, it was never misled by Defendants and, as a result, Plaintiff cannot identify any actionable statement to begin the class period or any supposed corrective disclosure to end it.

Plaintiff proposes to start the class period on April 22, 2004, based on its erroneous interpretation of a statement by Defendant George Morrow during an earnings call about the upcoming 2004 ODAC meeting.  But the evidence shows that the market did not share Plaintiff's misinterpretation.  Analysts were fully aware of everything that transpired at the 2004 ODAC meeting and knew that any safety concerns raised at the meeting could have an impact on Amgen's sales.  Because the market was not misled, there is no basis to start any class period on April 22, 2004.

Plaintiff's reliance on the May 10, 2007 ODAC meeting to end the class period is equally misplaced.  Plaintiff contends that Amgen's alleged off-label marketing practices

28800783

"came to light" on that date, and that ODAC's recommendation to add more restrictions to the use of Aranesp® and Epogen® somehow revealed safety issues that had previously been hidden.  But the extensive public record preceding the 2007 ODAC meeting belies this claim.  For months, there had been an ongoing public dialogue about the safety of ESAs, including Aranesp® and Epogen®, for both on and off-label use.  In January, Amgen disclosed that a study of Aranesp® to treat anemia of cancer (an off-label use) had yielded negative results, and that there was a possibility that the FDA would require a boxed warning for certain of Amgen's products.  Shortly thereafter, the *United States Pharmacopeia* "de-listed" Aranesp® for off-label use, and the Center for Medicare and Medicaid Services issued its National Coverage Analysis and sought extensive public comment on whether to limit reimbursement for certain off-label uses.  These events were reported by the press, including the New York Times and Associated Press, and known to the market, which fully understood the possible impact on Amgen's sales.

When the ODAC convened in May 2007, there was no discussion of any information that previously had been "concealed."  Contrary to Plaintiff's characterization, the ODAC did not even discuss off-label marketing—as opposed to off-label use—and no new information about Amgen's prior sales practices was revealed.  Nor was any new safety information disclosed.  Analyst reports issued before the meeting show the market understood that the ODAC might make recommendations, based on pre-existing public safety information, that could affect future sales of ESAs.  In fact, the ODAC's recommendations caused Amgen's market price to fall, not the revelation of any information that had previously been concealed by Defendants.  Such a market reaction is neither unusual nor actionable, and it cannot serve to end any class period.

For the same reason, neither the March 9, 2007 announcement that the FDA would require a "boxed" warning, nor Amgen's February 28, 2007 announcement that the SEC had initiated an informal inquiry (which has since been closed without a recommendation for action), disclosed any previously concealed information or corrected any prior misstatement.  Rather, each was a decision or reaction, by a third-party, to information that had been publicly

-2-

28800783

1  available for some time.  Such events cannot provide a basis for imposing damages under the

2  securities laws, and cannot end any class period.

3       Certification should also be denied because Plaintiff has not shown that it is entitled to

4  invoke the fraud-on-the-market presumption of reliance.  The fraud-on-the-market theory

5  assumes that in an efficient market, all available information is reflected in the market price of

6  a security, and any material misstatement or omission artificially inflates that price.  With the

7  benefit of this presumption, reliance on the integrity of the market substitutes for reliance on

8  the alleged misrepresentation or omission, making it possible for the Court to presume that the

9  entire class relied.  It is well-settled, however, that there can be no class if the fraud-on-the-

10 market presumption does not apply, because then the plaintiff  must prove reliance on behalf of

11 each and every class member, which destroys the predominance required under Rule 23(b)(3).

12      Plaintiff claims that it has met its burden to show that the fraud-on-the-market

13 presumption applies simply by demonstrating that the market for Amgen securities was

14 efficient.  But that is not nearly enough.  Here, all of the information and studies regarding

15 ESAs, including Aranesp® and Epogen®, were public.  As the Supreme Court explained in

16 *Basic Inc. v. Levinson*, the fraud-on-the-market presumption does not apply if the "'market

17 makers' were privy to the truth."  Moreover, Plaintiff has not and cannot demonstrate that the

18 market was misled and that the price of Amgen's stock was artificially inflated.  The events

19 Plaintiff relies on to establish loss causation were actions or decisions by third-parties, based on

20 their analyses of publicly available information, and not any correction of past misstatements

21 or disclosure of previously concealed information.  Plaintiff cannot show a connection between

22 any alleged misrepresentation or omission by any Defendant and a drop in the price of

23 Amgen's securities, because no such connection exists.  Without this connection, there is no

24 basis to invoke the fraud-on-the-market presumption, predominance fails, and certification is

25 improper.

26 **II.**   **BACKGROUND**

27      Amgen manufactures human therapeutics, including ESAs marketed and sold under the

28 trade names Aranesp® and Epogen®.  ESAs stimulate the production of red blood cells, and

-3-

28800783

1   thus reduce the need for transfusions in anemia patients.  To secure FDA approval, Amgen

2   demonstrated to the FDA that Aranesp® and Epogen® are "safe, pure and potent" when used

3   as labeled.  42 U.S.C. § 262(a)(2)(C)(i)(I).  Amgen also had to show, *inter alia*, "proof of

4   safety" in the form of data from "adequate tests by methods reasonably applicable to show the

5   biological product is safe under the prescribed conditions of use, including results of significant

6   human experience during use."  21 C.F.R. § 601.25(d)(1).  In 1989, the FDA approved

7   Epogen® for the treatment of anemic patients with chronic kidney failure and, subsequently,

8   for cancer patients who developed anemia from chemotherapy.  Aranesp® was approved for

9   the treatment of anemic patients with chronic kidney failure in 2001.

10       In 2002, the Journal of the National Cancer Institute published the results of a double-

11   blind, placebo-controlled randomized phase III study of Aranesp® in lung cancer patients

12   receiving chemotherapy (the "297 Study").[1]  The goal of the 297 Study was to determine

13   whether Aranesp® decreased the need for transfusions in these patients.[2]  Based on their

14   observations that "[p]atients receiving [Aranesp®] required fewer transfusions," and "did not

15   appear to have any untoward effect in disease outcome" the researchers concluded that

16   "[p]atients with chemotherapy-associated anemia can be safely and effectively treated with

17   weekly darbepoetin alfa therapy [Aranesp®]."[3]  That same year, Aranesp® was approved for

18   treatment of chemotherapy-induced-anemia.  For both Aranesp® and Epogen®, the labels

19   approved by the FDA advised that, to avoid possible adverse events, patients should receive

20   doses designed to achieve a hemoglobin level of no greater than 12 grams per deciliter (12

21   g/dL).

22

23   [1]  Vansteenkiste, J. *et al.*, Double Blind, Placebo-Controlled, Randomized Phase III Trial of

24   Darbepoetin Alfa in Lung Cancer Patients Receiving Chemotherapy. J. Nat'l Cancer. Inst. 94:16, 1211-20.  Ex. 62 to Defendants' concurrently filed Request for Judicial Notice ("RJN").  *See also* Hedenus,

25   M., *et al.*, Efficacy and safety of darbepoetin alfa in anemic patients with lymphoproliferative malignancies: a randomized, double-blind, placebo-controlled study.  Br. J. Haematol. 2003:122,394-

26   403 (safety profile of Aranesp® "was similar to that of placebo, and consistent with adverse events generally associated with malignant disease and the toxic effects of chemotherapy") (RJN Ex. 63).

27   [2]  Vansteenkiste, J. *et al*.  (RJN Ex. 62.)

28   [3]  *Id.*

In the second-half of 2003, two European studies on non-Amgen ESA products (Roche's NeoRecormon and Johnson & Johnson's Eprex) gave rise to safety concerns. Although the studies utilized target hemoglobin levels that exceeded the FDA-approved 12 mg/dL[4], the European studies nevertheless raised concerns about whether the ESAs sold in the United States posed similar risks and, in March 2004, the FDA announced that the ODAC would convene in May of that year to discuss, *inter alia*, "safety concerns associated with ARANESP (darbepoetin alfa) Amgen, Inc. and PROCRIT (epoetin alfa) Ortho Biotech, L.P."[5]

At the 2004 ODAC meeting, Amgen described current safety data on Aranesp®. This included an evaluation of data from over 1,100 patients in "randomized" and "placebo-controlled oncology trials" that demonstrated nearly identical safety results as patients receiving placebo.[6] Amgen also outlined a pharmacovigilance program of five ongoing trials involving Aranesp®.[7] One of these studies was an investigator-sponsored (rather than an Amgen-sponsored) study conducted by a third-party, the Danish Head and Neck Cancer Study Group ("DAHANCA"), which was designed, implemented and coordinated by Dr. Jens Overgaard. This study was designed to evaluate whether high doses of Aranesp® during curative radiotherapy and at a higher target hemoglobin level improved the outcome of head and neck cancer patients.[8] After the 2004 meeting, analysts reported what ODAC had discussed, and the market was fully aware of what took place at the meeting.[9]

---

[4] May 4, 2004 ODAC transcript at 92:5-22; 93:5-18. (RJN Ex. 74; Ex. 1 to McDonald Declaration in Support of Plaintiff's Motion for Class Certification.)

[5] 69 Fed. Reg. 61, 1658283 (March 30, 2004.) The purpose of the meeting was to review available safety data for Aranesp® and Procrit® [the brand name of Johnson & Johnson's ESA] "in the context of recent findings from two studies from Europe that suggested that there are certain practices in the administration of erythropoietin products which may raise concerns for the safety of the products," including dosing that exceeded the levels set forth on product labels. May 4, 2004 ODAC tr. at 11:11-15. (RJN, Ex. 74; McDonald Decl., Ex. 1.)

[6] May 4, 2004 ODAC tr. at 74:11-18. (RJN Ex. 74; McDonald Decl., Ex. 1.)

[7] The pharmacovigilance program was later approved by the FDA. Declaration of Sean Harper, Ex. 1.

[8] May 4, 2004 ODAC tr. at 158:16-159:2. (RJN Ex. 74; McDonald Decl., Ex. 1.)

[9] *See, e.g.*, May 5, 2004 Banc of America report at 1 ("Yesterday, the FDA's [ODAC] met to discuss safety concerns for AMGN's Aranesp. . . .") (RJN, Ex. 13); May 5, 2004 Lehman Bros. report at 1 ("We attended the [ODAC] meeting held yesterday in Gaithersburg, MD focused on the safety of

*(Footnote continued on following page)*

28800783

According to Plaintiff, the 2004 ODAC meeting was the birthplace of an alleged fraud that continued until 2006.  But publicly available information shows that nothing that happened between the 2004 ODAC meeting and late 2006 revealed any previously concealed information or corrected any prior misstatement.  It is not until October 18, 2006, when Dr. Overgaard decided to temporarily stop recruiting new patients into the DAHANCA study pending an "interim analysis" of the data,[10] that Plaintiff alleges anything "new" took place.  On December 1, 2006, Dr. Overgaard informed Amgen and others that, based on his interim analysis, he had decided to terminate the study altogether.[11]  Although Dr. Overgaard did not share the underlying interim data with Amgen, a notice about the study's termination was posted that same day on DAHANCA's website, and Amgen immediately informed the FDA.[12]  Nevertheless, Dr. Overgaard's decision to halt the study was not the harbinger of doom Plaintiff paints it to be.  Rather, his interim analysis showed only that the study was futile—*i.e.*, that it was not likely to meet its objective or "endpoint."[13]  Even Dr. Overgaard expressed concern about over-interpreting the rationale for terminating the trial and cautioned against reading more into the interim analysis than was warranted.  As Dr. Overgaard explained, such extrapolation would be improper because the DAHANCA researchers "do apparently not see any excess death from non-cancer causes."[14]

---

(*Footnote continued from previous page*)

erythropoietin (EPO) agents (JNJ's Procrit and Amgen's Aranesp) in the chemotherapy induced anemia (CIA) setting. . . .  There were no recommendations for labeling changes made in the meeting and no votes were taken.") (RJN Ex. 15); May 5, 2004 Lazard report at 2 ("The FDA's [ODAC] met yesterday to assess safety data of Epogen . . . and Aranesp (Amgen).") (RJN Ex. 14.)  Attached hereto as Exhibits A, B, and C are summary charts containing examples of analyst reports and press releases relevant to the April 22, 2004, March 9, 2007, and May 10, 2007 dates identified by Plaintiff.

[10]  October 18, 2006 email from Jens Overgaard.  (Harper Decl., Ex. 2.)

[11]  December 1, 2006 email from Jens Overgaard.  (Harper Decl., Ex. 2.)  *See also* April 14, 2007 email from Overgaard (*id.*), identifying those who were informed of the termination of the DAHANCA Study in December 2006.

[12]  December 5, 2006 letter from Amgen to FDA.  (Harper Decl., Ex. 3.)  It was not Amgen's practice to issue press releases regarding interim results of third-party studies, when Amgen had not been provided with the underlying data.  *See id.*, ¶ 8.

[13]  December 1, 2006 email from Jens Overgaard.  (Harper Decl., Ex. 2.)

[14]  April 14, 2007 email from Jens Overgaard.  (Harper Decl., Ex. 2.)

28800783

In late January 2007, Amgen announced Phase 3 data from the 103 Study (also known as the Anemia of Cancer Study). Although the 103 Study at first appeared promising, initial analysis of the Phase 3 data showed "a statistically significant increased risk of death in the Aranesp-treated group.[15] Defendant Roger Perlmutter, Amgen's Executive Vice President of Research and Development, discussed the disappointing results during the January 25, 2007 earnings call:

> The study was designed to show, as we had previously shown in Phase II studies, that Aranesp could reduce the frequency of transfusions and improve quality of life. With respect to the transfusion-end point, the study did not meet its primary end point. . . . Moreover, *we did see a statistically significant adverse effect of Aranesp on overall mortality in this patient population*, and so we conclude that the risk benefit ratio for Aranesp in these extremely ill patients with anemia secondary to malignancy is, at best, neutral and perhaps negative. We have made this information available to regulatory agencies around the world, and we are continuing to study this patient population.[16]

On the same call, Amgen advised the market that a boxed warning for Aranesp® and Epogen® was a possibility.[17] The next day, on January 26, 2007, Amgen voluntarily sent a letter to the relevant medical community of hematologists and oncologists, informing them of the 103 Study results:

> Dear Health Care Professional: Amgen wishes to inform you that . . . Aranesp was ineffective in reducing RBC [red blood cell] transfusions in patients with cancer who have anemia that is not due to concurrent chemotherapy. In addition, this study showed higher mortality in patients receiving Aranesp. . . . Aranesp is not approved for use in this population. Aranesp is approved for the treatment of patients with anemia, which is caused by chemotherapy treatment of their malignant disease, rather than the underlying malignant disease itself. Aranesp should be used only in accordance with its approved product labeling . . .[18]

The market fully understood the impact of the negative 103 Study results, with analysts

---

[15]  Amgen January 25, 2007 press release. (RJN, Ex. 46.)

[16]  January 25, 2007 earnings call tr. at 5-6 (emphasis added) (RJN Ex. 60). Amgen also noted the "negative results" of the study (*id*. at 3), and analysts were shown slides which reiterated this point. (RJN Ex. 61.)

[17]  January 25, 2007 earnings call tr. at 5-6 (RJN Ex. 60.)

[18]  Harper Decl., Ex. 5.

28800783

reporting that it could put 10-12% of worldwide Aranesp® sales at risk.[19]  In fact, one week

later, on February 2, 2007, Aranesp® was "de-listed" as a treatment for anemia of cancer by

the *United States Pharmacopeia*, the official standard-setting body for health care products

sold in the United States.[20]  Based in part on this de-listing, the Center for Medicare and

Medicaid Services ("CMS") announced its intention to re-evaluate reimbursement of ESAs.

This was followed by a formal two-month period of extensive public comment.

During this same time period in early 2007, other third-parties also reacted to the

information about the 103 Study and DAHANCA.  On February 16, 2007, a newsletter called

*The Cancer Letter* ran an article about the termination of the DAHANCA study, and even

included an exact reprint of the information posted on DAHANCA's website the previous

December.[21]  Then, on February 28, 2007, Amgen announced that it had been recently

contacted by the SEC as part of an informal inquiry—*which has since been closed with a*

*recommendation for no further SEC action*—regarding the DAHANCA study,[22] and that it had

been invited to participate in the May 10, 2007 ODAC meeting to "review progress made by

Amgen and other sponsors in delineating the effects of [ESAs] on survival and tumor

progression in cancer patients."[23]  Finally, although the market had been aware of this fact

since at least January 2007, on February 28, 2007, Amgen announced it was "in discussions

with the FDA" regarding a "boxed warning" for Amgen's ESA products, although its

---

[19]  *See, e.g.*, January 26, 2007 Baird report at 4 ("negative results in using Aranesp to treat anemia of cancer . . . Amgen stated that the Aranesp-treated patients had more negative events (deaths) and had no reduction in transfusions") (RJN, Ex. 17); January 26, 2007 Bank of America report at 1 ("Negative Aranesp study in anemia of cancer (AOC) could put 10-12% of global Aranesp sales at risk.") (RJN, Ex. 19); January 26, 2007 Deutsche Bank report at 1 ("[P]reliminary PIII data for Aranesp in AOC show that Aranesp did not significantly reduce the transfusion frequency and was associated with higher risk of death. . . .  Aranesp currently generates ~10-12% of WW sales in AOC.") (RJN, Ex. 21).

[20]  *See* February 22, 2007 Goldman Sachs Report at 1 ("[o]n February 2, 2007, Aranesp for the treatment of anemia of cancer (AOC) was removed from the USP DI Drug Reference Guides, one of two compendia that affect Medicare reimbursement") (RJN, Ex. 23.)

[21]  *The Cancer Letter* at 4-6 (McDonald Decl., Ex. 3.)

[22]  Amgen 2006 Form 10-K at 56.  (RJN, Ex. 64.)  In its 2008 Form 10-K, Amgen announced that the SEC closed this inquiry without taking any action.  *See* Amgen 2008 Form 10-K at F-45 (filed February 27, 2009).  (RJN, Ex. 65.)

[23]  Amgen February 28, 2007 press release.  (RJN, Ex. 48.)

28800783

"interactions with the FDA are ongoing and exact language for the updated prescribing information is not final."[24]

These interactions continued and, on March 9, 2007, the FDA announced that it would require a boxed warning for all ESAs, including Aranesp® and Epogen®.[25]  Then, on May 10, 2007, ODAC voted to recommend that additional restrictions be placed on the use of ESAs.[26] But none of this was new; in fact, throughout this entire period, analysts had been issuing reports and predictions about the boxed warning and the outcome of the May 10, 2007 ODAC meeting.[27]

In its motion, Plaintiff completely ignores the market's knowledge and monitoring of these events, and attempts to paint the period between February 16, 2007 and May 10, 2007 as the time when the "truth" finally emerged.  But no previously withheld information about the safety of Aranesp® and Epogen® was disclosed during that time period, and both products remained on the market.  In fact, less than one month after the 2007 ODAC meeting, the American Society of Clinical Oncology reiterated, "[a] number of published studies have confirmed the safety and efficacy of ESAs."[28]  And, only five months after that, the US Oncology National Policy Board explained, "over 15 years of patient treatment experience and over 40 published clinical and two Meta-analyses of safety data have established that there are no measurable safety concerns with respect to survival or tumor progression when ESAs are used appropriately in the range of 10-12 Hgb."[29]  Today, both Aranesp® and Epogen® are still

---

[24]   Amgen February 28, 2007 press release.  (RJN, Ex. 48.)

[25]   March 9, 2007 FDA news release.  (RJN, Ex. 66.)

[26]   May 10, 2007 ODAC tr. at 286:15-290:9.  (RJN, Ex. 75.)

[27]   *See, e.g.*, January 25, 2007 Morgan Stanley report at 3 (sales of Aranesp® could "come under pressure as . . . the FDA considers a black box warning") (RJN, Ex. 16); January 26, 2007 Credit Suisse report at 3 ("[W]e believe there is a likelihood of Aranesp getting strong wording on its label for patients not receiving chemotherapy and potentially a black box warning.") (RJN Ex. 20); March 1, 2007 UBS report at 1 ("We believe these discussions will ultimately lead to black box labeling in all of ESAs in off-label indications") (RJN Ex. 28.)

[28]   June 8, 2007 letter from ASCO to Steve E. Phurrough, Director, Ctrs. for Medicare and Medicaid Services (RJN. Ex. 80.)

[29]   October 26, 2007 letter from US Oncology Nat'l Policy Bd. to Hon. Mike Rogers (RJN Ex. 81.)

28800783

1    approved for the treatment of anemic patients with chronic kidney failure and for

2    chemotherapy-induced-anemia.[30]

3    **III.    PLAINTIFF HAS NOT MET ITS HEAVY BURDEN UNDER RULE 23.**

4           When deciding whether to certify a class, a court must conduct a "rigorous analysis" to

5    ensure the requirements of Rule 23 are met.  *General Telephone Co. of Southwest v. Falcon*,

6    457 U.S. 147, 161 (1982).  In doing so, the court is "not only at liberty to but must consider

7    evidence which goes to the requirements of Rule 23 . . . even [if] the evidence may also relate

8    to the underlying merits of the case."  *Dukes v. Wal-Mart*, 509 F.3d 1168, 1177, n.2  (9th Cir.

9    2007); *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 27 (2d Cir. 2006) (court must

10   consider whether each Rule 23 requirement is met, even if a requirement overlaps with a merits

11   issue).[31]  Because "the class determination generally involves considerations that are enmeshed

12   in the factual and legal issues comprising the plaintiff's cause of action," *Coopers & Lybrand*

13   *v. Livesay*, 437 U.S. 463, 468-69 (1978), it follows that a court will almost always need to

14   examine the merits to decide if certification is proper.  And as several courts have recognized,

15   the 2003 amendments to Rule 23 allow an even more exacting inquiry than was previously

16   appropriate, even under the already demanding "rigorous, analysis" standard.[32]

17          As the party seeking certification, Plaintiff must show "that each of the four

18   requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) have been met."

19

20   [30]  *See* FDA-approved package insert for Aranesp® and Epogen® (RJN Exs. 67, 68); FDA approval
     history for Aranesp® and Epogen® (RJN Exs. 69, 70.)

21   [31]  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), "does not require a court to accept plaintiffs'
22   pleadings when assessing whether a class should be certified. . . .  *Eisen* simply restricts a court from
     expanding the Rule 23 certification analysis to include consideration of whether the proposed class is
23   likely to prevail ultimately on the merits."  *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365-66 (4th
     Cir. 2004).  *See also Initial Public Offering*, 471 F.3d at 34, 41 ("Unfortunately, the statement in *Eisen*
24   that a court considering certification must not consider the merits has sometimes been taken out of
     context and applied in cases where a merits inquiry either concerns a Rule 23 requirement or overlaps
25   with such a requirement. . . .  [T]he obligation to make such determinations [*i.e.* that Rule 23 is
     satisfied] is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits
     issue that is identical with a Rule 23 requirement.").

26   [32]  *See, e.g., Initial Public Offering*, 471 F.3d at 39 (Rule 23(c) now "permit[s] a more extensive
     inquiry into whether Rule 23 requirements are met than was previously appropriate"); *Mulford v.*
27   *Altria Group, Inc.*, 242 F.R.D. 615, 619, n.2 (D.N.M. 2007) ( "[I]t is clear that Rule 23 itself
     contemplates that the court will consider information beyond that contained in the complaint.").

28

28800783

*Dukes*, 509 F.3d at 1176.  Rule 23(a) requires Plaintiff to demonstrate, *inter alia*, that its claims and defenses are typical of those of class members and that it will fairly and adequately protect the interests of the class.  Under Rule 23(b)(3), Plaintiff must also demonstrate that common questions of law or fact predominate over individual questions, and that a class action is superior to other methods for fairly adjudicating the controversy.

A plaintiff cannot meet this burden simply by relying on unsupported assertions or allegations in the complaint.[33]  Rather, the plaintiff must produce "sufficient information to [allow the court] to form a reasonable judgment . . . on each of the Rule's requirements." *Blackie*, 524 F.2d at 901, n.17.  Put another way, the plaintiff must "produce *evidence* by affidavits, documents or testimony establishing each Rule 23 requirement."  *Bishop v. Petro-Chem. Transport, LLC*, 582 F.Supp.2d 1290, 1306 (E.D. Cal. 2008) (emphasis added), citing *Initial Public Offering*, 471 F.3d at 33 (Rule 23 requirements must be met, not just supported by "some evidence").

Plaintiff has not met its burden.  Other than putting forth an expert on the threshold issue of market efficiency, Plaintiff has done nothing more than baldly assert that the requirements of Rule 23 are satisfied.  But certification is improper because the proposed class period is entirely without basis and the predominance and adequacy requirements are not met.

### A.    There is no basis for the proposed class period.

A district court has "broad power and discretion" regarding class certification issues. *Reiter v. Sonotone*, 442 U.S. 330, 345 (1979).  As a result, a court may refuse to certify a class, or may certify a class period other than the one sought by the plaintiff, if the period's beginning

---

[33]  If this were the standard, motions for class certification would be identical to motions to dismiss under Rule 12(b)(6).  That is not the law.  *Blackie v. Barrack*, 524 F.2d 891, 901, n.17 (9th Cir. 1975) (plaintiff must produce sufficient evidence to support certification); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001) (explaining that in contrast to a motion to dismiss under Rule 12(b)(6), "an order certifying a class usually is the district judge's last word on the subject; there is no later test of the decision's factual premises (and, if the case is settled, there could not be such an examination even if the district judge viewed the certification as provisional). . . . [T]herefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23.").

or ending date is not justifiable in light of the plaintiff's allegations and available evidence.[34] In a securities case, the class period should coincide with the time "during which the defendants' fraud was allegedly alive in the market." *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995). Indeed, "[n]o class period may commence prior to the earliest date on which the plaintiff can properly allege all the elements of his prima facie case." *Stevelman v. Alias Research, Inc.*, 2000 WL 888385, *5 (D. Conn. 2000). And the class period should end when liability under the securities laws is no longer possible—when curative information was disseminated to the market. *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 351, n.11 (3d Cir. 2009) (class period should end on date of curative disclosure).[35] Applying these rules, courts scrutinize the proposed class period and, if it is not consistent with available information, certify a different period, or deny certification altogether.[36]

Here, Plaintiff cannot defend its 36-month proposed class period. The period is (by Ninth Circuit standards) "unusually long,"[37] is inconsistent with publicly available information, and is arbitrary.

### 1.   <u>There is no basis to begin the class period on April 22, 2004.</u>

Plaintiff contends that Defendant Morrow misled analysts by incorrectly stating during an April 22, 2004 earnings call that the upcoming ODAC meeting would not focus on

---

[34]  1 McLaughlin on Class Actions § 4:3 ("[W]here undisputed facts demonstrate that the allegations of the complaint can only apply to a particular period of time, the class period may be restricted to that time period.").

[35]  *See also In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1464-65 (D.N.J. 1987); *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143-44 (D.N.J. 1984); *In re LTV Sec. Litig.*, 88 F.R.D. 134, 147-48 (N.D. Tex. 1980); 1 McLaughlin on Class Actions § 4:3 ("The class period may not extend past the date on which curative information became available").

[36]  *See, e.g., In re Ribozyme Pharm., Inc. Sec. Litig.*, 205 F.R.D. 572, 580-81 (D. Colo. 2001) (certifying shorter period than sought because events after press release could not have had any curative effect); *Stevelman*, 2000 WL 888385 at *5-6 (certifying shorter period); *Data Access Sys.*, 103 F.R.D. at 143-44 (same); *Piel v. Nat'l Semiconductor Corp.*, 86 F.R.D. 357, 369-70, n.14 (E.D. Pa. 1980) (same); *LTV*, 88 F.R.D. at 147 (same).

[37]  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (63-week class period was "unusually long"); *Broadsky v. YahooA Inc*., 592 F. Supp. 2d 1192, 1205 (N.D. Cal. 2008) (118-week class period was "unusually long").

28800783

Aranesp®, that there was no safety signal associated with Aranesp®, and that the safety of

Aranesp® had been comparable to placebo.  But Plaintiff mischaracterizes both the question

and Morrow's answer:

> *Question*:  "Could you comment on a FDA meeting that I've heard about I believe
> several weeks from now where they're going to look into the safety of Aranesp and
> other erythropoietic products and what the scope of that meeting would be?"
>
> Answer:  "Yes, this is the oncology.  It's called the ODAC meeting.  It's going to be
> held on May 4. And it really was called due to the two studies that were done on Eprex
> and Neorecormon in Europe where there was an issue about long-term survival in
> cancer populations.  So we had answered and recognized the risen [*sic.*] issue for
> Tobin, Alpha, and Beta [*sic.*].  Just a reminder, those products were used off-label at
> higher hematocrit levels than dictated by the label.  And we also feel there was some
> potential study design flaws. And so we're anxious to learn more about those studies
> during this meeting as well.
>
> Now we had decided to participate in that meeting 'cause the focus was not on Aranesp
> and as Roger said late last year, there is no signal associated with Aranesp.  We've had
> two perspective [*sic.*] randomized placebo controlled trials.  And the safety for Aranesp
> has been comparable to placebo.  We continue to investigate with well-designed studies
> on Aranesp and we're working closely with the FDA on this issue.  But just as a
> reminder, it's two weeks away so that's pretty much all we know today."[38]

Morrow did not state that the ODAC meeting would not be discussing Aranesp®.

Rather, he said the studies that prompted the meeting did not involve Aranesp®, and that the

safety of Aranesp® had been comparable to placebo, both of which were true.[39]

Nor did Morrow mislead the market, which already knew ODAC would discuss

Aranesp®—the agenda, after all, had been published in the Federal Register three weeks

before, on March 30, 2004.[40]  The market also knew that Aranesp® had been shown to be safe

for on-label uses, and that, as Morrow stated, prior studies had shown comparable safety results

---

[38]  *See* April 22, 2004 earnings call tr. at 5-6 (RJN Ex. 59.)

[39]  *See* n. 1, *infra*, describing results of the 297 Study and the Hedenus study.  (RJN Exs. 62, 63.)

[40]  *See, e.g.,* 69 Fed. Reg. 61, 1658283 ("On May 4, 2004, the committee will discuss these items: (1)
Safety concerns associated with ARANESP (darbepoetin alfa) Amgen, Inc. . . .") (RJN Ex. 77); March
15, 2004 Citigroup report ("FDA is scheduled to discuss safety issues related to the use of AMGN's
Aranesp . . . on May 4 ") (RJN, Ex. 1); March 16, 2004 Banc of America Report ("ODAC will review
on May 4 safety issues associated with the use of AMGN's Aranesp. . .") (RJN, Ex. 2.)

28800783

1    for patients receiving Aranesp® and patients receiving a placebo.[41]  Analyst reports issued after

2    the call, including several by analysts who were on the call, establish that the market was not

3    misled as a result of Morrow's statement.[42]

4         But even assuming that Mr. Morrow did misspeak, analyst reports issued before the next

5    trading day would be the appropriate corrective disclosures.  On April 22, 2004 at 10:56 p.m., a

6    Goldman Sachs analyst who was on the call reported, "[o]n May 4, 2004, an FDA Advisory

7    Committee (AC) will discuss safety concerns associated with Aranesp and Procrit (JNJ) as

8    therapies for anemia. . . .  On May 4, Amgen expects to present data from 2 randomized trials

9    of Aranesp in chemotherapy-induced anemia demonstrating comparable safety of Aranesp to

10   placebo."  Other reports contain similar information.[43]

11        These reports (not to mention the publication of ODAC's agenda in the Federal Register)

12   refute any claim that the market was misled by anything Morrow said on April 22, 2004.  But

13   regardless of what the market may have thought in April 2004, it is undeniable that two weeks

14   later, in May, the market knew exactly what happened at the ODAC meeting.  The fact that

15   Amgen's stock price did not drop in reaction to the 2004 ODAC meting demonstrates that it

16   was not misled by Morrow's comments.[44]  Because Morrow's statement did not mislead the

17   market, it is not actionable,[45] and accordingly, it cannot serve as the beginning of any class

18

19   [41] *See, e.g.*, March 15, 2004 Citigroup report at 2 (studies "demonstrated a similar safety profile between Aranesp and the placebo group" and "indicate a trend toward enhanced survival in patients receiving Aranesp. This result is supported by an independent meta-analysis of 27 randomized clinical trials.") (RJN, Ex. 1); March 16, 2004 Banc of America report at 1 ("Aranesp has not been shown to adversely impact survival in cancer patients.") (RJN, Ex. 2.)

20

21   [42] April 23, 2004 UBS report at 1 ("We believe that there is a risk in front of the ODAC panel meeting called to review safety issues with Aranep [sic.] and Procrit.  This may introduce a heightened sense of caution regarding the liberal use of EPO.") (RJN, Ex. 10); April 23, 2004 Jeffries report at 2 ("We do not believe Aranesp sales will be negatively impacted by the May 4th ODAC panel safety review of erythropoetin products used in oncology patients. The two clinical trials that raised concerns were done with alternative products (Eprex and Neorecormon) that were used off-label at higher than usual hematocrit levels.") (RJN, Ex. 9).  *See also* April 22, 2004 10:56 p.m. Goldman Sachs report (cited above, in text). (RJN, Ex. 6.)

22

23

24

25   [43] *See, e.g.*, analyst reports identified *supra* at n. 42.

26   [44] CAC ¶ 63 ("There was no significant movement in Amgen's share price following the 2004 ODAC Meeting.").

27

28   [45] *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 513-14 (9th Cir. 1991) (rejecting

*(Footnote continued on following page)*

period.[46]  In fact, putting aside that certification is otherwise improper under Rule 23, Plaintiff does not identify *any* potentially actionable statement that could start a class period until December 2006, the so-called "DAHANCA Period," but even that date is fraught with problems.[47]

### 2.   There is no basis to use any post-DAHANCA corrective event to end the class period.

Putting aside DAHANCA (for the moment), none of the three alleged remaining "corrective events" could end any class period, because none involved any disclosure of previously "concealed" information or correction of previous misstatements.  Rather, on each date, the only "new" thing that happened was that a third-party took some action or made a decision in response to *information that was already public*.  Each time, the market not only knew that the third-party was going to act, or was notified contemporaneously by Amgen that it had acted, but it also understood that these actions might have an adverse impact on future Aranesp® sales.

### a.   May 10, 2007:  the ODAC vote

Plaintiff claims that the May 10, 2007 ODAC meeting should end the class period, because the meeting allegedly revealed new information, such as Amgen's purported improper off-label marketing practices, and that a portion of Amgen's sales were from off-label uses. CAC ¶¶ 120-27, 207.  But this is simply not accurate.

---

(*Footnote continued from previous page*)

contention that accurate reporting of past results misled market).  *Accord In re Verizon Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993); *In re Sofamor Danek Corp.*, 123 F.3d 394, 401 & n.3 (6th Cir. 1997); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290-91 (4th Cir. 1993).

[46]  *See* notes 34-36, *supra*.

[47]  In discovery, Plaintiff identified several pre-December 2006 statements it claims are misrepresentations and omissions.  (Kramer Decl., Ex. 1).  Tellingly, Plaintiff does not claim that any of these statements (which are either forward-looking statements, statements about on-label safety, or statements about earnings) could start a class period.  And, they could not.  *See* 15 U.S.C. § 78u-5(c) (forward-looking statements not actionable); *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) (accurate statement about FDA finding that drug had "acceptable safety profile" could not be actionable under securities laws).  *Cf. Anspach v. City of Philadelphia*, 503 F.3d 256, 276 (1st Cir. 2007) ("Defendants were entitled to rely on the FDA's scientific and policy conclusions") (internal citations omitted).

28800783

*First*, as the director of the FDA's oncology review division stated at the outset of the meeting, the FDA convened the ODAC to consider and make recommendations for use of ESAs in light of "new safety findings related to the use of ESAs," in the oncology arena, many of which "have been in off-label indications."[48]  Consistent with this statement, the ODAC's discussion related to safety information that had already been included in the boxed warning, posted on the FDA website, and disclosed to the market.

Plaintiff's attempt to blur the distinction between off-label use and off-label marketing is unavailing.  Unlike off-label marketing, off-label prescribing and off-label use are *not* unlawful.  To the contrary, off-label use is an "accepted and necessary" part of the practice of medicine.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).[49]  The FDA has stated that off-label uses may even represent the standard of care, and that "off-label use does not reflect inadequate scientific rationale for such use."[50]  The focus of the ODAC meeting thus was not off-label marketing by Amgen and, in fact, Amgen's marketing practices were not discussed.[51]

---

[48]  May 10, 2007 ODAC tr. at 13:6-17.  (RJN, Ex. 75; McDonald Decl. Ex. 2.)  *See also* 72 Fed. Reg. 63, 15887 (RJN Ex. 78.)

[49]  *See also Oncology Tools: A Short Tour,* FDA/Center for Drug Evaluation and Research,  ("Neither the FDA nor the Federal government regulate [*sic*.] the practice of medicine. Any approved product may be used by a licensed practitioner for uses other than those stated in the product label. Off-label use is not illegal, but means that the data to support that use have not been independently reviewed by the FDA.") (RJN Ex 71.)

[50]  *See* Patient Access to New Therapeutic Treatments for Pediatric Cancer, December 2003 Report to Congress, pp. 10-11 (RJN Ex. 72); FDA report "Guidance for Industry, IND Exemptions for Studies of Lawfully Marketed Drug or Biologic Products for the Treatment of Cancer," p. 4 ("Off-label therapy with cancer drugs is common in practice. . . .  A 1996 GAO report (*Prescription Drugs, Implications of Drug Labeling and Off-Label Use*) showed that there was substantial off-label use in situations where satisfactory treatment was not available . . . .") (RJN Ex. 73.)

[51]  The closest ODAC came to discussing marketing was when it discussed Johnson & Johnson television commercials that claimed Procrit® increased quality of life, when used according to the label.  *See* May 10, 2007 ODAC tr. at 138:13-140:8; 144:5-17. 158:20 163:9; 176:9-177:9; 185:12-188:12; 284:2-13; 347:1-8, 13-18; 348:1 19; 349:21 350:5; 350:7-15, 17-22.  (RJN Ex. 75; McDonald Decl. Ex. 2.)

28800783

*Second*, ODAC's discussion about off-label *uses* did not involve any new information.[52] Rather, the market already knew studies were being conducted to test off-label uses, and this topic had become part of the public dialogue as early as January 2007 when Amgen announced the negative results of the 103 Study and sent a letter to the relevant medical community informing them of the results.[53]  The conclusion that the market knew about these issues is bolstered by the February 2, 2007 "de-listing" of Aranesp® by the *United States Pharmacopeia* as a treatment for anemia of cancer,[54] and by Amgen's 2006 Form 10-K, filed on February 28, 2007 (RJN Ex. 64), which disclosed (again) the 103 Study results, the de-listing of Aranesp®, and the scheduling of the May 10, 2007 ODAC meeting.  And, as Plaintiff alleges in its complaint, on February 23, 2007, the Associated Press published an article about Aranesp® having been "de-listed" as a treatment for anemia of cancer and, on February 27, the *New York Times* wrote about safety concerns associated with ESAs.[55]  In addition, the market was already well aware that a significant portion of Aranesp® sales were for off-label uses.[56]

*Third*, there is no evidence, much less any evidence common to the class, that Amgen marketed Aranesp® or Epogen® for off-label use.  Plaintiff's allegations about off-label marketing rest entirely on five confidential witnesses, four of whom Plaintiff has refused to

---

[52]  Even assuming that Amgen had an off-label marketing program (which it did not) and that it was discussed at the May 2007 ODAC meeting, any corrective disclosure took place on April 17, 2007, when the original complaint in this action was filed:  "During the Class period, defendants marketed Aranesp and Epogen to doctors for off-label use.  *Kairalla v. Amgen Inc.*, Complaint, ¶ 5 (Kramer Decl. Ex. 2).

[53]  Because the market was already aware of the scope of studies being conducted on Aranesp®, there is no support for Plaintiff's claim that the discussion at the 2007 ODAC meeting revealed a supposed failure by Amgen to conduct certain studies.  CAC ¶ 120-27.  These studies were discussed at the 2004 ODAC meeting (*see* 2004 ODAC tr. at 68-83), and were reported to the market by analysts.  (RJN, Ex. 74; McDonald Ex. 1.)  Even assuming that ODAC was surprised at the nature of these studies, nothing new about the studies, or their results, was revealed at the ODAC meeting.

[54]  *See* n.20, *supra*.  (RJN Exs. 24, 43.)

[55]  CAC ¶¶ 104-05.

[56]  *See, e.g.*, April 24, 2007 Goldman Sachs report at 8 ("On the off-label use of AOC [anemia of cancer], which accounts for about 18% of sales in the United States, the ODAC will likely recommend limited usage until further data are available.  We believe that Amgen shares may move 3-5% either way depending on the ODAC decision.") (RJN, Ex. 40); March 6, 2007 HSBC report ("According to Amgen, off-label use in AOC [anemia of cancer] accounted for approximately USD500m of the total USD2.1bn in total US oncology sales of Aranesp reported for 2006.") (RJN, Ex. 32.)

-17-
28800783

identify and instead stated that it would not rely upon (the subject of Defendants' concurrently filed evidentiary objections and request to strike).  And the testimony of the sole witness Plaintiff has identified does not support any finding of company-wide off-label marketing.  To the contrary, his testimony makes clear that Amgen had a policy *against* off-label marketing, and that this policy was enforced.[57]

Moreover, the market had understood for months that the ODAC was going to vote on whether to recommend additional restrictions for ESAs, and analysts hotly debated the possible outcome.[58]  While the market may ultimately have been disappointed and surprised by the result of the ODAC vote, the information on which ODAC based its decision was already public.[59]  For example, although Plaintiff claims that the price of Amgen's stock fell as a result of *disclosures* made at the ODAC meeting, in fact the bulk of the price drop took place *after* the press reported the outcome of the ODAC vote.[60]  There is no support for the contention that the ODAC meeting corrected any previous misstatements by Amgen, or disclosed any facts that were not known or understood about Amgen's ESAs, and thus no basis for extending the class period to May 10, 2007.[61]

### b.   March 9, 2007:  Announcement of a "Boxed" Warning

The next "corrective" event identified by Plaintiff is the March 9, 2007 announcement that the FDA would require a boxed warning for ESAs.  But as with the May 10 ODAC

---

[57]  *See* Defendants' Evidentiary Objections and Request to Strike.

[58]  *See, e.g.*, Exhibit C hereto, and RJN Exs. 20, 29, 31-32, 38-42, 50-52, 52, 54-58.

[59]  *See, e.g.*, Exhibit C hereto, and RJN Exs. 20, 29, 31-32, 38-42, 50-52, 52, 54-58.

[60]  *See, e.g.,* Exhibit C hereto, and RJN Exs. 20, 29, 31-32, 38-42, 50-52, 52, 54-58, and 79.

[61]  *See Alaska Elec. Pension Fund*, 554 F.3d at 346-47; *ORFA Sec. Litig.*, 654 F. Supp. At 1464-65; *Data Access Sys.*, 103 F.R.D. at 143; *LTV*, 88 F.R.D. at 147-48.  *Cf. Teachers' Ret. Sys. of Louisiana v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) (rejecting characterization of event as curative because facts "had already been disclosed . . . [and] could not have caused [the] stock price to decline"); *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) ("A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure."); *In re Merck & Co. Sec. Litig*, 432 F.3d 261, 270-71 (3d Cir. 2005) (no corrective event where basic facts regarding revenue recognition practices had already been disclosed, because "[a]n efficient market for good news is an efficient market for bad news"); *Longman v. Food Lion Inc.*, 197 F.3d 675, 684 (4th Cir. 1999) (television program could not constitute corrective event because information was already public).

meeting, there is no basis to extend the class period to this date, because the FDA's announcement did not reveal any previously undisclosed information or correct any prior misstatement.  Rather, the FDA simply announced that it would consolidate the already-public information from studies about off-label uses, including the 103 Study and DAHANCA, and include them in an updated label.  In other words, the FDA decided to update the label to reflect current information.[62]

Moreover, in light of the public discussion of off-label studies,[63] the market was aware as early as the January 2007 earnings call that a boxed warning was possible, and that the FDA would announce its decision at some point.[64]  And on February 28, 2007, Amgen issued a press release and filed its 10-K, both of which stated that Amgen was in discussions with the FDA regarding a boxed warning.  The market's knowledge of the possibility of a boxed warning is also apparent from reports issued *after* the FDA's announcement, which describe the announcement as "consistent with our expectations," "expected," and indicated that analysts were "not surprised."[65]

Contrary to Plaintiff's characterization, the only "new" thing that happened on March 9, 2007 was that the FDA finalized its decision regarding the boxed warning.  This is not a curative event,[66] and cannot serve as the end of the class period.

---

[62] *See* Aranesp® and Epogen® approval history (RJN, Exs. 69, 70), and FDA-approved labels.  (RJN, Exs. 67, 68).

[63] *See* discussion supra re: 103 results, Amgen's "Dear Healthcare Professional" letter, and the de-listing of Aranesp® for a treatment of anemia of cancer) (Harper Decl., Ex. 5).

[64] *See also* January 25, 2007 Morgan Stanley report (RJN, Ex. 16); January 26, 2007 Credit Suisse report at 3  ("[W]e believe there is a likelihood of Aranesp getting strong wording on its label for patients not receiving chemotherapy and potentially a black box warning.") (RJN, Ex. 20); Amgen February 28, 2007 News Release ("Amgen is in discussions with the FDA with the goal of updating safety information on all ESA labels that will take the form of a boxed warning on its products.") (RJN, Ex. 48); March 1, 2007 UBS report ("Black box on ESA off-label usage likely to ensue.") (RJN, Ex. 28); March 1, 2007 Reuters press release ("The company is discussing with the FDA an update of patient safety information on labels that would take the form of a boxed warning.") (RJN, Ex. 49).

[65] *See* March 9, 2007 CIBC report (RJN, Ex. 33); March 11, 2007 Deutsche Bank report (RJN, Ex. 37).

[66] *See* cases cited *supra* in n.34-36, 61.

-19-

28800783

### c.   February 28, 2007:  SEC Informal Inquiry

The last so-called curative date is February 28, 2007, when Amgen announced in its 10-K that the SEC had contacted Amgen regarding an informal inquiry related to DAHANCA.[67] In January 2009, when the SEC closed the inquiry without recommending any action, Amgen disclosed this in its 10-K as well.[68]

There was nothing curative about Amgen's announcement.  Amgen did not reveal any previously withheld information or correct any prior misstatement.  Rather, Amgen simply announced that a third-party (the SEC) had taken an action (asking for information) regarding DAHANCA.  The termination of the DAHANCA study was already public information (a point Plaintiff implicitly acknowledges by identifying the February 16, 2007 article on DAHANCA as a corrective event).  There is thus no basis to extend the class period to February 28, 2007.[69]

\*   \*   \*

The Court should deny certification, because Plaintiff does not and cannot provide any evidentiary or legal basis for either the start or the end of its proposed class period.

### B.   Plaintiff Cannot Establish Reliance.

To prevail on its Rule 10b-5 claim, Plaintiff must prove (1) a false representation (or omission) of material fact; (2) in connection with the purchase or sale of any security; (3) made with scienter; (4) upon which there was justifiable reliance; (5) which proximately caused (6) damages to each class member.  17 C.F.R. § 240.10b-5.  During discovery on class certification issues, Plaintiff identified alleged misrepresentations, but admitted that it did not

---

[67]  *See* Amgen 2006 Form 10-K (filed February 28, 2007) at 56 (RJN, Ex. 64).

[68]  *See* Amgen 2008 Form 10-K (filed February 27, 2009) at F-45 (RJN, Ex. 65).

[69]  *See* cases cited in n.34-36, 61, *supra*.  *See also In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (disclosure of SEC request for documents was not a corrective event because it did not disclose any wrongdoing); *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1221 (E.D. Wash. 2005) (disclosure of formal investigation by governmental agency "insufficient, on its own, to plead loss causation" because announcement "did not reveal any factual information showing [Defendants] illegally manipulated the energy market or made factual misrepresentations.").

28800783

rely, consult, review or even see any of these statements.[70]  Accordingly, the only way Plaintiff can prove reliance for itself and a class of purchasers is to invoke the fraud-on-the-market ("FOTM") presumption articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  But class certification must be denied if a plaintiff cannot rely on the FOTM presumption because predominance is destroyed by the requirement that plaintiff prove reliance on an individual basis.  *Id*. at 242 ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones.").

In this case, there is no basis for substituting reliance on the market for actual reliance. Plaintiff cannot show that the price of Amgen's stock dropped in response to any disclosure of previously withheld information or correction of a prior misstatement.  Rather, all of the information was already public, and the basis for applying the FOTM presumption, therefore, is absent.

**1.**   **The fraud-on-the-market presumption applies only where there is a basis to presume the market was misled.**

Under FOTM, reasonable reliance is presumed due to market efficiencies, and the class representative need not demonstrate reliance by each class member.  *Basic*, 485 U.S. at 242.  A plaintiff may only rely on the presumption if it can demonstrate:

> (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed.

*Id*. at 248, n.27.

---

[70]  *See* Interrog. Responses, Exhibit 2 (Kramer Decl. Ex. 1); Deposition of Catherine LaMarr (Kramer Decl., Ex. 3) at 204:19-22; 253:6-255:11; Deposition of Susan B. Sweeney (Kramer Decl., Ex. 4.) at 78:7-79:23; 137:14-138:8; 140:24-148:23.

Despite this, Plaintiff erroneously proceeds as though, in order to invoke FOTM, it needs only to show that the market for Amgen's securities was efficient.[71]  But *Basic* requires more. In *Basic*, the Supreme Court explained that the FOTM theory assumes the market price of a security properly reflects all available information (including any material misrepresentation). *Id.* at 244.  The Court explained that the theory only makes sense (and the presumption only applies) if the market was not aware of the "truth" during the period in question and the price of the security was in fact artificially inflated because of a material misrepresentation or omission.  *Id.* at 248.  Thus, if there was no misrepresentation, or if all information was already public, there would be no basis for presuming that the class was misled based on its reliance on the market.[72]

To ensure that the FOTM presumption is applied only in cases where there is a basis to presume that the market was misled, the Supreme Court held in *Basic* that a defendant may rebut the presumption by "any showing" that breaks the connection between a movement in the security's price and an alleged misrepresentation or omission:

> Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.  For example, *if petitioners could show that the 'market makers' were privy to the truth . . . the causal connection could be broken:  the basis for finding that the fraud had been transmitted through market price would be gone.*  Similarly, if, despite petitioners' allegedly fraudulent attempt to manipulate market price, news of the merger discussion credibly entered the market and dissipated the

---

[71]  The opinion of Plaintiff's proffered expert, Scott Hakala, is limited to market efficiency and does not extend to loss causation.  (Kramer Decl., Exs. 5, 6.)  Based on the limited scope of Hakala's opinion, Defendants have not challenged his qualifications.  If and when Hakala does opine on an issue such as loss causation, Defendants reserve the right to challenge his qualifications, given he has been rejected as an expert witness in several securities litigation cases.  *See, e.g., In re Omnicon Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (Hakala's event study failed to correctly identify several corrective disclosures, and did not adequately isolate the effect of the disclosures it did identify); *In re Broadcom Corp. Sec. Litig.*, 2005 WL 1403756, * 2 (C.D. Cal. 2005); *Fener v. Belo Corp.*, 560 F. Supp. 2d 502, 505-07  (N.D. Tex. 2008); *In re Xcelera.com Sec. Litig.*. No. 00-11649-RWZ, (D. Mass. 2008).

[72]  *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 414 (5th Cir. 2001) ("It is clear that a fraud-on-the-market theory may not be the basis for recovery in respect to an alleged misrepresentation which does *not* affect the market price of the material in question.").

effects of the misstatements, those who traded Basic shares after the corrective
statements would have no direct or indirect connection with the fraud.

*Basic*, 485 U.S. at 248 (emphasis added).

Adding to this "list of examples" identified in *Basic*, the Fifth Circuit has held that the
FOTM presumption does not apply if the defendant makes "a showing that the market price
would not have been affected by the alleged misrepresentations."  *Oscar Private Equity
Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 265 (5th Cir. 2007).  In *Oscar*, the court
held that a defendant could resist application of the presumption on a class certification motion
by showing that the market drop plaintiff relied on to show loss causation could be attributable
to something other than the revelation of the "truth" that allegedly had been concealed.  *Id*. at
264-66.  Consistent with *Basic*, the *Oscar* court then shifted the burden to the plaintiff to show
that the price had been inflated by the alleged misstatement and that the market dropped once
the truth was disclosed.  *Id*.

In this case, Defendants have made a "showing" both that information was publicly
available *and* that the market drops that Plaintiff relies on to establish loss causation were not
caused by the revelation of any allegedly concealed information.  Rather, as Defendants have
shown, the market was "privy" to the truth, and the price drops were the result of third-parties'
reactions to public information.  Thus, under *Oscar*, the burden shifts to Plaintiff to show that
the market was misled and the stock price was artificially inflated because of the alleged
deception.

In its motion, Plaintiff paints *Oscar* as an aberration decided by a renegade court.  But
*Oscar* correctly applies *Basic* by limiting the FOTM presumption to cases where it actually
applies.  *Oscar* addressed "the simultaneous disclosure of multiple negatives, not all of which
are alleged culpable," and recognized that, "[w]ith multiple negatives, our usual approach to
gauging efficiency and presuming reliance fails because we cannot know that the culpable
information was priced, even if objectively material."  *Id.* at 265, n.22.  To ensure that the
rationale for applying FOTM was present, the *Oscar* court required the plaintiff to show loss
causation as a prerequisite to invoking the presumption.  *Id*. at 270.  This is entirely consistent

-23-

with *Basic*, which recognized that without a "causal connection" between an alleged misrepresentation or omission and a drop in stock price, "the basis for finding that the fraud had been transmitted through market price would be gone." *Basic*, 485 U.S. at 248.[73]   *Oscar* correctly found that a plaintiff must show loss causation to invoke FOTM, and this Court should do the same.

Moreover, the Ninth Circuit has never ruled that *Oscar* is inapplicable,[74] and Plaintiff's characterization of *Oscar* as an aberration is supported only by unconvincing rulings that are not binding on this Court.[75]   In *In re Micron Technologies, Inc. Sec. Litig.*, 247 F.R.D. 627, 633 (D. Idaho 2007), for example, the court relied on *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), and concluded that loss causation "is an issue related to the merits rather than to the Rule 23 inquiry," and, therefore, that it could not consider the issue.  247 F.R.D. at 633-34.  But *Dura* did not hold that loss causation is irrelevant to certification and, in fact, the issue in *Dura* was not certification at all, but whether a complaint had been properly dismissed for failure to state a claim.  Given that the class determination "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Livesay*, 437 U.S. at 468-69, there is no support for the implicit assumption in the holding of

---

[73]   To read *Basic* otherwise, and to allow a plaintiff to establish reliance simply by showing market efficiency and claiming there was a misleading statement, would render the defendant's right of rebuttal meaningless, and make FOTM available to every putative class representative alleging a violation related to a stock traded on an efficient market.  There is no reason to believe the Supreme Court intended this result.

[74]   Plaintiff claims that the Ninth Circuit "rejected the logic" of *Oscar* in a recent decision, *Huberman v. Tag-It Pac. Inc.*, 2009 WL 485053 (9th Cir. 2009).  *Huberman* is an unpublished case and, pursuant to Ninth Circuit Rule 36-3, is not precedent.  But even if it were controlling, it is inapposite.  *Huberman* sought review of the district court's summary judgment in favor of the defendants on a 10b-5 claim, as well as the court's denial of his motion for class certification.  In reversing summary judgment, the Ninth Circuit found Huberman had "presented sufficient evidence of loss causation to survive a summary judgment motion."  2009 WL 485053 at *2.  On the class certification issue, the Ninth Circuit did not address loss causation (and does not cite *Oscar* at all).  Rather, the court clarified that Huberman had shown an efficient market existed and, because the remaining elements for certification were present, remanded with an order to certify the class  *Id.* at *3.

[75]   *NASD Dispute Resolution, Inc. v. Judicial Council of State of Cal.*, 488 F.3d 1065, 1069 (9th Cir. 2007) ("[O]utside of future litigation involving the same parties and their privies . . . a district court opinion does not have binding precedential effect.").

28800783

1  the *Micron* court, that causation can relate either to the merits, or to Rule 23, but not both.[76]

2  Nevertheless, even without following the loss causation approach adopted in *Oscar*, this

3  Court can determine that fraud-on-the-market does not apply simply by comparing Plaintiff's

4  allegations to publicly available information.  As *Basic* itself says, the fraud-on-the-market

5  presumption does not apply if the "truth" is known to the market makers, *id*. at 248, which is

6  undoubtedly the case here.

7  **2.   The fraud-on-the-market presumption does not apply before**

8  **December 1, 2006 or after February 16, 2007.**

9  As noted, Plaintiff cannot invoke the FOTM presumption prior to December 2006

10  because it cannot show that the market was defrauded during that time.  Rather, public

11  information shows the market was well aware of the relevant facts,[77] which renders FOTM

12  inapplicable.  *Basic*, 485 U.S. at 248.

13  Nor can Plaintiff invoke the presumption for the period after February 16, 2007.  The

14  May 10, 2007 ODAC meeting was not a corrective event.  The ODAC's discussion did not

15  reveal any new safety information about ESAs, or disclose any information about Amgen's

16  marketing practices.[78]  The market was already aware that the boxed warning announced on

17  March 9, 2007 was possible, and the announcement did not disclose any new information.  And

18  the February 28, 2007 announcement of an informal SEC inquiry did not disclose any

19

20  [76]  Plaintiff's other cited authorities are equally unconvincing.  In *In re LDK Solar Sec. Litig.*, 2009 WL 196369 (N.D. Cal. 2009), the court misconstrued the connection between fraud-on-the-market and reliance as explained in *Basic*, assuming (wrongly) that fraud-on-the-market relates primarily to the element of materiality.  2009 WL 196396 at *11.  Working off of this erroneous understanding of *Basic*, the court in *LDK* rejected *Oscar* as improperly including *reliance* and, therefore, causation, among the elements required to invoke fraud-on-the-market.  But *Basic* held that fraud-on-the-market relates to reliance, and *Oscar* is consistent with *Basic*.  In fact, the court in *Oscar* even acknowledged that if "loss causation were only empirical proof of materiality," the causation inquiry would likely be inappropriate at the certification stage.  487 F.3d at 269.  Plaintiff's other cited authority, *In re Cooper Companies Inc. Sec. Litig.*, 2009 WL 32568 (C.D. Cal. 2009), is also not pertinent.  *Cooper*, which does not cite *Oscar*, addressed whether a court could refuse certification on the grounds that certain members of the class would ultimately lose on the merits, because they could not show any loss causation.  *Id*. *11.  *Cooper* did not address whether a plaintiff may invoke the fraud-on-the-market presumption when all information is disclosed to the public and, for that reason, it is inapposite here.

27  [77]  *See* discussion *supra*, at pgs. 3-10.

28  [78]  *See* discussion *supra*, at pgs. 3-10, 15-18.

28800783

previously hidden information or correct any prior misstatement.[79]

Because there is no connection between any drop in Amgen's stock price and any revelation or correction after February 16, 2007, there is no basis to apply the FOTM presumption. *Basic*, 485 U.S. at 248; *Oscar*, 487 F.3d 264-70.

### 3.   The fraud-on-the-market presumption does not apply to the DAHANCA period (December 1, 2006 to February 16, 2007).

On December 1, 2006, the DAHANCA study was terminated based on the results of an interim analysis.[80]  Plaintiff contends that Defendants should have disclosed the termination of DAHANCA, and that the market was only fully informed on February 16, 2007, when *The Cancer Letter* ran an article about the study's termination.  But Defendants had no duty to disclose the termination of the study, which had been published on the DAHANCA website and reported to the FDA in December 2006.  Because the market was not misinformed, there is no basis to apply the FOTM  presumption to this period and thus certification is improper.

*First*, the DAHANCA Study was not terminated, as Plaintiff alleges, because of "adverse outcomes in patients using Aranesp," (CAC ¶ 202) or because "cancer patients treated with Aranesp had greater tumor growth than those not receiving Aranesp." *Id*. ¶ 3.  Rather, Dr. Overgaard terminated the study because it was futile.  He made this clear not only on December 1, 2006, but also four months later:

> *December 1, 2006*:  The treatment with Aranesp has not caused ecxess [*sic*.] major serious adverse events and has been well tolerated by the patients included. . . .  [T]he DAHANCA group concluded that the likelihood of a reverse outcome, *i.e.*, that Aranesp would be significantly better than in control was almost non-existing even if we await a longer follow-up and additional inclusion of the remaining planned 78 patients.[81]

> *April 14, 2007*:  [N]othing was known before November 28 – and nothing was communicated in writen [*sic*.] english [*sic*.] before December 1 – and Amgen has been notified in parallel with the Dahanca group and the investigators. . . .

---

[79]  *See* discussion *supra*, at pgs. 3-10, 15-18.

[80]  December 1, 2006 email from Jens Overgaard to Tom Lillie (Harper Decl., Ex. 2).
[81]  *Id.*

28880783

We are a bit concerned about the data being over intrepreted [*sic.*]. . . .  I will warn about concluding more that we have done – namely that it was not likely that the trial (if completed) would come out in favour of Aranesp – no more no less.  We are now in the process of doing this additional collection, and so far we have not seen any data which are in disagreement [*sic.*] with this conclusion.  This also include that we do apparently not see any excess death form [*sic.*] non-cancer causes (including cadio-vascular [*sic.*] event) despite the high hemoglobin levels accepted in the study.  I do in principle think that it is too early to declare the Dahanca 10 study for 'negative' in the sense that Aranesp will cause a decreased survival in the patients – as mentioned do we just conclude that the likelyhood [*sic.*] that it become 'positive' is very small – so please do not intrepretent [*sic.*] the study beyond that.[82]

A corporation is not required to disclose the results of third-party interim analyses where, like here, the information is inconclusive.  By their very nature, interim analyses are often inconclusive and, therefore, incapable of creating "an impression of a state of affairs that differs in a *material* way from the one that actually exists."  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis added).[83]  Moreover, Dr. Overgaard did not provide Amgen with the underlying data,[84] and it was not Amgen's practice to issue press releases about the results of such "interim analyses" of third-party, investigator-sponsored studies until Amgen had an opportunity to review the underlying data.[85]  There was no duty to disclose the DAHANCA interim analysis because it would have not altered the total mix of information and, therefore, was not material.  *Basic*, 485 U.S. at 231-32.

In *Oran v. Stafford*, 226 F.3d 275, 284 (3d Cir. 2000) (Alito, J.) for example, the court found that a drug manufacturer was not required to disclose adverse events where the impact of those events had not been analyzed and, thus, was inconclusive.  The court reasoned that because not all information was available, the market would still be unable to determine whether the drug was unsafe.  *Id*.  Similarly, in *Siracusano v. Matrixx Initiatives, Inc.*, 2005

---

[82]  April 14, 2007 email from Jens Overgaard to Sean Harper (Harper Decl., Ex. 2).

[83]  *See also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976) (companies should not be forced to "bury the shareholders in an avalanche of trivial information that is hardly conducive to informed decision making").

[84]  *Id.  See also* December 5, 2007 letter from Amgen to FDA (Harper Decl. Ex. 3).

[85]  Harper Decl. at ¶ 8.

28800783

WL 3970117 (D. Ariz. 2005), the court found that a drug manufacturer did not have to disclose results that recognized only a "possible" adverse safety outcome: "[m]edical researchers may well differ with respect to what constitutes acceptable testing procedures, as well as how to best interpret data garnered under various protocols." *Id* at *7.[86]  *See also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007) (prudent managers "conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention. . . .  Taking the time to get things right is both proper and lawful.").

In any event, the termination of the DAHANCA study was posted on DAHANCA's website on December 1, 2006.  Indeed, although Plaintiff claims that the February 16, 2007 article in *The Cancer Letter* revealed the truth, the article indicates that the information about DAHANCA was obtainable on Google.[87]  Where information has already been made publicly available, there is no duty to disclose and, thus, no actionable omission.  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 976-77 (9th Cir. 1999).[88]  This is because the total mix of information is not altered by disclosure of already public information; such information is, by definition, not material.  *Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996) (misstatement or omission is not material if the undisclosed fact is already in the public domain).

Accordingly, the February 16, 2007 *The Cancer Letter* is not a corrective event because it did not disclose any previously withheld information or correct any prior misstatement.[89]  Rather, *The Cancer Letter* simply republished information that was not required to be

---

[86]  *See also Pandes v. Scios Nova, Inc.*, 1996 WL 539711, *5 (N.D. Cal. 1996) ("The fact that plaintiffs disagree with the Colorado researchers and with defendants about the import of the Colorado data does not make defendants' summaries of the study false or misleading."); *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 189 (S.D.N.Y. 2003) ("There is no general duty to provide status updates regarding ongoing activities. . . .  [N]ot every adverse effect in a clinical trial is automatically material.").

[87]  *The Cancer Letter* at 2 (McDonald Decl., Ex. 3).

[88]  *See, e.g.*, January 18, 2007 Lillie email ("Jens [Overgaard] informed me that the letter to investigators regarding the study closing and the preliminary results is posted in the DAHANCA website. . . .  This is publicly accessible.") (Harper Decl., Ex. 4).

[89]  Defendants had no intention to withhold anything and, if the Court certifies a class for the DAHANCA period, Defendants will bring motions related to, *inter alia*, their lack of scienter and the absence of materiality.

28800783

disclosed, but nonetheless was already public (in fact, the article even reprinted what had previously been published on the DAHANCA website).[90]  Such a republication of already available information does not constitute a correction, and cannot support FOTM.[91]  *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999) (television program was not a corrective event because information was "well known to the market before the . . . broadcast").  The information in *The Cancer Letter* was already available to the market; thus Plaintiff cannot invoke FOTM because any movement in the price of Amgen's stock could not have been due to the disclosure of new information.

### C.   Plaintiff cannot satisfy the adequacy requirement.

The "adequacy inquiry … serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  The representative must "be free from economic interests that are antagonistic to the interests of the class."  *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990).

As a current holder of Amgen securities,[92] Plaintiff has "divided loyalties."  *In re Seagate Technologies II Sec. Litig.*, 843 F. Supp. 1341, 1359 (N.D. Cal. 1994).  On the one hand, Plaintiff hopes for recovery for itself; "as an equity holder in the relevant issuer, however, [Plaintiff] also wish[es] to minimize the overall liability of the company."  *Id*.  The conflict potential is great, because in prioritizing its own recovery, an equity holder class representative such as Plaintiff "is not likely to be interested in whether the class members whose recoveries he prevents are equity holders or non-equity holders.  In other words, his antagonism will not discriminate."  *Id.*

Here, Plaintiff alleges that Defendants made a "series of partial corrective disclosures," each of which removed a portion of the purported artificial inflation from the price of Amgen's stock.  CAC ¶ 202.  This "step effect" creates "an increased potential for the presence of in/out

---

[90]  *The Cancer Letter* at 4-6 (McDonald Decl., Ex. 3).

[91]  *See also Teachers' Ret. Sys. of Louisiana*, 477 F.3d at 187-88; *Omnicom*, 541 F. Supp. 2d at 552; *Merck*, 432 F.3d at 270-71.

[92]  LaMarr Depo. (Kramer Decl. at 3, pg. 224:8-15); Interrog. Responses, No. 18 (*Id*., Ex. 1).

28800783

traders in the plaintiff class" because "*all* persons whose transactions branch across 'steps' will be entitled to in/out damages." *Seagate II*, 843 F. Supp. at 1365. Accordingly, "cases involving partial curative disclosures give rise to greater cause for concern . . . [and] a court, when faced with a partial curative disclosure case, ought to be considerably more wary in making a class certification decision than in a full disclosure case."[93] *Id*. Here, Plaintiff has not met its burden to show that these conflicts do not preclude certification.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny certification or, at the very least, limit certification to a class period from December 1, 2006 to February 16, 2007.

Dated:   April 29, 2009                 MAYER BROWN LLP


By: _Steven Kramer_____
          Steven O. Kramer

Attorneys for Defendants

---

[93] *Blackie*, 524 F.2d at 891 does not moot this analysis. *Blackie* was decided before *Basic*, and its analysis on this point is therefore not controlling. *See Seagate II*, 834 F. Supp. at 1367. And, having cited the decision in *Seagate II* in support of its own motion (at 19), Plaintiff should not be heard to complain now about a portion of the decision it does not like.

28800783