1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3     HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

4   CONNECTICUT RETIREMENT,              )
                                         )
5                                        )
                                         )
6                        Plaintiff,      )
                                         )
7                                        )
                                         )
8        Vs.                             )   No. CV 07-2536-PSG
                                         )
9                                        )
                                         )
10  AMGEN, INC., ET AL.,                 )
                                         )
11                                       )
                                         )
12                       Defendants.     )
                                         )
13  _____     )

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17             LOS ANGELES, CALIFORNIA

18             THURSDAY, JULY 16, 2009

19  _____

20

21        MIRIAM V. BAIRD, CSR 11893
        OFFICIAL U.S. DISTRICT COURT REPORTER
22        255 EAST TEMPLE STREET, # 181-K
        LOS ANGELES, CALIFORNIA 90012
23             (213) 894-2853
             MVB11893@AOL.COM
24

25

1                          **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFF,**        LABATON SUCHAROW
     **CONNECTICUT RETIREMENT:**            BY:  CHRISTOPHER MC DONALD
4                                           140 BROADWAY
                                            NEW YORK, NY 1005
5                                           - AND -
                                            KREINDLER & KREINDLER
6                                           BY:  GRETCHEN M. NELSON
                                            707 WILSHIRE BOULEVARD
7                                           LOS ANGELES, CA 90017

8

9

10

11   **IN BEHALF OF THE DEFENDANTS,**       SHEPPARD MULLIN
     **AMGEN, INC., ET AL:**                BY:  STEVEN KRAMER
12                                          - AND -
                                            JOHN STIGI III
13                                          333 SOUTH HOPE STREET
                                            43RD FLOOR
14                                          LOS ANGELES, CA 90071

15

16

17

18

19

20

21

22

23

24

25

```
1          LOS ANGELES, CALIFORNIA; THURSDAY, JULY 16, 2009; 1330

2                              ---

3

4          THE CLERK:  Calling CV 07-2536, Connecticut

5     Retirement vs. Amgen, Inc., et al.

6          Counsel, please state your appearance for the

7     record.

8          MS. NELSON:  Good afternoon, Your Honor.

9     Gretchen Nelson of Kreindler & Kreindler on behalf of the

10    plaintiff.  With me today is Christopher McDonald from the

11    Labaton Sucharow firm and Laura Killian Mummert.  For today's

12    argument, Mr. Mc Donald will be handling the argument.

13         THE COURT:  Thank you.

14         MR. KRAMER:  Good afternoon, Your Honor.

15    Steven Kramer and John Stigi from the law firm of Sheppard

16    Mullin appearing on behalf of defendants.

17         THE COURT:  Good afternoon.

18         Let me set out the parameters of what I'd like to

19    do this afternoon.  Typically, I would tell you don't repeat

20    what is in your papers, but in this particular case, I think

21    you are going to repeat what is in your papers because

22    everything has been covered fairly nicely.  I was -- as I was

23    going through things I wanted to talk about, I want to talk

24    about all of the arguments you've raised in your papers.

25         Why should I or should I not follow *Seagate*?  Why
```

```
 1    isn't Binder and Huberman controlling in this case or not?
 2    Has efficient market been conceded?  The issue of rebuttal
 3    and class period, should I leave it for another day for a
 4    motion down the line or deal with it in class certification?
 5           I'm going to allow each side 15 minutes to take
 6    your best shot and talk to me about the issues.  If I have
 7    any questions, I'll interrupt.
 8           Mr. Mc Donald?
 9           MR. MC DONALD:  Thank you, Judge.
10           I'll try to respond to any questions the Court may
11    have.  I have attempted to provide some semblance of
12    structure to my remarks.  Just very quickly, probably a
13    minute or less, to deal with the three 20(b)(a) requirements
14    that the defendants haven't challenged.  I'll then turn to
15    the adequacy argument.  Then next address 23(b),
16    predominance, and spend a fair amount of time of the
17    15 minutes addressing to what the defendants refer to -- what
18    I refer to based on the defendants' brief, their no-basis
19    argument.
20           So my minute to -- on the 23(a) requirements that
21    have not been challenged, numerosity.  The defendants haven't
22    challenged it --
23           THE COURT:  I wouldn't waste your one minute on
24    those three issues.
25           MR. MC DONALD:  Sure.  Numerosity, typicality,
```

1    commonality, the defendants haven't challenged them.

2        Moving on, adequacy.  The defendants have

3    challenged adequacy based on the *Seagate* case which is a case

4    that pre-dates the PSLRA, and, which as the Court knows from

5    our briefing in the cases cited therein, has been roundly

6    criticized by the majority of courts where defendants have

7    raised the issue.  Actually, there are two issues in

8    connection with the alleged conflict that potentially makes a

9    plaintiff inadequate.

10       One, referred to as the equity conflict, which is

11   essentially a perceived tension between class members who are

12   still equity holders in the defendant company and those who

13   are not.  The tension being that a current equity holder may

14   not wish to fully prosecute the case out of some fear that by

15   being too successful in the litigation, you'll wind up

16   hurting yourself as a shareholder.

17       The second conflict has to do with different groups

18   of shareholders who have competing interest based on when

19   bought and sold their shares.  As in this case, there are a

20   few partial disclosures, so the tension there would be where

21   a shareholder who bought on the date of a partial disclosure

22   would want to maximize the degree of inflation on that date,

23   whereas a person who sold on that date, would want to

24   minimize inflation.

25       These conflicts are, as the Courts have stated,

1    present largely in almost every large securities case.  For

2    practical purposes, they really don't exist.  They overstate

3    the importance of price inflation, which is a damages issue.

4    As we state in our brief, the *Blackie* case notes that Courts

5    generally decline to consider conflicts, particularly, as

6    they relate to damages.  There is a very practical reason

7    for -- essentially, for all intents and purposes, ignoring

8    the perceived conflict raised.  That is, before class members

9    can debate how to apportion damages, they need to establish

10   liability.  They need to focus on the common issues.

11            So there's a quote from the *Honeywell* case, "common

12            questions with respect to whether misleading

13            statements were made, whether such statements were

14            material, and whether they were made with scienter

15            bind class members with more force than the varying

16            questions relating to price inflations driving them

17            apart."

18            That's, again, the *Honeywell* case which itself is

19   quoting the Gaming Lottery case, which is a 1999 decision

20   from the Southern District of New York.

21            As a practical matter, the adequacy argument the

22   defendants raise essentially swamps the PSLRA.  Many large

23   investors, and in this case, Connecticut, as an example, have

24   index funds as a way to spread their risks.  So by in large,

25   you'll have large institutional investors that always

1    continue to own shares during the course of a litigation.  So

2    by applying the conflicts that defendants have raised, you

3    would essentially wind up knocking out the very companies

4    that the PSLRA has specifically stated that ought to be lead

5    plaintiffs.

6         So what we have then with respect to 23(a) are

7    three prerequisites that the defendants haven't challenged.

8    One that has been raised where the challenge is really one

9    that plaintiffs submit ought not concern the Court at this

10   juncture.  So with that said, given the speculative

11   theoretical nature of the conflicts that the defendants have

12   raised, I'll turn my comments to 23(b).

13        So with respect to predominance, I actually -- I

14   have a handout -- may I approach, Your Honor?

15        THE COURT:  You may.

16        MR. MC DONALD:  Just a quick point of order, some

17   of the material in here is confidential or has been marked as

18   confidential by the defendants.  If I may turn to Mr. Kramer,

19   to what extent should I not refer to or read out loud the

20   materials?  I had sent this to Mr. Kramer yesterday.  So he's

21   aware of the contents.

22        Is there any reason why I shouldn't speak out loud

23   with respect to a few things in there marked confidential?

24        MR. KRAMER:  Only two exhibits, 52 and 53.  I have

25   no problem in counsel referring to those exhibits, making his

1     argument, or discussing.

2              THE COURT:  We are having difficulty hearing you.

3              MR. KRAMER:  I'm sorry.  I developed a little cold

4     on my trip.  I said there's only two exhibits that I saw, 52

5     and 53.  I have no objection to counsel referring to them,

6     arguing them, saying whatever he wants about them.  Just when

7     he gets to the quote, simply rather than quoting on the

8     record, simply refer Your Honor to the quote on the page.

9     Your Honor can read it for himself.

10             THE COURT:  All right.

11             MR. MC DONALD:  Just -- before getting to the 23(b)

12    argument which is a few pages in, let me take a brief detour

13    to explain the first few pages.

14             The first page is to point out that the defendants

15    make points several times in their brief that our proposed

16    class period is, quote, unquote, unusually long, citing the

17    Ninth Circuit *Vantive* opinion.  We didn't scour all

18    post-*Vantive* Ninth Circuit or District Court cases looking

19    for longer class periods.  All we did was turn to those cases

20    that we had already cited for the proposition in our own

21    brief.  You'll see that there are numerous that have class

22    periods that are longer than the 14 months that the Ninth

23    Circuit described as unusually long in the *Vantive* case.

24             Another point we make in our brief was that the

25    defendants' opposition was essentially read -- it essentially

1    read more like either a motion to dismiss argument or a

2    summary judgement argument than it did a class certification

3    argument.  When you look at the case law that they cited, it

4    seems to line up that way.  They have more dismissal and

5    summary judgement motion related cases than they do class

6    certification cases.

7            Third and fourth slides just focus on the class

8    certification cases.  With the fourth slide itself, the

9    defendants made reference in --

10           THE COURT:  I want to make sure I'm on the same

11   page.

12           MR. MC DONALD:  Sure.

13           THE COURT:  Are you counting the cover sheet as

14   one?

15           MR. MC DONALD:  No.  No.  There is a diagram that

16   shows the number of dismissal and summary judgement cases and

17   class certification cases.  Then there's a sheet behind that

18   that focuses specifically on the class certification cases.

19           THE COURT:  All right.

20           MR. MC DONALD:  And then what is the fourth slide

21   in the deck which focuses on those class certification cases

22   that are Supreme Court or Ninth Circuit cases.  The reason we

23   did this was because there was a particular Footnote 75 in

24   the defendants' brief that was included to remind the Court

25   that several of the District Court decisions within the Ninth

1    Circuit rejecting the *Oscar* case were not binding on the

2    Court.

3              So if we look to the Supreme Court and Ninth

4    Circuit cases that discuss class certification that are --

5    that could be argued to be binding on the Court, we have just

6    this small set.  The *Amchem* case was mentioned in the

7    defendants' brief only connection with the adequacy argument.

8    I'll be talking more about the *Basic* case with respect to the

9    23(b).

10             The *Coopers & Lybrand* case.  I just want to bring

11   the Court's attention to that.  On Page 10 of their brief,

12   the defendants begin -- they have a sentence that quotes a

13   portion of the *Coopers* case.

14             They say because, quote, "the class determination

15             generally involves considerations that are enmeshed

16             in the factual and legal issues comprising the

17             plaintiffs' cause of action," closed quote, which

18   is in reference to the *Coopers* case.  It follows that "a

19             Court will almost always need to examine the merits

20             to decide if certification is proper."

21             I'm raising that because the second part of that

22   sentence that encourages the Court to focus on the merits to

23   decide whether class certification is proper, that doesn't

24   have a cite to it.  Certainly, the *Coopers* case doesn't stand

25   for that proposition.  No decision that is binding on this

1    Court does stand for that proposition.

2           The *Dukes* case, as we mentioned in our brief, has

3    been vacated.  When we last checked, which was earlier today,

4    there's still no word on that.  I'm sorry.  I skipped over

5    the *Eisen* case, the defendants only brought that up so that

6    they could use it as a foil to make reference to a Fourth

7    Circuit case.  The *General Telephone* case only talks about a

8    rigorous analysis.

9           Finally, the *Huberman* case, defendants only raise

10   that to distance themselves from it because we raise it in

11   our opening brief.  The defendants also point out that the

12   *Huberman* case is not precedential, but, of course, Federal

13   Rule of Appellate Procedure 32.1 certainly allows us to bring

14   it to the Court's attention.

15          The next slide just to get back on task, which

16   reads, "plaintiff has established predominance under Rule

17   23(b)" focuses on predominance and the common questions.  And

18   the two quotes that we have from the *Huberman* case and from

19   the *Basic* case.  The reason that we wanted to focus the

20   Court's attention on these is because they make clear, I

21   think, that once the plaintiff has established that the stop

22   trades on an efficient market, that in and of itself is

23   enough in a securities class action to establish that the

24   requirements of 23(b) have been satisfied.

25          The *Huberman* case itself makes it explicitly clear

1    that at -- the -- the quote being further, "We conclude that

2              at this stage of the proceeding, *Huberman* satisfied

3              Rule 23(b)'s superiority requirement by presenting

4              evidence that Tag-It traded on an efficient market,

5              thereby establishing the application of a

6              fraud-on-the-market presumption.  Common questions

7              of fact and law predominant over individual

8              questions pursuant to 23(b)(3).

9              That coupled with the *Basic* quote -- which I won't

10   read; it's in our brief and here as well -- has been followed

11   in this Circuit, the Northern District of California recently

12   in the *Connetics* case, which we mentioned in our brief.

13   There's additional case law on Pages 6 and 7 of our reply

14   brief making clear that the challenges to the presumption of

15   reliance, substantive challenges to the presumption of

16   reliance that is established by the efficient market are

17   properly left for summary judgement and shouldn't be dealt

18   with at the class certification stage.

19              Defendants essentially seek to import to the class

20   certification stage merits issues beyond those that are

21   necessary to determine whether 23(a) and (b) are satisfied.

22   Materiality, loss causation, whether the truth is on the

23   market, all these are issues that become common issues once

24   the efficiency of the market is established.  The defendants

25   have not challenged efficiency in this case.  Therefore, I

1    would argue we have established predominance under 23(b).

2         So turning to the rule itself, we have under Rule

3    23(a), the prerequisites of 23(a) 1 through 4.  It states --

4    the rule states, "One or more members of a class may sue or

5         be sued as representative parties on behalf of all

6         members only if those four are satisfied."  I

7    submit that we have.

8         With respect to 23(b), "A class action may be

9         maintained if Rule 23(a) is satisfied, and if the

10        Court finds under Rule 23(b) that questions of law

11        or fact common to the class predominate over any

12        questions affecting only individual members.  That

13        a class action is superior to other available

14        methods for fairly and efficiently adjudicating the

15        controversy."

16        That's the scope of the controversy we have here.

17   Nothing beyond that.  The merits issues that the defendants

18   have raised are essentially either trial or, at best, summary

19   judgement issues that don't have a place before the Court at

20   this juncture.

21        THE COURT:  Mr. Mc Donald, it's been 15 minutes.

22   If you could wrap up.

23        MR. MC DONALD:  Sure.

24        The *Oscar* case, we spilled quite a bit of ink in

25   our papers on the *Oscar* case.  It is an example of an

1    improper merits issue being shoe-horned into the class

2    certification period.

3            The remainder of the slide presentation deals with

4    what I refer to the basis of the class period or -- the

5    defendants' no-basis argument which is essentially another

6    way of saying that there is no merit to our case.  So what I

7    wanted to do without turning this into a summary judgement

8    argument -- I guess the way that I viewed it is all of the

9    legal arguments to this point are for the purpose of

10   convincing the Court that the merits -- the issues we have

11   here are ones that you don't need to consider.  What we've

12   done is provide the Court with some evidence from the

13   defendants' own production that suggests that's there's a

14   rational basis for the class period to begin when it does and

15   a rational basis for the class period to end when it does.

16           With respect to the beginning of the class period,

17   we have a February 2004 communication between the FDA and

18   Amgen.

19           THE COURT:  Wasn't the argument the same too with

20   regard to the class period, you're essentially bringing

21   different motions for partial adjudication as to this period

22   and that period?  If the class period is too long because

23   there were partial disclosures along the way, maybe after

24   certification, there would be a summary judgement motion

25   dealing with specific periods of time as opposed to dealing

 1    with it now.

 2         MC DONALD:  Whether on -- certainly the Court has

 3    the ability to revisit the class issue even if certification

 4    is granted.  I'm not sure that with respect to the partial

 5    disclosure it would result in essentially different summary

 6    judgement motions.  It might mean that there's a need for

 7    subclasses.

 8         THE COURT:  Right.

 9         MR. MC DONALD:  Although, I don't know that's an

10    issue that needs to be dealt with when we're focusing on

11    liability.

12         So very quickly, there is a document that we wanted

13    to bring to the Court's attention.  It's also in our papers,

14    but it's focused on here, which is a meeting between the FDA

15    and Amgen before the beginning of the class period that

16    essentially we would argue establishes that Amgen was

17    perfectly aware at the time that they ought to be bringing --

18    ought to be doing on-label testing of their products, and

19    that the testing that had been done on the products on the

20    ESAs to that point was insufficient.  And yet, Amgen stated

21    publicly that -- Mr. Morrow, in particular, stated at the

22    beginning of the class period that the testing that had been

23    done to that point established that the products were safe.

24    And then at the 2004 ODAC meeting, Amgen essentially relied

25    on their Pharmacovigilance program.

1          The next set of slides after that fast-forwards to

2     2007, establishes that, essentially, Amgen was informed yet

3     again that the on-label trials were necessary and that they

4     had failed to establish safety.  One of the points, in

5     particular, was that the FDA emphasized that its Amgen's job

6     to prove safety, rather than the FDA's job to disprove

7     safety.  That meeting takes place in February.  In March,

8     Amgen continues to tell the market that it believes that its

9     products are safe and effective when used on-label.

10          There's a slide that follows that shows that the

11     market continued to believe that, quoting from a number of

12     analysts' reports.  To establish for the Court to very

13     minimally provide some evidence to suggest that there is a

14     rational basis for the class period to end when it does,

15     although, plaintiffs' position is that is not an issue for

16     class certification.  We provide information to suggest that

17     the market was unaware that the Pharmacovigilance program was

18     inadequate; that the additional restrictions that the ODAC

19     panel suggested came as a surprise to the market not because

20     of anything other than the fact that Amgen had continued to

21     say all along that the products were safe and effective when

22     used on-label when, in fact, that was not the case.

23          THE COURT:  Mr. Mc Donald, thank you.

24          MR. MC DONALD:  Thank you.

25          THE COURT:  Mr. Kramer?

1          MR. KRAMER:  Thank you, Your Honor.

2          Your Honor, let me structure my argument for the

3     Court in this fashion.  I want to talk about what we've

4     termed in our brief the pre- and post-DAHANCA period.  In

5     other words, what the starting date and what the ending date

6     of any class if the Court would decide to certify should be.

7          Under that, there's two different legal arguments.

8     The first is, their starting date and ending date arbitrary?

9     It has nothing to do with the *Basic* case; nothing to do with

10    fraud on the market.  If you'll note in their reply brief,

11    Your Honor, plaintiffs almost don't address this.  Plaintiffs

12    start out with DAHANCA, focus on DAHANCA.  All their

13    documents deal with DAHANCA.  The DAHANCA period, which is,

14    Your Honor, the date of the interim analysis of December 1st,

15    2006 through February 16, 2007, the Cancer Letter, or a

16    two-and-a-half-month period.

17         The second is a fraud-on-the-market theory.  Have

18    they satisfied 23(b)(3)?  Can they invoke the

19    fraud-on-the-market theory?  Have they satisfied the five

20    elements which are required in the *Basic* case?  They have

21    not.  There is only one, market efficiency.  Have we rebutted

22    it, which is allowed?  In preparing for this argument, Your

23    Honor, I was looking at their reply brief.  I found a couple

24    of additional cases saying you can rebut.  If I can cite

25    those to the Court, I would like to.  I won't argue them.

1     THE COURT:  Go ahead.

2     MR. KRAMER:  The first one is the In re Solomon

3  Analysis, which is a Second Circuit case, which is at 544 F.

4  3rd at 473.  And the other one is dealing with *In re Fannie*

5  *Mae* which is at -- excuse me, 247 Federal Rules decision 32

6  at Page 38.

7     What I wanted to say, Your Honor -- I took an aside

8  to tell you those two cases -- is have we rebutted it,

9  etcetera?  Then after we do that discussion, and I'd like to

10  spend most of my time on that, then I deal with DAHANCA.

11  Should the Court certify a DAHANCA class, either from

12  December 1st, 2006 to February 16, 2007, or maybe even moving

13  it back to the date that there was a temporary stopping of

14  new patients.  Although, the interim analysis weren't in yet,

15  which is, I believe, October 16, 2006.  I have to go back and

16  check.  I may be off a day or two.

17     I'd like to deal with DAHANCA.  And then I'd like

18  to deal with adequacy.  Adequacy, I'm only going to spend a

19  minute or two on, Your Honor.  Your Honor, if you look at

20  Page 8 of the charts that plaintiff just gave you, it has a

21  list of three cases we cited which show that the Court chose

22  an ending date two months earlier, three months earlier, one

23  day earlier.  Plaintiffs do not anywhere in their reply

24  papers contest that this Court has the power to set the

25  starting and ending date.

1          In fact, Your Honor, if you look at the *Basic* case

2    and look at Footnote 5 in the *Basic* case, prior to the

3    discussion on fraud on the market and materiality, when

4    they're discussing with the Court -- the Court is discussing

5    the class period and what the District Court said.  It says,

6    that the District Court moved the starting date one year from

7    October, I believe, it was of '77 to October of '78.  The

8    reason it moved that is because it said, although, there

9    was -- there were negotiations -- as you recall, the

10   discussion was the misstatements regarding the merger.

11   Although there were negotiations about a merger, the first

12   alleged misstatement of the three made, that one didn't come

13   until October of '78; therefore, the class period should

14   start later.

15          So if you look at all of the cases we cited in our

16   brief -- those are basically at Page 12 of our opposition

17   brief -- we cite a series of cases which stand for the

18   proposition that this Court has the power to have a starting

19   date and an ending date.  Footnote 5 of *Basic.*  I will give

20   you one example.

21          In re *Ribozyme Pharmacy*, the Court said, quote,

22          "the class period should end when the curative

23          information is publicly announced or otherwise

24          effectively disseminated to the market."

25          Skipping ahead.  "At that point, subsequent

```
 1              purchasers are charged with knowledge of the true

 2              state of business affairs."

 3         Plaintiff has not contested that law.  This Court

 4    has that right.  Many District Courts have done it.  Then

 5    they say, well, wait a second, Your Honor, isn't that a

 6    merits decision?  As you said, maybe I should hear partial

 7    summary judgement motion.  I think it has to be decided now,

 8    Your Honor.

 9         Plaintiff's charts of the various cases don't have

10    all of the cases which the Court can look to.  For example,

11    in addition to Coopers & Lybrand, which I refer the Court to

12    Page 469 and General Telephone.  In plaintiff's reply papers,

13    they cite a Ninth Circuit case called Hanon, at 976 F.2nd

14    497.  At Page 509 of that case, the Ninth Circuit said in a

15    class certification case under the topic of class

16    certification, quote, "Nevertheless, we are at liberty to

17              consider evidence which goes to the requirement of

18              Rule 23 even though the evidence may also relate to

19              the underlying merits of the case."

20         The Ninth Circuit said you have the power to do

21    this.  So should the Court do this?  Well, we say absolutely,

22    the Court must do this.  Why do we say that?  Your Honor,

23    plaintiff claims there's market efficiency to support that

24    they gave you a declaration of an expert called Hakala.

25    Exhibit B to his declaration is an event study.  That event
```

```
 1    study is based on analyst reports.

 2              All we're saying to the Court is for pre- and

 3    post-DAHANCA, you have to look at all of the analyst reports.

 4    The analyst reports show everything is public, everything.

 5    There was open public discussion about everything.  The only

 6    alleged thing not public which was what they raised at the

 7    motion-to-dismiss stage when the Court had to assume their

 8    complaint was pled with true facts.  That was Amgen should

 9    have disclosed DAHANCA on December 1st their position.  It

10    didn't come out until February 16.

11              There's an easy way for the Court to do this.  He's

12    giving you three charts.  I want to give you three charts.

13    These were attached as Exhibit A, B, and C to our opposition

14    to class certification.  I would like to hand you them so you

15    may have a chance to look at them.

16              May I approach?

17              THE COURT:  You may.

18              MR. KRAMER:  Would the Court like one or two

19    copies?

20              THE COURT:  One is fine.

21              MR. KRAMER:  Your Honor, I'll try to do this

22    quickly.  I know the Court has only given me 15 minutes.

23    There's so much to say.  This is such an important motion to

24    my client.  So I apologize if I go a little past.

25              The first one, Your Honor, is essentially taking
```

1    the Court through what the start date should be.  It is

2    saying what happened with respect to pre-DAHANCA.  All

3    plaintiff did in their complaint was quote from one statement

4    from Mr. Morrow in a 40-minute call in which he talked for

5    maybe a minute or two on it.

6           If the Court looks at Page 13 of our opposition,

7    the question appears, which is, could you comment on the FDA

8    meeting that I've heard about, I believe, several weeks from

9    now where they're going to look into the safety of Aranesp --

10   it goes on to other products.  What is the scope of the

11   meeting?  Mr. Morrow responds.  The meeting was set up.  He

12   tells about the fact there were two studies done of Roche and

13   another company on their products in Europe.  We don't have

14   the results of those studies; they raised a concern.  The

15   meeting is going to talk about that and the other products

16   like Aranesp.

17          And then they take out of context what he said,

18   which is, we had to decide to participate in the meeting

19   because the focus was not on Aranesp.  They said well, that's

20   false.  What he meant to say was the focus of the studies was

21   not on Aranesp.  Then he talks about an Amgen study, which is

22   a real study that existed that no one has ever alleged is

23   false.  It is quoted in Footnote one and two of our

24   opposition.  We talk about it.  We quote to that study.

25          And then they say, well, this was false.  Let's

 1   assume for the sake of argument that he was misunderstood or

 2   misstated.  If you look at that earnings call, you will see

 3   all the analysts who were on it.  One of the analysts who was

 4   on it was Goldman Sachs.  The very person on it wrote that

 5   night on April 22, 10:56 p.m., on May 4th, 2004, an FDA

 6   advisory committee will discuss safety concerns associating

 7   with Aranesp and Procrit for anemia and cancer chemotherapy.

 8           Everybody in the market knew what was going on.

 9   Everybody in the market knew what was happening at the May

10   ODAC meeting.  If you look at Exhibit C to the declaration of

11   Hakala, you will see that the price never went down.  He

12   cites the price every day.  Never went down.  It didn't go

13   down a day after the May 4th meeting when people didn't come

14   out and say, oh my God, they didn't talk about Aranesp --

15   they talked about Aranesp.  They were not supposed to.

16           What this chart shows you is examples, just

17   examples which will show the Court if you consider the

18   analyst reports for an efficient market, you've got to

19   consider these.  It shows you that the truth was on the

20   market.

21           So to start this on April 22nd is an arbitrary

22   start date.  The Court says, well, why shouldn't I wait until

23   summary judgement?  Your Honor, we're stuck with three years

24   of discovery versus two-and-a-half months of discovery.

25   Remember, Your Honor, you dismissed the outside director, the

1   non-speaking officer.  But for this statement of Mr. Morrow,

2   he wouldn't be in this case.

3           It seems to me that the Court needs to focus on

4   this and say, plaintiff, have you met your burden?  Is this a

5   right start date?  Isn't all of this public?  The first time

6   they allege that there's anything false is when they say, you

7   should have disclosed the interim analysis in DAHANCA which

8   I'll get to.  Let me jump ahead to the post-DAHANCA events.

9           It seems to me, Your Honor, it's very clear that

10   those, quote, "post-DAHANCA events" were simply statements by

11   third parties.  Everyone knew that third parties were going

12   to respond, do something.  They are statements by third

13   parties.  The first is SEC investigation.  What happens

14   there?  The SEC writes a letter saying, gee, we've heard

15   about DAHANCA, the Cancer Letter, we'd like some documents.

16   Amgen puts it in their February 2007 10K.  They say -- it's

17   in our request for judicial notice.  It's in there.  We've

18   got a letter from the SEC.  They want information about

19   DAHANCA.

20           Two years later, last February of 2009 for the end

21   of the year calender 2008, Amgen announced SEC is closing

22   their investigation.  That investigation is closed.  There is

23   a case we cite, Your Honor, which is *In re Hansen Natural*

24   *Corporation Securities Litigation* 527 F. Supp. 2nd 1142 at

25   Page 1162 that basically says, because you get a letter from

1      the SEC, that's not enough to be a loss causation event.

2              So we didn't do a chart on that one, but then we

3      moved ahead to the black box warnings.  Your Honor, what we

4      show you in that is if you look at the same analyst reports

5      that he wants you to look at to declare market efficiency.

6      This is a two-way street.  I, again, argue, Your Honor, Amgen

7      announced at its January 25, 2007 earnings call, Amgen tells

8      analysts on earnings call that a box warning is a

9      possibility.  That's the same day they disclose the 103

10     study, which was a negative study Amgen disclosed.

11             If you read through this, you'll see that everyone

12     assumed that there was going to be boxed or black box

13     warnings.  Everyone knew it.  It was being discussed.  There

14     was nothing held back.  How can that be an end date for this?

15     I really request -- because of my time, I'd love to be able

16     to walk you through these, but I know I can't.

17             What happens is on March 9th, their, quote, "loss

18     causation event" that the class should go on.  What do they

19     say?  Well, the FDA came out with a decision.  Sure they did.

20     Everybody knew they were, but nobody knew until the FDA made

21     a decision that was going to happen.

22             Then we go to the May ODAC meeting.  Once again,

23     Your Honor, Exhibit C.  I urge you to look through that.

24     What do they say happened?  Well, what happened is the SEC --

25     ODAC took a vote at the end of the day.  If you look at the

last page of this chart, we did the same thing that they did

in Exhibit C to Hakala's declaration; that is, where they

took the prices.  We use the same reference information and

we broke it down for the day.  You'll see what happened.

After the vote of the third party, the stock price went down.

If you read what happened, everybody knew there was a vote.

Some people thought it would be more or less.  One person on

April 24th said the -- the ODAC will likely recommend limited

uses until further data is available.  We believe that

Amgen's shares may move three to five percent either way

depending on the ODAC decision.

       Everybody knew.  There was nothing being hidden.

Therefore, those are arbitrary dates.  For the same reasons

I'm going to walk ahead to their second theory, fraud on the

market.  Let me digress for one second.  Your Honor, we move

to strike -- part of the reason we move to strike is because

plaintiffs relied at the motion to dismiss stage on five

confidential witnesses.  Four of whom they said, we're not

going to tell you their names and we won't use them.  We

said, okay, for this stage of the case.  One who they did

give us, and we'd oppose.  There's no indication now -- the

Court at that time had to consider the facts as alleged in

the complaint as true.

       Now we're past that stage.  They have the burden.

There's no evidence of off-label sales.  In fact, the

1    evidence that comes out is no information -- Mr. Naranjo, who

2    we deposed, saying, I was trained to not do off-label sales.

3    I was given these documents that said, don't do it.  When I

4    heard about a doctor who talked to a small group, Dr. Patton,

5    I immediately reported somebody else at Amgen.  We called the

6    Amgen hotline, reported it.  He was talked to.  There's

7    declarations and information on that.

8         Then they said to you, oh, it was discussed during

9    the ODAC meeting.  You don't see one page where they quoted

10   from the May '07 ODAC meeting where it was discussed.  In

11   fact, quality of life on Procrit advertising was discussed

12   and nothing else.

13        Let me move on --

14        THE COURT:  Can you wrap up for me, please.

15        MR. KRAMER:  All right.  Let me move on quickly to

16   fraud on the market.

17        Fraud on the market requires more than just

18   efficiency.  It requires materiality.  It requires other

19   things.  It is a rebuttal presumption.  All the Court has to

20   look at is the analyst reports to be rebutted.  Nothing else.

21   If we're correct, the start date and stop date is December 1,

22   2006 to February 16, 2007.

23        That's what we're really asking for, Your Honor.

24   Our primary purpose for this motion was to say to the Court

25   let's get this down right now to a realistic date so we can

1    limit discovery.  We can move forward, et cetera.

2              With respect to -- of course, Your Honor, I would

3    love to talk about their Footnote 29.  I'm happy to answer

4    questions.  I have answers for that, et cetera.  It was a

5    footnote -- *Basic* said you can rebut it one or two ways.

6    One, the information is in the market.  It gets in the

7    market.  It's there.  Look at the analyst reports.

8    Alternatively, somehow it creeps into the market.  Footnote

9    29 was commenting upon what the dissent said.  We don't have

10   to do a factual analysis.  Excuse me, Your Honor.

11             THE COURT:  You may.

12             MR. KRAMER:  I'm talking fast.  I'm trying to get

13   it all in.

14             We don't have to do a factual analysis here.  The

15   Court does need to hook at the facts.

16             Finally, let me talk about DAHANCA.  I'll address

17   adequacy for one minute.  DAHANCA, Your Honor, is the only

18   period that the Court could reasonably certify.  It would

19   start on the December 1st date, the date that the interim

20   analysis is published on DAHANCA's website in English and

21   when it comes in the Cancer Letter, which is simply in our

22   view, a reprinting.

23             The Court does need in order to look at DAHANCA to

24   focus on the rebuttable presumption of the rebuttal in *Basic*

25   and does need to look at a few documents beyond the analyst

1    reports.  I'll list them for you.  There are very few that

2    I'd ask the Court to look at.  Sorry, Your Honor.

3            One is the interim analysis published on DAHANCA's

4    website on December 1st, 2006 in English.  It's reprinted in

5    the Cancer Letter.  It's in the Cancer Letter in full.

6            Two, is Amgen's letter to the FDA advising them of

7    the termination of the DAHANCA study which came, Your Honor,

8    a day or two after they heard about it on December 1.

9            Three, Overgaard's e-mail, especially his

10   April 14th e-mail 2007, which is attached to the declaration,

11   I think, it is of Sean Harper, but I can find it for

12   Your Honor.  It's probably on DAHANCA one of the most

13   important documents I'd ask you to read.  They basically say,

14   we have to report to congress.  Could you tell us in your own

15   words -- that's before this case was filed -- about the

16   DAHANCA study.  He goes, I stopped it as futile because it

17   wasn't going to meet its end points.  There was no survival

18   issue.  I don't know why everybody is making such a big deal

19   about it is, in effect, what he said.

20           That e-mail goes back -- and it is important,

21   Your Honor, because plaintiff in their complaint alleged

22   there were survival issues with DAHANCA.  It was a big

23   problem.  Look at Paragraph 3 of their complaint, Your Honor.

24   Look at Paragraph 65 of their complaint.  DAHANCA was a major

25   negative study.  In fact, it wasn't.

1        Finally, look at both the declaration of Sean

2   Harper where he says, it wasn't Amgen's practice at that time

3   to discuss third-party studies, as well as the Cancer Letter

4   where Roy Banks was quoted saying the same thing, including

5   Amgen saying, look, we would like to get the underlying data

6   before we say something.

7        Let me move on to adequacy.  I'll take one minute.

8   We only brought that up for two reasons, Your Honor.  Number

9   one, we wanted to point out that somebody who is an equity

10  holder would have a different view than a buyer.  Second, and

11  more important, we wanted to point out the more

12  loss causation events you have, the bigger that problem

13  becomes.  If this Court were to limit this to a DAHANCA

14  period, then that adequacy would be -- the problems with that

15  would be diminished significantly.

16       I apologize and thank the Court for letting me take

17  a little extra time.  We think that at this stage, under the

18  Ninth Circuit rules, under the *Hanon* case, the Ninth Circuit

19  case, under *Coopers*, the Court has to look at these analyst

20  reports that they use to support market efficiency.

21       The Court has to say before it even gets to *Oscar*

22  and *Basic*, is this an arbitrary start and stop case?  Before

23  it gets to *Oscar*, which I'm happy to talk about too, Your

24  Honor, have they satisfied the requirements, and have we

25  rebutted it with the analyst reports?  Everything out there

```
 1    was public and discussed.
 2              THE COURT:  Thank you.
 3              Mr. Mc Donald, I gave Mr. Kramer a couple extra
 4    minutes.  A minute or two to rebut?
 5              MR. MC DONALD:  And only that, Your Honor.
 6              THE COURT:  I think I've accomplished what I wanted
 7    to accomplish during this hearing.  That is, I've looked at
 8    everything.  I want to make sure I'm on the same page with
 9    both sides in terms of understanding their arguments.  I
10    think I do.  I want to take a second look at everything
11    again.  So I wanted you to do exactly what you've done to get
12    me focused on some points.  I appreciate it.
13              MR. MC DONALD:  I will just -- Mr. Kramer spoke a
14    lot.  There's a lot to respond to, but I will only pick a few
15    things.
16              Number one would be Mr. Kramer talks about the
17    Hanon case.  I am more than happy to have the Court focus on
18    it.  Particularly, Page 509 when you read the quote -- this
19    is in connection with Mr. Kramer trying to convince the Court
20    that the truth on the market is something that ought to be
21    addressed now.  The Hanon Court specifically says, "The
22    defense of non-reliance is not a basis for denial of class
23    certification."
24              It also talks about -- relies on Hanon to allow the
25    Court to focus on the merits issues.  The key part -- and
```

1    this goes back as well to the Solomon case that he mentioned

2    and other in their briefs, it has to focus on a merits issue

3    that is necessary for purposes of deciding class

4    certification.  And figuring out whether the class period

5    ought to begin on a Monday or Tuesday is a common question.

6            So, therefore, once the efficiency of the market is

7    established, that becomes a common question that is to be

8    dealt with later, but to the extent that there are questions

9    that might be lingering with the Court with respect to the

10   start and end date, again, I wasn't revisit it.  The specific

11   reason we included the materials that we did in the handout

12   that you have, Your Honor, is so that way -- simply for the

13   purpose of giving some degree of an indication that there is

14   a rational basis to start and end the class period when we

15   do.

16           Finally, let me just state that -- now, the

17   defendants in their opposition essentially said, we would

18   like the Court to deny the class period outright.  In the

19   absence of that, please only certify to what they refer to as

20   the DAHANCA period.  So the flip side of that would be me

21   asking for the entire class period.  If you're not going to

22   do that, do the DAHANCA period.

23           My request is not that quite mirror image of

24   theirs.  Rather, it's this:  Obviously, certify the class

25   please.  If not, if merits matters to the Court for purposes

1     of deciding class certification, then the answer is to allow

2     merits discovery to continue.  So what I would ask for -- we

3     and the defendants have an agreement that we reached that

4     limits merits discovery until the class is certified.

5               If merits is supposed to be a critical issue for

6     purposes of class certification, if the Court wants to change

7     the rules, I would submit that's changing the rules, that's

8     fine.  We need to be released from the obligations that we

9     have with respect to that agreement so that we way can take

10    full merits discovery, and then Your Honor will be able to

11    make a decision as to whether the class ought to be certified

12    at the same time you do summary judgement.  So the fall-back

13    argument is let full merits discovery go forward.  The

14    fall-back argument to that is certify the DAHANCA period.

15              THE COURT:  All right.  Thank you.  The matter will

16    stand submitted.  Thank you.

17              (Whereupon proceedings were concluded at 2:20 p.m.)

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

3    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

4    THE ABOVE MATTER.

5    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

6    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

7    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

8

9    _____          07/29/2009

10   MIRIAM V. BAIRD                      DATE
     OFFICIAL REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25